**No. 26-7415**

---

**In the United States Court of Appeals**
**for the Ninth Circuit**

---

MARION COUNTY, a political subdivision of the State of Oregon,
Plaintiff-Appellant,

and,

SANTIAM WATER CONTROL DISTRICT, and CITY OF STAYTON, an Oregon municipal corporation,
Intervenor-Plaintiffs,

v.

U.S. ARMY CORPS OF ENGINEERS; DANIEL P. DRISCOLL, in his official capacity as Secretary of the Army; and WILLIAM H. GRAHAM, JR., in his official capacity as Chief of Engineers and Commanding General of the U.S. Army Corps of Engineers,
Defendants-Appellees,

and,

NORTHWEST ENVIRONMENTAL DEFENSE CENTER and NATIVE FISH SOCIETY,
Intervenor-Defendants-Appellees.

---

On Appeal from the United States District Court
for the District of Oregon
Case No. 6:26-CV-00956-MTK

---

**PLAINTIFFS-APPELLANTS' EMERGENCY MOTION UNDER CIRCUIT RULE 27-3 FOR INJUNCTION PENDING APPEAL**
**RELIEF NEEDED BY 9:00 AM NOVEMBER 21, 2026**

***Attorneys for Marion County:***

Steve Elzinga
Marion County Counsel
555 Court Street N.E., Suite 5242
P.O. Box 14500
Salem, OR 97309
Telephone: (503) 588-5220
selzinga@co.marion.or.us

***Attorneys for Marion County, City of Stayton, Santiam Water Control District:***

Ryan Adams
Fir Law Group
PO Box 35
Silverton, OR 97381
Ryan@FirLawGroup.com
(503) 383-1640

## CIRCUIT RULE 27-3 CERTIFICATE

Pursuant to Circuit Rule 27-3, Plaintiffs-Appellants (hereinafter, "Plaintiffs") provide the following information:

***(I) The names, telephone numbers, e-mail addresses, and office addresses of the attorneys for all of the parties.***

| | |
|---|---|
| Steve Elzinga<br>Marion County Counsel<br>555 Court Street N.E., Suite 5242<br>P.O. Box 14500<br>Salem, OR 97309<br>Telephone: (503) 588-5220<br>selzinga@co.marion.or.us | ***Attorneys for Plaintiffs-Appellants Marion County, a Political Subdivision of the State of Oregon*** |

| | |
|---|---|
| Ryan Adams<br>Fir Law Group<br>PO Box 35<br>Silverton, OR 97381<br>Ryan@FirLawGroup.com<br>(503) 383-1640 | |
| Ryan Adams<br>Fir Law Group<br>PO Box 35<br>Silverton, OR 97381<br>Ryan@FirLawGroup.com<br>(503) 383-1640 | ***Attorneys for Intervenor-Plaintiff City of Stayton, An Oregon Municipal Corporation*** |
| Ryan Adams<br>Fir Law Group<br>PO Box 35<br>Silverton, OR 97381<br>Ryan@FirLawGroup.com<br>(503) 383-1640 | ***Attorneys for Intervenor-Plaintiff Santiam Water Control District*** |

| | |
|---|---|
| Brad Leneis<br>Appellate Section<br>Energy & Natural Resources Division<br>U.S. Department of Justice<br>303-844-1363<br>brad.leneis@usdoj.gov<br>efile_app.enrd@usdoj.gov | ***Attorneys for Defendants-Appellees U.S. Army Corps of Engineers; Daniel P. Driscoll, in his official capacity as Secretary of the Army; William H. Graham, Jr., in his official capacity as Chief Engineers and Commanding General of the U.S. Army Corp of Engineers;*** |
| Elizabeth Hunter Potter<br>ADVOCATES FOR THE WEST<br>P.O. Box 1682<br>Bend, OR 97709<br>Telephone: (503) 954-2721<br>epotter@advocateswest.org | ***Attorneys for Intervenor-Defendants-Appellees Northwest Environmental Defense Center; Native Fish Society*** |

| | |
|---|---|
| Lauren Rule<br>ADVOCATES FOR THE WEST<br>2512 S.E. Twenty-fifth Avenue,<br>Suite 304<br>Portland, OR 97202<br>Telephone: (503) 914-6388<br>lrule@advocateswest.org | |



***(II) The facts showing the existence and nature of the emergency.***

At 9:00AM on November 21, Federal Defendants plan to commence a deep drawdown of Detroit Reservoir below its minimum conservation pool level. The deep drawdown will increase turbidity (i.e. muddy water resulting from increased sedimentation) in the Detroit Reservoir and North Santiam River, but Federal Defendants have not analyzed whether the operation will comply with Oregon's water quality standards, as required by Section 313 of the Clean Water Act (CWA). Defying the pleas of Oregon's Congressional delegation and a broad array of local governments, Federal Defendants' actions endanger clean drinking water for hundreds of thousands of Marion County residents, threatening irreparable harm to schools, hospitals, businesses, farmers, recreation, fish, public services, and the environment. Plaintiffs seek this injunction pending appeal to preserve the status quo and prevent this harm before it is too late.

In 2023, the Army Corps commenced a deep drawdown at nearby Green Peter Reservoir. Downstream turbidity skyrocketed more than tenfold from normal levels below 10 Nephelometric Turbidity Units ("NTU") to over 100 NTU every

day for several months and over 200 NTU on some days. ECF 52-7, Pulley Decl. Ex. G at 17–18. Thousands of Kokanee salmon died. Downstream water systems were harmed. ECF18 (SEIS at W-387). The picture below shows how dirty the downstream 2023 South Santiam River was compared to the North Santiam River as a result of the increased turbidity:




Santiam River Confluence during the 2023 deep drawdown of Green Peter Dam.

SEIS, p. W-304; *see also* ECF 27 (Elzinga Decl. ¶ 16); ECF 20 (Amerman Decl. ¶ 13).

Turbidity over 10 NTU is harmful to drinking water systems like Stayton's. Turbidity over 100 NTU is catastrophic.

The second year of deep drawdown at Green Peter in 2024 also increased turbidity above 20 Formazin Nephelometric Units ("FNU")[1] for almost 8 straight weeks and over 40 NTU for over 20 days straight with spikes during that time to 300 FNU, 640 FNU and 760 FNU across multiple days each. ECF No. 66-9 at 40-41 (Willamette Basin Bi-Annual Status Report February 28, 2025). Although the stated goal of deep drawdowns is to improve fish passage, the proportion of wild ESA-listed salmon returning to the South Santiam River has declined since the drawdowns started. ECF 20 (Amerman Decl. ¶ 12).

The new policy of similar, annual deep drawdowns of Detroit Lake will repeat the South Santiam River turbidity issues on the North Santiam River. The Corps claims it is taking precautions to avoid repeating the Green Peter disaster, yet its own Final Supplemental Environmental Impact Statement ("SEIS") analysis recognizes that its plan is likely to create adverse levels of turbidity that harm downstream water users (emphasis added):

1. "**Turbidity** . . . **substantially more adverse** below Green Peter, Foster, and Detroit reservoirs." SEIS, p. 213 (Table 3-42; *see* Water Quality Under Interim Operations) (emphasis added).

[1] NTU and FNU are essentially equivalent measurements for present purposes.

2. "**USACE expects** the drawdown to mobilize sediment, **increasing turbidity levels downstream of Detroit**." SEIS, p. 217 (emphasis added).
3. Although the Army Corps expects less turbidity at Detroit than 2023 Green Peter, still "fine clay material eroded from exposed sediment is **likely** to stay in suspension and pass downstream of Detroit dam." *Id*.
4. "Increased turbidity **would result** in adverse effects to drinking water facilities that use water from the North Santiam River below Detroit." SEIS, p. 218 (emphasis added).

The cities of Salem and Stayton have slow sand filtration drinking water systems on the North Santiam River below Detroit Lake that are especially vulnerable to turbidity. *See e.g.*, ECF 52, Pulley Decl. ¶ 11. Together, they provide water to over 220,000 people, plus businesses, hospitals, firefighting, schools, and Marion County services. ECF 52, Pulley Decl. ¶ 4; ECF 52-2, Pulley Decl. Ex. B at 7. A multi-week turbidity pulse of more than 10 NTU would exhaust water treatment filter capacity and force plants offline. *See* ECF 52-3, Pulley Decl. Ex. C at 4. The Corps' own Operations Project Manager said in May 2025 that the Salem and Stayton sand-filtration systems are "way more sensitive to turbidity" than the systems already damaged by Green Peter, and that once they start failing it is "too

late" to stop the drawdown without damage that takes "a long time to repair and a lot of money." ECF 25, (Teed Decl. ¶ 10).

Time is of the essence as Federal Defendants represented that they planned to start the drawdown at 9:00 AM on November 21.

### *(III) Why the motion could not have been filed earlier.*

Marion County filed a preliminary injunction motion on August 10, 2026 and other Plaintiffs joined that motion soon thereafter. The district court held a hearing and took the preliminary-injunction motions under advisement on October 6, 2026, and issued its opinion and order denying the motions on November 4, 2026 ("Opinion"). ECF 86. Within 26 hours, Plaintiffs filed an emergency motion for injunction pending appeal with the district court (ECF 89), as well as a notice of appeal in this Court. Although Plaintiffs requested a decision from the district court within five days, the district court has been considering the emergency motion for over eleven days. Since federal defendants say a drawdown will start 9:00 AM on November 21, Plaintiffs could not wait any longer to file this motion. *See A.A.R.P. v. Trump*, 605 U.S. 91 (2025). On November 17, Marion County Counsel conferred with Federal Defendants' counsel by phone and agreed that it was better not to wait any longer to file this motion in order to allow Federal Defendants time to review and respond and this Court time to review.

***(IV) Notice and service of motion to counsel for other parties and Clerk's office.***

Counsel for Marion County notified counsel for Federal Defendants and Defendant-Intervenors on November 5, 2026 of the intent to file this motion if the district court denied a similar motion. Plaintiffs served the motion on all Defendants and the Clerk by the appellate CM/ECF system. Both Federal Defendants and Intervenor-Defendants oppose this motion. Emails between the parties over the past few days have made clear that this motion would be filed imminently. This motion is also being served by email to the parties.

***(V) Whether the relief sought in the motion was sought in the district court.***

Yes. Plaintiffs sought a preliminary injunction in the district court prohibiting a deep drawdown of Detroit Reservoir below 1,450 feet. ECF 18; ECF 51; ECF 54; ECF 58. When that was denied, ECF 86, Plaintiffs asked the district court for an injunction pending appeal. ECF 89. The relief requested here is the same injunction pending appeal.

DATED: November 17, 2026

Respectfully submitted,

MARION COUNTY, CITY OF
STAYTON, AND SANTIAM
WATER CONTROL DISTRICT

By: *s/ Ryan Adams*

Ryan Adams, OSB #150778
Fir Law Group
PO Box 35
Silverton, OR 97381
Ryan@FirLawGroup.com
(503) 383-1640

*Attorneys for Marion County, City of Stayton, Santiam Water Control District*

MARION COUNTY

By: *s/ Steve Elzinga*

Steve Elzinga, OSB #123102
Marion County Counsel
selzinga@co.marion.or.us
555 Court Street N.E., Suite 5242
P.O. Box 14500
Salem, OR 97309
Telephone: (503) 588-5220

*Attorneys for Marion County*

# TABLE OF CONTENTS

**Page**

CIRCUIT RULE 27-3 CERTIFICATE .......... ii

(I) THE NAMES, TELEPHONE NUMBERS, E-MAIL ADDRESSES, AND OFFICE ADDRESSES OF THE ATTORNEYS FOR ALL OF THE PARTIES. .......... ii

(II) THE FACTS SHOWING THE EXISTENCE AND NATURE OF THE EMERGENCY. .......... iv

(III) WHY THE MOTION COULD NOT HAVE BEEN FILED EARLIER.... viii

(IV) NOTICE AND SERVICE OF MOTION TO COUNSEL FOR OTHER PARTIES AND CLERK'S OFFICE. .......... ix

(V) WHETHER THE RELIEF SOUGHT IN THE MOTION WAS SOUGHT IN THE DISTRICT COURT. .......... ix

I. INTRODUCTION .......... 1

II. DISTRICT COURT OPINION .......... 2

III. PROCEDURAL BACKGROUND .......... 2

IV. FACTUAL BACKGROUND .......... 3

V. STANDARD FOR INTERIM RELIEF .......... 9

VI. ARGUMENT .......... 9

A. Likelihood of Success on the Merits .......... 9

B. Irreparable Injury Pending Appeal .......... 12

C. Serious Legal Questions and a Balance of Hardships That Tips Sharply .......... 18

D. Public Interest Weighs in Favor of Granting Relief .......... 19

VII. CONCLUSION .......... 20

CERTIFICATE OF COMPLIANCE AND SERVICE .......... 21

APPENDIX .......... A-1

## TABLE OF AUTHORITIES

### Cases

*Alliance for the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011) ....................9
*Amoco Prod. Co. v. Vill. of Gambell,*
480 U.S. 531, (1987)....................16
*California v. Azar*,
911 F.3d 558 (9th Cir. 2018) .................... 19, 20
*City of Lebanon v. U.S. Army Corps of Eng'rs,*
No. 3:25-cv-01789-AR (D. Or.)....................19
*Ctr. for Envtl. Law & Policy v. United States Fish & Wildlife Serv.*,
No. 2:15-CV-0264-SMJ, 2017 U.S. Dist. LEXIS 67630, at *15
(E.D. Wash. May 3, 2017)....................16
Hamilton Watch Co. v. Benrus Watch Co.,
206 F.2d 738, (2d Cir. 1953) ....................20
*League of Women Voters of U.S. v. Newby,*
838 F3d 1 (D.C. Cir. 2016) ....................21
*Nat'l Wildlife Fed'n v. U.S. Army Corps of Eng'rs*,
384 F.3d 1163 (9th Cir. 2004) ....................11
*Nken v. Holder*,
556 U.S. 418 (2009)....................13
*Novedades Y Servicios, Inc. v. Fin. Crimes Enf't Network*,
181 F.4th 961, (9th Cir. 2026)....................21
*Or. Council for Humanities v. U.S. Doge Serv.,*
794 F. Supp. 3d 840, (D. OR. 2025) ....................21
*Or. State Pub. Interest Research Grp. v. Pac. Coast Seafoods Co.*,
374 F. Supp. 2d 902 (D. Or. 2005)....................16
Republic of the Philippines v. Marcos,
862 F.2d 1355, (9th Cir. 1988) ....................20
*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co., Inc.,*
240 F.3d 832 (9th Cir. 2001) ....................19

*United States v. Cow Palace, LLC,*
No. 1:24-CV-3092-TOR, 2024 U.S. Dist. Lexis 228138, at *4-5
(E.D. Wash. Dec. 17, 2024) ....................................................................17
*Washington v. Reno,*
35 F.3d 1093, (6th Cir. 1994) ..................................................................22
Weinberger v. Romero-Barcelo,
456 U.S. 305, (1982)...............................................................................22
*Winter v. Natural Resources Defense Council, Inc.*,
555 U.S. 7 (2008).......................................................................................9

**Statutes**

33 U.S.C. § 1323(a) .............................................................................1, 10
5 U.S.C. § 706(2)(A)...............................................................................11

**Rules**

Fed. R. Civ. P. 62(d)...............................................................................13
OAR 340-041-0004 ...............................................................................1, 10
OAR 340-041-0007 ...............................................................................1, 10
OAR 340-041-0036 ........................................................................1, 10, 12

# I. INTRODUCTION

In the next few days, the U.S. Army Corps of Engineers ("Corps") plans to begin annual deep drawdowns of Detroit Reservoir below the minimum conservation pool level of 1,450 feet. This plan ignores the Clean Water Act ("CWA") mandates designed to prevent the irreparable harms Plaintiffs seek to prevent. Section 313 requires federal agencies to "comply with" state water quality standards in the "same manner, and to the same extent as any nongovernmental entity." 33 U.S.C. § 1323(a). Instead, the Corps' proposed drawdowns disregard Oregon's water quality standards, including those set for turbidity in OAR 340-041-0036 and OAR 340-041-0007(1) and Oregon's antidegradation policy outlined in OAR 340-041-0004(1). The Corps does not deny that its proposed actions will violate Oregon's water quality standards, but simply alleged that it "consider[ed]" those standards. ECF 68 at 32

In addition to failing to adhere to the CWA, the plan's stated purpose of complying with the Endangered Species Act fails to look at the history and effects of these drawdowns. The 2023 drawdown of Green Peter Reservoir killed thousands of Kokanee salmon, and three years later, ESA-listed salmon populations continue to decline in the impacted South Santiam River. ECF 18 (SEIS at W-387); ECF 20 (Amerman Decl. ¶ 12).

Draining a large volume of water in the winter also risks insufficient refill in a dry year that prevents ESA-listed fish from passing the dam in the Spring (as there is not enough water to use the spillway at the top of the dam). Insufficient refill also means that, as water levels drop during the summer, there likely will not be enough water remaining for late summer and early fall lake recreation, agricultural irrigation, and fish habitat downstream.

## II. DISTRICT COURT OPINION

In its Opinion, the district court stated that it "shares Plaintiffs' concerns about the threats posed by the possibility of high turbidity and inadequate refill to their interests, and to the interests of the many people, communities, and businesses that rely on a clean and adequate water supply from the North Santiam River downstream of the Detroit Dam and Reservoir." ECF 86, p. 20. While recognizing that "the ultimate harm Plaintiffs and Plaintiff-Intervenors discuss in their motions, should it occur, is undoubtedly irreparable," *Id.* at 16, the district court did "not find that the drawdown is likely to cause the harm Plaintiffs identif[ied] in their motions," *Id.* at 18. On the "likelihood" issue, the court erred for reasons that are explained in detail in Section VI(B) at pages 13-15 below.

## III. PROCEDURAL BACKGROUND

Marion County filed its complaint on May 13, 2026. The County filed an amended complaint on July 17, 2026, and moved for a preliminary injunction on

August 10, 2026. ECF 18. The City of Salem filed a separate action that was consolidated as a trailing case and moved for a preliminary injunction. ECF 51. The Santiam Water Control District and the City of Stayton intervened as plaintiff-intervenors and joined the motions for preliminary injunction. ECF 55; ECF 58. Federal Defendants and Defendant-Intervenors opposed. ECF 68; ECF 66. Plaintiffs replied. ECF 73; ECF 56; ECF 74; ECF 75. The district court heard argument on October 6, 2026, and took the motions under advisement. The Opinion issued on November 4, 2026. ECF 86. Plaintiffs filed a notice of appeal on November 5, 2026. On November 5, 2026, Plaintiffs filed an emergency motion for injunction pending appeal from the district court and sought expedited consideration within five days. ECF 87. On November 10, Defendants and Intervenor-Defendants filed oppositions. ECF 93; ECF 94. Plaintiffs filed replies on November 12, the next business day. ECF 95; ECF 96; ECF 97; ECF 98. Given that Defendants plan to begin the drawdown 9:00AM Nov. 20, Plaintiffs must now seek relief in this Court even though the District Court has not yet ruled.

## IV. FACTUAL BACKGROUND

Detroit Reservoir is near the headwater of the North Santiam River in Marion County. The Corps operates the Detroit Dam. The minimum conservation pool is 1,450 feet. Below that elevation, the bed is exposed and fine sediment is driven into the river.

The City of Salem and the City of Stayton both rely on the North Santiam River for drinking water. Water passes through their slow-sand filtration plants to serve more than 220,000 people, as well as hospitals, schools, and firefighting. ECF 18 (SEIS at W-144, W-488). Those plants fail above approximately 10 NTU from the river for extended periods of time (shorter than the planned duration of the drawdown). ECF 51 at 26–27.

In 2023, the Corps commenced a deep drawdown at Green Peter Reservoir. Turbidity levels exceeded 100 Nephelometric Turbidity Units ("NTU") every day for several months and over 200 NTU on some days. ECF 52 (Pulley Decl., Ex. H). Thousands of Kokanee died. Downstream plants were harmed. The proportion of wild ESA-listed salmon returning to the South Santiam has declined since. ECF 18 (SEIS at W-387); ECF 20 (Amerman Decl. ¶ 12). A multi-week pulse of the kind the Corps produced at Green Peter would exhaust Stayton's water treatment filter capacity and force its plant offline. ECF 58 at 21–23.

The Corps' own Operations Project Manager said in May 2025 that these sand-filtration systems are "way more sensitive to turbidity" than the systems already damaged at Green Peter, and that once they start failing it is "too late" to stop the draft without damage that takes "a long time to repair and a lot of money." ECF 25 (Teed Decl. ¶ 10).

The Corps previously opposed a Detroit deep drawdown. *See* ECF 25 (Teed Decl. ¶ 10). A December 2024 biological opinion included a reasonable and prudent alternative that identified fifty-five measures to address fish passage and survival, only one of which was a four-year "test" of deep drawdowns of the Detroit Reservoir. Nevertheless, in June 2026, the Corps issued a Final Supplemental Environmental Impact Statement ("SEIS") [2] and Record of Decision selecting that measure. This fall, the plan is to draft Detroit Reservoir from an elevation of 1,450 feet to 1,425 feet over a two-week period, and hold it at that artificially low, exposed level for two more weeks. Later years go lower.

The Corps admits that "the exact amount of turbidity in any given year cannot be accurately predicted." ECF 68 at 31. The district court recognized that Federal Defendants expect "moderately more adverse" turbidity to result from these deep drawdowns that will only "lessen in severity after a few years." ECF 86, p. 10. Yet Defendants' Emergency Plan "does not provide a timeframe for how long it would take to pause or halt the drawdown in the event of an emergency."

---

[2] The SEIS and its Appendices are contained in ECF 27 (Elzinga Decl., Ex. 3). The main SEIS (without appendices) is also available here: https://publibrary.sec.usace.army.mil/api/download?id=1b9ef053-ad16-47ff-e47b-7fbdcffc20f4&filename=WVS_Final_SEIS_May2026.pdf&token=&preview=true
The SEIS appendices are also available here: https://www.nwp.usace.army.mil/WVS-EIS/

*Id.* Nor does the plan identify any specific circumstances or criteria under which the Corps commits to halt the drawdown. ECF 77-1, p. 3.

Federal Defendants' own SEIS analysis recognizes the Detroit deep drawdown will increase turbidity levels and cause harm as a result:

1. "*Turbidity . . . substantially more adverse* below Green Peter, Foster, and Detroit reservoirs." SEIS, p. 213 (Table 3-42; *see* Water Quality Under Interim Operations) (emphasis added).
2. "*USACE expects* the drawdown to mobilize sediment, *increasing turbidity levels downstream of Detroit.*" SEIS, p. 217 (emphasis added).
3. "[F]ine clay material eroded from exposed sediment is *likely* to stay in suspension and pass downstream of Detroit dam." *Id.* (emphasis added).
4. "Increased turbidity *would result* in adverse effects to drinking water facilities that use water from the North Santiam River below Detroit and Big Cliff reservoirs." SEIS, p. 218 (emphasis added).

Yet despite its acknowledgments, the Corps still has not completed the turbidity report that the law required by January 6, 2026 under the Water Resources Development Act of 2024, which would have provided additional turbidity data in advance of finalization of the SEIS. ECF 79, p. 3, 5. Oregon Senators Ron Wyden and Jeff Merkley and Representatives Janelle Bynum and Andrea Salinas asked the Corps to delay the Detroit drawdown until water

providers finish upgrades and emergency measures. ECF 27 (Elzinga Decl. ¶ 3, Ex. 1). Their support for delay of a fish-passage measure shows how serious this is.

The deep drawdowns of Detroit Reservoir will violate Oregon's water quality standards and cause substantial and irreparable harm to drinking water infrastructure. ECF 52 (Pulley Decl. ¶¶ 7, 9, 11). The City of Salem operates the region's primary drinking water treatment facility and is responsible for supplying safe and reliable drinking water to approximately 220,000 individuals, as well as to hospitals, schools, businesses, and other critical infrastructure. *Id*. at ¶22. Multiple Marion County facilities and public services, including the county jail, rely on clean water from Salem. ECF 9 ¶¶ 21–22, 33; ECF 100 (Ex. 4; Ex. 5). Elevated turbidity in the North Santiam River will cause irreparable harm to the City of Salem's drinking water treatment system, which relies on slow sand filtration and is designed to treat raw water with very low turbidity levels. ECF 51 at 26–27. High turbidity introduces fine sediments that clog the slow sand filters and significantly reduce the treatment plant's capacity to produce safe drinking water, with sustained high turbidity levels ultimately causing complete failure and shutdown of the filtration system, resulting in the inability to produce any safe drinking water. ECF 52 (Pulley Decl. ¶ 7).

Spikes in turbidity likewise threaten irreparable harm to the City of Stayton. Stayton's water filtration plant uses direct online slow sand filters that are uniquely

vulnerable to very fine sediments like those that will be released by a deep drawdown. ECF 59 (Ex. B to Buchanan Decl. at 2-3). Very fine sediments infiltrate and compact the filters' lower sand layer, are not easily cleared or removed, and disrupt the effectiveness of the filters' biological treatment layer. *Id.* A deep drawdown forces Stayton to either take filters offline to avoid damage or allow damage that then forces the filters offline for long-term maintenance. *Id.* Either way, Stayton's municipal water delivery is brought to a halt, cutting off water service to residents, a hospital, schools, businesses, and firefighting. *Id.*

Marion County operates multiple parks and a campground on the North Santiam River downstream of Detroit. It funds and coordinates emergency services, roads, and the public-health response for the communities and North Santiam School District campuses that drink this water. ECF 18 at 5–7, 13, 35–36. If the intakes close, the County responds.

The Santiam Water Control District operates a water distribution system that extends 114 miles between Stayton and Salem and delivers water for irrigation and domestic purposes. ECF 39 (Stevenson Decl. ¶ 2). The District meets demand with water from the North Santiam River and Detroit Reservoir, *id.* ¶¶ 3-6, Ex. 1-3, and contracts with the City of Stayton to deliver water to its water filtration plant, *id.* ¶ 9. The District's ability to convey water to downstream channels will be hindered if it is required to modify or close its systems as a result of increased turbidity. *Id.* ¶

10. Increased turbidity also causes destructive sediment accumulation on the District's fish screens and fish barrier, mandatory structures designed to mitigate harm to fish and aquatic life, and affects the District's strategies to manage methylmercury levels. *Id.* ¶¶ 8, 11; ECF 55 at 5.

## V. STANDARD FOR INTERIM RELIEF

To obtain an injunction pending appeal, Plaintiffs must establish that they are likely to succeed on the merits, that they are likely to suffer irreparable harm absent relief, that the balance of equities tips in their favor, and that an injunction is in the public interest. *See Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008). Under the Ninth Circuit's serious-questions approach, relief may also be warranted where Plaintiffs raise serious questions going to the merits and the balance of hardships tips sharply in their favor, provided they also establish a likelihood of irreparable harm and that an injunction is in the public interest. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). As demonstrated below, Plaintiffs satisfy both tests.

## VI. ARGUMENT

### A. Likelihood of Success on the Merits

Plaintiffs are likely to succeed on the merits because the Opinion contains legal error, or, at minimum, because the case presents serious questions. Nowhere

is this plainer than with respect to Plaintiffs' claims that Defendants violated the APA for failing to act in accordance with the Clean Water Act.

CWA Section 313 requires every federal agency to "comply with" state water-quality standards "in the same manner, and to the same extent as any nongovernmental entity." 33 U.S.C. § 1323(a). Oregon's numeric turbidity criterion is such a standard: no more than a ten percent cumulative increase over natural upstream background. OAR 340-041-0036. Oregon's statewide narrative criteria further require that deleterious substances, including turbidity, be maintained at the lowest possible levels. OAR 340-041-0007(1). Oregon's antidegradation policy requires protecting existing beneficial uses and preventing unnecessary degradation of water quality. OAR 340-041-0004(1).

The June 2026 Record of Decision selected annual deep drawdowns of Detroit Lake without a determination that the operation will meet any of those criteria, even though the Corps expressly acknowledged that the deep drawdowns will adversely affect turbidity. Such action is "not in accordance with law." *See* 5 U.S.C. § 706(2)(A). That the deep drawdown is part of a 2024 Biological Opinion does not constitute Clean Water Act compliance. The Ninth Circuit has held that "full compliance with the recommended steps outlined in [a Biological Opinion] did not necessarily mean that the Corps fulfilled its obligations under the CWA." *See Nat'l Wildlife Fed'n v. U.S. Army Corps of Eng'rs*, 384 F.3d 1163, 1171 (9th

Cir. 2004). Rather, "[a]n independent analysis of the Corps's compliance with the requirements of the CWA is required." *Id.*

Here, an independent analysis makes clear that the Corps' plan does not comply with Clean Water Act requirements. The Corps never applied Oregon's percentage-of-background criterion to the selected operation. It stated that quantitative models "were not available"—because the Corps performed no such modeling—and that "the exact amount of turbidity in any given year cannot be accurately predicted." ECF 68 at 30–31. An agency that cannot say whether the operation will stay inside a ten-percent band has not determined that the operation will comply with the band—especially when they also admit that turbidity will be "substantially more adverse."

Adaptive-management language and a promise to "modify, pause, or terminate" after conditions become "unacceptable" do not ensure compliance with a standard. ECF 68 at 14, 35. Federal Defendants do not claim to have obtained an ODFW-coordinated emergency authorization or a section 401/404 permit with turbidity conditions for this drawdown. The Corps similarly never considered Oregon's statewide narrative criteria or antidegradation policy.

The Endangered Species Act does not displace Clean Water Act Section 313. The two statutes are co-equal, and a Reasonable and Prudent Alternative (RPA) that is silent on OAR 340-041-0036 does not repeal Oregon's criterion.

ECF 73 at 10–15. Because the Corps failed to act in accordance with the Clean Water Act when it declined to observe Oregon's water quality standards, it has violated the APA. For that reason, and all those briefed and argued in connection with the preliminary injunctions, Plaintiffs are likely to succeed on the merits.

The proof of exceedance is already in the record. Stayton's typical raw water is 3 to 7 NTU. ECF 58 at 12. Ten percent of that band is a fraction of an NTU. Prior Willamette Valley deep drafts produced 20 to 200 NTU at Salem's gauges and 300 to 500 NTU below Green Peter. ECF 51 at 8, 17; ECF 58 at 12. Those numbers are in the Corps' own SEIS. The Corps selected a multi-year Detroit program without applying Oregon's numeric criterion to the first pulse or to the later, deeper pulses the ROD schedules. ECF 73 at 18–21.

**B. Irreparable Injury Pending Appeal**

Plaintiffs will suffer irreparable injury while this appeal is pending if the 2026 Detroit drawdown proceeds. To support an injunction under Fed. R. Civ. P. 62(d), the harm must be likely and must occur during the period before the appeal can be decided. *Nken v. Holder*, 556 U.S. 418, 434–35 (2009). Both are true here.

Plaintiffs have presented evidence that, among other things, the drawdown is likely to increase concentration of suspended solids and fine particles in excess of Oregon's turbidity thresholds and the capabilities of the slow-sand filtration plants, threatening drinking water access for hundreds of thousands of people in Salem

and Stayton. ECF 18 (SEIS at W-144, W-488); ECF 51 at 26–27; ECF 58 at 21–23; *see also* Opinion at 17 (acknowledging that the record "suggests turbidity is likely to occur at some level."). And since Federal Defendants have stated that the drawdown will begin November 21, these harms will occur before a merits appeal on a Circuit Rule 3-3 briefing schedule is decided.

As relevant to this emergency motion, the district court's reasoning was based primarily on: (1) lack of evidence that turbidity would reach the *same* astronomical levels observed during the 2023 Green Peter Reservoir drawdowns, Opinion at 17-18, and (2) the Corps' adoption of a Deep Drawdown Emergency Response Communications Plan ("Emergency Plan"), Opinion at 19-20.

First, even a fraction of the turbidity observed at Green Peter Reservoir would lead to irreparable injury. In other words, any turbidity above 10 NTU (as opposed to the 200+ NTU values observed at Green Peter) for a prolonged period would create the conditions for irreparable injury. Plaintiffs provided evidence in the record of such levels occurring, which the Corps did not rebut. ECF 52 (Pulley Decl. Ex. H ("[t]hroughout the drawdown event, turbidity will likely increase well-above 10-15 NTU, with potential spikes above 200 NTU, significantly higher than the normal raw water turbidity of less than 2-5 NTU historically seen in the N. Santiam River.")); *see also* ECF 59 (Ex. B to Buchanan Decl. at 2-3).

Even the Corps' own SEIS analysis recognizes that, under its drawdown plan, (1) there will be "substantially more adverse" turbidity below Detroit (SEIS, p. 213 (Table 3-42; *see* Water Quality under Interim Operations)); (2) "fine clay material eroded from exposed sediment is likely to stay in suspension and pass downstream of Detroit dam," even with less turbidity than occurred at Green Peter Reservoir in 2023 (SEIS, p. 217); and (3) "[i]ncreased turbidity *would result* in adverse effects to drinking water facilities that use water from the North Santiam River below Detroit" SEIS, p. 218 (emphasis added).

Second, regarding the Emergency Plan, the Corps failed to adopt any concrete measures or triggers that could prevent irreparable injury. Instead, the Emergency Plan is full of bureaucratic delays. "If drinking water facility concerns arise," the Plan directs the impacted city to contact the Oregon Health Authority, which will "consider whether to ask for a halt of operations" while obtaining "alignment among Oregon agencies and through the Governor's Office" ECF 77-1 at 3. At that juncture, the Governor's Office "may contact the Commander, Portland District, and follow up with an email." *Id.* The Corps will not even *consider* taking action unless requested by the Governor's Office or if a drinking water emergency has been determined based on State-developed criteria. *Id.*

Requesting a pause must meet certain criteria, including when a water system is already "at high risk of failing" and "[r]easonable options available to

provide adequate water quantity or quality have been exhausted," meaning that the Corps would only consider a pause when the harm is done and the public is without adequate supplies. *Id.* at 2. Even in this situation, the Corps does not commit to pause or halt the drawdown but simply provides for the State to issue a "request." *Id.* at 3. That request will then need to go "through the USACE chain of command as appropriate and as feasible." *Id.* If the Corps agrees, it "*may* pause or terminate the drawdown by raising the reservoir elevation." *Id.* (emphasis added). However, the Corps may be unable to stop a drawdown even when it wants to do so as its "ability to refill the reservoir is highly dependent on inflow rates" (determined by rain levels) exceeding minimum outflow rates. *See id.* at 3, n.2.

Environmental injury "is often permanent or at least of long duration, i.e., irreparable." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987). Violating water quality standards can constitute irreparable injury. *Or. State Pub. Interest Research Grp. v. Pac. Coast Seafoods Co.*, 374 F. Supp. 2d 902, 907 (D. Or. 2005); *Ctr. for Envtl. Law & Policy v. United States Fish & Wildlife Serv.*, No. 2:15-CV-0264-SMJ, 2017 U.S. Dist. LEXIS 67630, at *15 (E.D. Wash. May 3, 2017) (both cases applied *Amoco* in their findings that discharge of pollutants constituted an irreparable injury). And interference with a municipal water system's ability to provide water free of contamination is irreparable. See *United*

*States v. Cow Palace, LLC,* No. 1:24-CV-3092-TOR, 2024 U.S. Dist. Lexis 228138, at *4-5 (E.D. Wash. Dec. 17, 2024).

Even if the Corps' Emergency Plan were to prove effective at pausing an increased flow of turbidity, it is not enough to prevent the irreparable harm. The turbidity will outlast the drawdown. Fine sediment is likely to remain suspended and continue moving downstream even after drawdown operations are modified or halted. SEIS, p. 217. Sediment deposited along the river is resuspended in later storms, elevating turbidity "even when a deep drawdown is not actively occurring." ECF 52 (Pulley Decl. Ex. G at 7). A four-week operation therefore produces a far longer turbidity event at downstream intakes beyond what Cities can handle. Rainy weather patterns during the likely drawdown window exacerbate the problem. Historical precipitation events have rapidly elevated the North Santiam River to turbidity values between 20 and 60 NTU for one to three days, depending on precipitation intensity and duration, and those values are expected to increase during and after drawdown. ECF 52 (Pulley Decl. Ex. H at 23).

Salem's slow-sand filtration system cannot function when intake water from the North Santiam River exceeds approximately 10 NTU for an extended period of time. ECF 51 at 26–27. Stayton has explained that a turbidity pulse of the kind produced at Green Peter would exhaust its reserves and force the plant offline. ECF 58 at 21–23. Those are not filter-cleaning costs. They are the difference

between a functioning municipal system and a boil-water, haul-water, or plant-shutdown event while the appeal is pending. The Corps' own Operations Project Manager admitted that once these systems start failing, it is "too late." ECF 25 (Teed Decl. ¶ 10). The Corps classified the operation as likely to have "moderately more adverse" turbidity and admitted that the exact amount "cannot be accurately predicted." ECF 68 at 31. However, the Corps did not identify the turbidity levels expected and did not compare those levels to the drinking water treatment plant's operational parameters. The Corps thus has not predicted and cannot bound either a pulse or prolonged elevated turbidity. Given the plants' documented sensitivity to turbidity and the Corps' admission that moderately more adverse turbidity is likely, there is a likelihood of irreparable harm to the Cities and their water users.

Likewise, if Santiam Water Control District is hindered in its ability to deliver committed water to customers, that harms not only the customers, but the District itself. *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co., Inc.,* 240 F.3d 832, 841 (9th Cir. 2001) (irreparable harm where litigant stands to lose customers or goodwill).

Marion County operates a campground and multiple parks on the North Santiam River impacted by turbidity and water shortages. It funds and coordinates emergency services and the public-health response for the communities and North Santiam School District campuses that rely on the North Santiam for water. ECF

18 at 5–7, 13, 35–36. Harm to these services and public health responses occasioned by high turbidity would be costly and irreparable. ECF 100 (Ex. 1-6).

Finally, the position that Defendants are taking in ongoing litigation arising from the disastrous Green Peter drawdown—that they cannot be held liable for damages caused by the foreseeable and specific harms from their deep drawdowns—is its own independent, irreparable form of harm to all Plaintiffs. *See City of Lebanon v. U.S. Army Corps of Eng'rs,* No. 3:25-cv-01789-AR (D. Or.), ECF 13. When economic loss like that which Plaintiffs are very likely to suffer as a result of the Detroit deep drawdown cannot be recovered from the United States, it too is irreparable. *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018).

### C. Serious Legal Questions and a Balance of Hardships That Tips Sharply in Plaintiffs' Favor

Serious legal questions are raised by Plaintiffs' claims, and the balance of hardships tips sharply in Plaintiffs' favor. A serious legal question is one that is "substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation." *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988) (en banc) (quoting *Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 740 (2d Cir. 1953)). Whether a qualitative SEIS discussion and post-hoc adaptive-management language satisfies Clean Water Act Section 313, and whether the Endangered Species Act displaces that independent duty, are serious questions. ECF 73 at 10–15.

The balance of hardship tips sharply toward Plaintiffs. The hardship to Plaintiffs is the loss of the North Santiam River water supply, the emergency-management burden if the intakes close, and costs that Federal Defendants say cannot be recovered from the United States. *Azar*, 911 F.3d at 581. By contrast, the hardship to Defendants from a one-season hold at the existing minimum conservation pool is the delay of half of one measure among fifty-five. Night passage, the spring spillway, and the other RPA measures continue. Even Intervenor-Defendants stated at oral argument that they would not bring an ESA lawsuit if there is a one-year delay. Tr. 99. The balance of hardships tips sharply in the Plaintiffs' favor.

**D. Public Interest Weighs in Favor of Granting Relief**

The balance of the equities and public interest "merge when the government is the opposing party." *Nken,* 556 U.S. at 435. There is "no public interest in the perpetuation of unlawful agency action." *Novedades Y Servicios, Inc. v. Fin. Crimes Enf't Network*, 181 F.4th 961, 981 (9th Cir. 2026) (citing *League of Women Voters of U.S. v. Newby,* 838 F3d 1, 12 (D.C. Cir. 2016)). There is a "substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *Or. Council for Humanities v. U.S. Doge Serv.,* 794 F. Supp. 3d 840, 893 (D. OR. 2025). (citing *Washington v. Reno,* 35 F.3d 1093, 1103 (6th Cir. 1994)).

An adequate supply of safe drinking water for the downstream population is the public interest. *Alisal Water Corp. v. United States*, 431 F.3d 643, 656 (9th Cir. 2005). Here, the remedy asked is no broader than the harm: one season at 1,450 feet. Equitable discretion under *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312–13 (1982), includes the power to grant that limited relief.

## VII. CONCLUSION

For the reasons stated, Plaintiffs respectfully request that this Court grant an injunction pending appeal prohibiting Federal Defendants from drafting Detroit Reservoir below elevation 1,450 feet during the 2026–27 operating season. Given the strong public interest, no bond should be required.

Respectfully Submitted this 17th day of November, 2026

MARION COUNTY, CITY OF STAYTON, AND SANTIAM WATER CONTROL DISTRICT

By: *s/ Ryan Adams*
Ryan Adams, OSB #150778
Fir Law Group
PO Box 35
Silverton, OR 97381
Ryan@FirLawGroup.com
(503) 383-1640

*Attorneys for Marion County, City of Stayton, Santiam Water Control District*

MARION COUNTY

By: *s/ Steve Elzinga*
MARION COUNTY COUNSEL
555 Court Street N.E., Suite 5242
P.O. Box 14500
Salem, OR 97309
Telephone: (503) 588-5220
selzinga@co.marion.or.us

*Attorneys for Marion County*

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing motion is 20 pages long, excluding the parts excluded by Federal Rule of Appellate Procedure 27(d)(2), and therefore complies with the 20-page limitation contained in Ninth Circuit Rule 27-1(1)(d).

Dated: November 17, 2026

*s/ Steve Elzinga*
*Attorneys for Marion County*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the attached document with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on November 17, 2026. I certify that all participants in the case are registered CM/ECF users to the best of my knowledge and that service will be accomplished by the appellate CM/ECF system. I further certify that a copy of this motion are being emailed to counsel for all parties.

Dated: November 17, 2026

*s/ Steve Elzinga*
*Attorneys for Marion County*

# APPENDIX

## Index of Exhibits

**Page**

Exhibit 1: Declaration Jason Pulley (ECF 52) .......................................A-2

Exhibit 2: Declaration Barry Buchanan (ECF 59) .................................A-10

Exhibit 3: Declaration Julia Hajduk (ECF 60) .......................................A-15

Exhibit 4: Declaration Lee Loving (ECF 62) .........................................A-19

Exhibit 5: Declaration Margaret Hudson (ECF 41-3) ............................A-23

Exhibit 6: Declaration Scott Amerman (ECF 20) ..................................A-26

Exhibit 7: Declaration Brent Stevenson (ECF 39) .................................A-32

Exhibit 8: Final SEIS, Excerpts ...........................................................A-36

Exhibit 9: Final SEIS, Appendix W ......................................................A-41

Exhibit 10: Willamette Basin Bi-Annual Status Report
February 28, 2025 ...................................................................A-82

Exhibit 11: Congressional Letter (ECF 27-1) ........................................A-86

Exhibit 12: Opinion and Order (ECF 86) ..............................................A-90

Exhibit 13: Email exchange re: Emergency Motion: Marion County, et al
v. US Army Corps of Engineers, et al, Case No. 26-7415 ...............A-110

**OLIVIER JAMIN** OSB # 173805
olivierjamin@dwt.com
**KEVIN H. KONO**, OSB # 023528
kevinkono@dwt.com
**VERÓNICA MURIEL CARRIONI**, OSB #213881
veronicamuriel@dwt.com
**DAVIS WRIGHT TREMAINE LLP**
560 SW 10th Ave, Suite 700
Portland, Oregon 97205
Telephone: (503) 241-2300
Facsimile: (503) 778-5299

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

AT EUGENE

**MARION COUNTY,** a Political Subdivision of the State of Oregon,

Plaintiff,

And

**SANTIAM WATER CONTROL DISTRICT** and **CITY OF STAYTON,**

Plaintiff-Intervenors

v.

**U.S. ARMY CORPS OF ENGINEERS, DANIEL P. DRISCOLL,** in his official capacity as Secretary of the Army, and **WILLIAM H. GRAHAM, JR.,** in his official capacity as Chief of Engineers and Commanding General of the U.S. Army Corps of Engineers,

Defendants.

And

Lead Case No. 6:26-cv-00956-MTK

Trailing Case No.: 6:26-cv-1381-MTK

**DECLARATION OF JASON PULLEY IN SUPPORT OF PLAINTIFF CITY OF SALEM'S MOTION FOR PRELIMINARY INJUNCTION**

**NORTHWEST ENVIRONMENTAL DEFENSE CENTER** and **NATIVE FISH SOCIETY**,

Defendant-Intervenors.

---

**CITY OF SALEM,** an Oregon Municipal Corporation,

Plaintiff,

And

**SANTIAM WATER CONTROL DISTRICT** and **CITY OF STAYTON,**

Plaintiff-Intervenors

v.

**UNITED STATES OF AMERICA**, and **UNITED STATES ARMY CORPS OF ENGINEERS**, an agency of the United States government**,**

Defendants,

And

**NORTHWEST ENVIRONMENTAL DEFENSE CENTER** and **NATIVE FISH SOCIETY**,

Defendant-Intervenors.

---

I, Jason Pulley, declare as follows:

1. I submit this Declaration in support of Plaintiff the City of Salem's ("Salem") Motion for Preliminary Injunction. I am competent to make this declaration based on my personal knowledge.

2. I am Salem's Utility Planning Manager. I have been the Utility Planning Manager for 14 years. For the past six months, I have also served as the acting Assistant Public Works Director for Infrastructure Planning. As Utility Planning Manager, I manage master planning for



DAVIS WRIGHT TREMAINE LLP
560 SW 10th Ave, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

Salem's water, wastewater, and stormwater systems. Before becoming the Utility Planning Manager, I worked for ten years as Salem's Water Quality and Treatment Supervisor. In that role, I oversaw the City's regulatory compliance program for its drinking water system. I have a Bachelor of Science degree in Natural Resource Management from the University of Tennessee and a Master of Science in Agronomy from the University of Arkansas. In total, I have over 25 years' experience in the environmental and water utility field.

3. The North Santiam River serves as a critical municipal drinking water source for communities throughout the Mid-Willamette Valley, including Salem. As described in additional detail in this Declaration, Salem operates one of the largest slow-sand filtration water treatment plants in the United Sates, the Geren Island Water Treatment Plant ("Facility"). Water released from Detroit Dam flows downstream through the North Santiam River and enters the Facility through a large intake structure. I describe the slow-sand filtration process further below.

4. Salem operates the Facility, which is the primary regional drinking water treatment facility in the Mid-Willamette Valley. The Facility treats water diverted from the North Santiam River to provide drinking water to approximately 220,000 residents, as well as to hospitals, schools, businesses, and industries. The water users rely on water processed through the Facility even if using the water for purposes other than drinking water. Salem has no way to send water through the Facility for only non-potable uses. Due to the nature of the water distribution system, all water processed through the Facility must meet Safe Drinking Water Act and other drinking water standards.

5. In addition to all of Salem's citizens, Salem's water service area includes the City of Turner, two water districts, and portions of unincorporated Marion and Polk Counties. Salem is also the sole emergency drinking water source for the City of Stayton and the City of Keizer.

6. As Oregon's capital city, Salem is home to state government offices, the Oregon State Police headquarters, federal offices, correctional facilities, and the Oregon State Hospital, all of which depend on Salem's municipal water supply. Salem Hospital also relies on Salem's



DAVIS WRIGHT TREMAINE LLP
560 SW 10th Ave, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

drinking water system. Salem additionally must maintain sufficient water supplies for firefighting and other emergency response functions. Salem must maintain sufficient water in storage to ensure adequate supply line pressure for firefighting purposes. Any reductions in available supply, including shutdowns caused by increased turbidity, or Salem's switch to emergency-only supplies, will increase the risk that Salem cannot maintain adequate water supply storage for firefighting purposes.

7. Because Salem relies on the North Santiam River as its principal drinking water source, operational changes at Detroit Dam directly affect the quality, reliability, and safety of Salem's municipal water supply. If turbidity levels exceed 10 Nephelometric Turbidity Units ("NTU"), Salem may be required close the Facility's intake gates to prevent damage to sand filters. In the event of intake shutdown, Salem will rely on limited backup sources, including groundwater wells, stored reservoir water, and emergency interties with the City of Keizer and Stayton. These back-up water supplies lack operational redundancy. If any component of these alternative supplies (such as interties with Keizer) fails or is unexpectedly limited during a turbidity event, Salem will be unable to provide adequate drinking water to the region, creating a public health emergency.

8. Salem also supplies emergency water to both the City of Stayton and the City of Keizer. The City of Stayton also relies on slow-sand filtration intakes along the North Santiam River, which will be subject to the same operational challenges as Salem. Any operational changes at Detroit Dam that results in increased turbidity will increase the risk that the City of Stayton will be unable to operate its water treatment facilities and unable to rely on Salem to provide emergency water. Likewise, if Salem is unable to operate the Facility, it will be required to rely on the emergency water supply from the City of Keizer, thereby placing a strain on the City of Keizer's groundwater supply, increasing the risk of water rationing or other adverse impacts.



DAVIS WRIGHT TREMAINE LLP
560 SW 10th Ave, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

9. As noted, Salem's drinking water treatment Facility relies on a slow sand filtration system designed to treat source water diverted from the North Santiam River, which typically has very low turbidity levels. The facility uses a two-stage slow sand filtration system that cleans drinking water by passing river water slowly through deep sand beds and a biologically active surface layer, which captures and breaks down contaminants. Under ordinary conditions, turbidity in the North Santiam River is typically below 10 NTU, allowing Salem's filters to operate for approximately three months between cleaning cycles. During a cleaning cycle, operators conduct a routine scraping process that removes the accumulated solids layer and about 0.25 inches of sand from the top of the filter bed, after which the filters are refilled, biologically matured, and returned to service.

10. Salem's Facility utilizes seven slow sand filtration beds, six of which are approximately 2.5 acres in size and one is approximately 4.6 acres. Each can hold up to six feet of water. True and correct photographs of Salem's water treatment facility and the sand filters used are attached hereto as **Exhibit A**.

11. The deep drawdown operations of the Detroit Reservoir as proposed by the Corps and evaluated in the Corps' Final Supplemental Environmental Impact Statement ("SEIS") are expected to significantly disturb fine sediments in Detroit Reservoir and downstream channels. The Corps' operations will likely increase the concentration of suspended solids and fine particles in the river well above 50 NTU—more than five times normal turbidity in the North Santiam River and well above the Facility's operational design of 10 NTU or less. Salem's studies show that increase in turbidity above 10 NTU will jeopardize the operations of Salem's drinking water treatment facility, forcing either shutdowns or substantial maintenance that would further disrupt water supplies for months.

12. Based on empirical data Salem has collected, if implemented as analyzed in the Final SEIS, the deep drawdown of Detroit Reservoir will likely violate the CWA and Oregon's numeric criteria for turbidity, Oregon's statewide narrative criteria, and Oregon's antidegradation



DAVIS WRIGHT TREMAINE LLP
560 SW 10th Ave, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

policy by increasing turbidity over the maximum 10% cumulative increase in natural turbidity authorized under OAR 340-041-0036.

13. Based on empirical data Salem has collected, previous drawdown actions on the Green Peter Dam likely resulted in violations of the CWA and Oregon's numeric criteria for turbidity, Oregon's statewide narrative criteria, and Oregon's antidegradation policy.

14. For this reason, Salem has actively participated in the Corps' public comment process in preparing the SEIS, in which the Corps was required to analyze operational measures throughout the Corps-operated Willamette Valley System, including the annual deeper drawdowns of Detroit Reservoir as an interim operational measure intended to facilitate downstream migration of juvenile fish.

15. Before and during the SEIS process, Salem repeatedly informed the Corps of the risks to the Facility and therefore to drinking water and water supply posed by the proposed drawdown. Salem representatives met with the Corps on numerous occasions and invited the Corps to tour Salem's Facility, during which Salem representatives again explained how any increase in turbidity above 10 NTU resulting from the proposed drawdown would impair, damage, and ultimately shut down the filtration system.

16. Salem submitted detailed comments on June 20, 2025, before the Corps issued the draft SEIS. In my professional capacity as Utility Planning Manager, I am familiar with the data, findings, recommendations, and conclusions of these comments. A true and correct copy of these comments is attached hereto as **Exhibit B**.

17. On January 12, 2026, following the Corps' publication of the draft SEIS and during the public comment period, Salem submitted additional comments. In my professional capacity as Utility Planning Manager, I am familiar with the data, findings, recommendations, and conclusions of those comments. A true and correct copy of these comments is attached hereto as **Exhibit C**.



DAVIS WRIGHT TREMAINE LLP
560 SW 10th Ave, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

18. On May 22, 2026, the Corps published the Final SEIS. The Corps later certified the Final SEIS on June 23, 2026, as part of its Record of Decision ("ROD"). In my professional capacity as Utility Planning Manager, I reviewed the Final SEIS and am familiar with the data, findings, and conclusions of that document as they relate to Detroit Reservoir. A true and correct copy of the Final SEIS is attached hereto as **Exhibit D**.

19. On June 23, 2026, the Corps issued the ROD. In my professional capacity as Utility Planning Manager, I reviewed the ROD and am familiar with the data, findings, conclusions, and ultimate action of that document as they relate to Detroit Reservoir. A true and correct copy of the ROD is attached hereto as **Exhibit E**.

20. Because the Corps decided to implement the deep drawdown, most of the comments submitted by Salem are still applicable and relevant to the present motion for preliminary injunction.

21. Through registered professional engineers, Salem also has conducted pilot testing to evaluate the potential impacts of the proposed drawdown on Salem's water treatment plant. In my professional capacity as Utility Planning Manager, I participated in directing that pilot testing and am familiar with the data, findings, and conclusions of that report. A true and correct copy of the most recent report of the results of the pilot testing dated August 20, 2026, is attached hereto as **Exhibit F**. True and correct copies of the initial technical memorandums (TM) titled "Anticipated Water Quality Challenges and Operational Impacts from Detroit Drawdown", which summarize the preliminary results from the pilot testing conducted in February 2025 are attached hereto as **Exhibit G** and **Exhibit H**. Exhibit G (TM 1) presents a summary of the literature and studies available to predict the potential impacts of the proposed drawdown. Exhibit H (TM 2) performs bench-scale and pilot-scale testing to determine whether the concerns identified in TM 1 are actually borne out in real-world testing.

22. The deep drawdown will imperil Salem's drinking water. The pilot testing summarized in Exhibit F shows that elevated turbidity even at 10 NTU level substantially



DAVIS WRIGHT TREMAINE LLP
560 SW 10th Ave, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

shortens the filter run time (the time the filter can be used before needing to be taken offline for cleaning) and that repeated turbidity events accelerate the shortening of run times. This testing shows that elevated turbidity could force Salem to impose emergency water restrictions or leave the City unable to provide safe drinking water in compliance with state and federal standards, which would create a public health emergency affecting residents, hospitals, emergency responders, and critical public infrastructure. For instance, a water shortage would impact Salem Hospital, which relies on Salem water, and impact Salem's ability to fight fires by affecting available water supply.

**In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.**

21 Aug 2026
Date

Jason Pulley



DAVIS WRIGHT TREMAINE LLP
560 SW 10th Ave, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

Jennifer L. Gates, OSB No. 050578
jgates@pearllegalgroup.com
Heather C. Doherty, OSB No. 244304
htourgee@pearllegalgroup.com
Pearl Legal Group PC
529 SW Third Avenue, Suite 600
Portland, OR 97204
Telephone: (503) 445-7101
**Counsel for Intervenor-Plaintiff City of Stayton**

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
EUGENE DIVISION

MARION COUNTY, a Political Subdivision of the State of Oregon,

Plaintiff,

and

SANTIAM WATER CONTROL DISTRICT, and CITY OF STAYTON, an Oregon municipal corporation,

Intervenor-Plaintiffs,

v.

U.S. ARMY CORPS OF ENGINEERS, DANIEL P. DRISCOLL, in his official capacity as Secretary of the Army, and WILLIAM H. GRAHAM, JR., in his official capacity as Chief of Engineers and Commanding General of the U.S. Army Corps of Engineers,

Defendants,

and

NORTHWEST ENVIRONMENTAL DEFENSE CENTER and NATIVE FISH SOCIETY,

Intervenor-Defendants.

Case No. 6:26-cv-00956-MTK (Lead Case)
Case No. 6:26-cv-01381-MTK (Trailing Case)

**DECLARATION OF BARRY BUCHANAN IN SUPPORT OF PLAINTIFF-INTERVENOR CITY OF STAYTON'S JOINDER IN MOTIONS FOR PRELINIMARY INJUNCTION**

CITY OF SALEM, an Oregon Municipal Corporation,

Plaintiff,

and

SANTIAM WATER CONTROL DISTRICT, and CITY OF STAYTON, an Oregon municipal corporation,

Intervenor-Plaintiffs

v.

UNITED STATES OF AMERICA, and UNITED STATES ARMY CORPS OF ENGINEERS, an agency of the United States government,

Defendants,

and

NORTHWEST ENVIRONMENTAL DEFENSE CENTER and NATIVE FISH SOCIETY,

Intervenor-Defendants.

I, Barry Buchanan, declare as follows:

1. I submit this declaration in support of Intervenor-Plaintiff City of Stayton's Joinder in Motions for Preliminary Injunction filed by Marion County and the City of Salem. I am competent to make this declaration, and it is based on my personal knowledge.

2. I served as the Interim Director of Public Works for the City of Stayton (Stayton) from December 2024 through May 2026. As a direct employee and through my company, Buchanan & Associates, I have served as a consultant to municipalities and public service providers on infrastructure management and development, particularly water treatment systems. I am a certified Professional Engineer in Oregon and have over 40 years of experience with potable water and wastewater treatment systems in Oregon, the United States and internationally, including 10, years as a consultant Public Health Engineer in New Zealand, 10 years as a



PEARL LEGAL GROUP PC
529 SW THIRD AVE, SUITE 600
PORTLAND, OR 97204
T: 503-445-7101

Thames Water Utilities UK's Project Coordinator for local Greater London and international water treatment and distribution projects, 11 years as the City of Salem's Senior Utilities Planning Coordinator, and 12 years as an owner-operator of an Infrastructure Planning/Public Health Engineering consultancy.

3. As Stayton's Interim Director of Public Works, my responsibilities included oversight of the planning for and development and maintenance of all city infrastructure including 34.6 miles of public streets, 44.5 miles of water mains, nearly 39 miles of sanitary sewer lines, four wastewater lift stations, and almost 138 acres of parks, trails, and natural open space. This included responsibility for management of the City's water treatment and distribution system, wastewater treatment facility, stormwater infrastructure, municipal facilities, engineering services, development review and capital projects.

4. During my tenure as Interim Director of Public Works, I was Stayton's lead for evaluation of the potential effects on Stayton's infrastructure of the U.S. Army Corps of Engineers' (Corps) proposed drawdown of the Detroit Reservoir. I led Stayton's efforts to participate in the Corps' 2025 public comment period in advance of the Corps' preparation of the Supplement Environmental Impact Statement (SEIS) and the 2026 comment period on the Draft SEIS. I attended several public meetings regarding the drawdown with Corps representatives, including a meeting in Stayton to discuss the anticipated impacts of a Detroit Reservoir drawdown on Stayton's drinking water treatment facility.

5. Attached hereto as **Exhibit A** is a true and correct copy of the June 17, 2025 comments submitted by Stayton in advance of the Corps' preparation of the SEIS.

6. Attached hereto as **Exhibit B** is a true and correct copy of Stayton's January 12, 2026 comments on the Draft SEIS.

7. Stayton obtains its drinking water from the North Santiam River. Stayton's water intake is located on a Santiam Water Control District canal that is fed exclusively from the

North Santiam River. From the intake, pipes carry the river water by gravity directly to Stayton's drinking water treatment plant. The plant is comprised of three slow sand filters (SSFs), pH correction, and disinfection to render the river water potable. The SSFs are constructed of a layer of underdrains and gravel at the bottom, on top of which is a lower buffer sand layer (18-inches deep), and an upper filtering sand layer (also 18-inches deep), topped by a filtering layer called the schmutzdecke, which is a biologically active dirt layer that traps a significant amount of impurities in the raw (pretreatment) water.

8. Turbidity in raw water is measured in NTUs, nephelometric turbidity units. Typical turbidity of the Santiam River water taken in by Stayton is 3-7 NTUs. Stayton's SSF system can handle turbidity levels of less than 10 NTUs. This turbidity limit is not unique to Stayton. The U.S. Environmental Protection Agency (in collaboration with the Oregon Health Authority) recommends that SSFs be operated with raw water measuring less than 10 NTUs and containing no colloidal clays. Attached hereto as **Exhibit C** is a true and correct copy of the U.S. EPA Area-Wide Optimization Program (AWOP) "Water Quality Goals and Operational Criteria for Optimization of Slow Sand Filtration" at p. 16 (2024).

9. While an NTU measurement identifies the turbidity in water, it does not identify the sizes of the particles that constitute that turbidity. Those particles can vary in size to a degree that, while small to the eye, is significant in terms of the particles' effects on SSF systems. Colloidal clays are extremely fine particles and are often found in the sediment behind dams. Because fine clays are so small, they may penetrate deep into the sand layers of an SSF system.

10. The effect on Stayton's SSFs of prolonged increased turbidity in raw water is not merely slowing of the purification process. Rather, as the schmutzdecke traps impurities, filtered water production declines until potentially all flow of water through the filters ceases because the schmutzdecke becomes clogged with sediment. Likewise, penetration of the clays into the deeper



PEARL LEGAL GROUP PC
529 SW THIRD AVE, SUITE 600
PORTLAND, OR 97204
T: 503-445-7101

filter layers will result in a complete shutdown of the filter and require replacement of the sand media.

11. Under normal operations, maintenance of the SSFs occurs several times each year. A filter is taken out of service, drained of water, and ¼ to ½ inch of the surface sand and the schmutzdecke are mechanically removed. Once cleaned, the filter enters a ripening phase to encourage re-growth of the schmutzdecke. When the schmutzdecke matures, the filtering process returns to an acceptable performance level at which time the filter is returned to service. This process takes several days. If the turbidity during a drawdown requires frequent cleaning, the system will not be able to provide sufficient water to meet Stayton’s needs. If one or both sand layers require replacement due to penetration of clays during the drawdown, the process of cleaning and returning a filter to service will take significantly longer as a rebuild of the filter will be required and further reduce or eliminate the provision of clean water.

12. Stayton uses approximately 0.8 – 1.8 million gallons of clean water per day in the winter, with an average of about 1 MGD.

13. The Corps’ plan to conduct a drawdown over at least several weeks every year puts Stayton’s drinking water treatment system and the residents and other users who depend on the proper functioning of that system at risk of not only reduced or limited water availability but also closure of all the public services, hospitals, schools and other functions that depend on the availability of clean water.

**I declare under penalty of perjury that the foregoing is true and correct.**

DATE: August 26, 2026.

Barry Buchanan. PE.– OR.



PEARL LEGAL GROUP PC
529 SW THIRD AVE, SUITE 600
PORTLAND, OR 97204
T: 503-445-7101

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

MARION COUNTY, a Political Subdivision of the State of Oregon,

Plaintiff,

and

SANTIAM WATER CONTROL DISTRICT, and CITY OF STAYTON, an Oregon municipal corporation,

Intervenor-Plaintiffs,

v.

U.S. ARMY CORPS OF ENGINEERS, DANIEL P. DRISCOLL, in his official capacity as Secretary of the Army, and WILLIAM H. GRAHAM, JR., in his official capacity as Chief of Engineers and Commanding General of the U.S. Army Corps of Engineers,

Defendants,

and

NORTHWEST ENVIRONMENTAL DEFENSE CENTER and NATIVE FISH SOCIETY,

Intervenor-Defendants.

CITY OF SALEM, an Oregon Municipal Corporation,

Plaintiff,

and

SANTIAM WATER CONTROL DISTRICT, and CITY OF STAYTON, an Oregon municipal corporation,

Intervenor-Plaintiffs

v.

Case No. 6:26-cv-00956-MTK (Lead Case)
Case No. 6:26-cv-01381-MTK (Trailing Case)

**DECLARATION OF JULIA HAJDUK IN SUPPORT OF INTERVENOR-PLAINTIFF CITY OF STAYTON'S MOTION FOR PRELIMINARY INJUNCTION**

| | |
|---|---|
| UNITED STATES OF AMERICA, and UNITED STATES ARMY CORPS OF ENGINEERS, an agency of the United States government,<br>Defendants,<br>and<br><br>NORTHWEST ENVIRONMENTAL DEFENSE CENTER and NATIVE FISH SOCIETY,<br>Intervenor-Defendants. | |

I, Julia Hajduk, declare:

1. I am over the age of 18 and make the statements below freely, not for compensation and based on my personal knowledge or as indicated.

2. I am the City Manager of the City of Stayton (Stayton). I have served in this position for over four years. I make this declaration with the support of Stayton's City Council and Mayor.

3. Stayton is located 35 miles downstream from the Detroit Reservoir. Stayton is a small city of about 8,200 people in Marion County, Oregon, where generations of families, young professionals, and retirees share a strong sense of community. Stayton's median household income is $78,268, below both the state and national figures.

4. Stayton has operated its slow sand filtration system for decades and provides potable water for municipal uses, including operation of the City's wastewater treatment plant and drinking water for residents and nearly every business in the City, as well as North Santiam School District elementary, middle and high schools and Santiam Hospital and Clinics.

5. I have worked closely with Stayton's former Interim Director of Public Works, Barry Buchanan, and understand the likely harm that the proposed drawdown of the Detroit Reservoir will cause to the City's slow sand filtration system and users of City-provided drinking

water.

6. This harm is not limited to a reduction in volume of drinking water and could include cessation of water treatment and thus inability for the City to provide water for use by residents and businesses in Stayton. The ability of Stayton residents and businesses to mitigate the loss of potable water during the proposed weeks-long annual drawdown is extremely limited.

7. If the slow sand filters were shut down due to increased turbidity during a drawdown, it would compromise the City's existing systemwide water conveyance infrastructure by not being able to maintain the necessary 20 PSI of pressure to maintain the integrity of the waterlines.

8. Stayton infrastructure and its residents and businesses are not the only ones likely to be harmed by the proposed drawdown:

a. I have communicated with representatives of Santiam Hospital and understand it cannot operate without potable water. The next closest hospital with an emergency department is about 20 miles away, in Salem.

b. The Stayton Fire District, which serves not just Stayton but also Marion, Mehama and Elkhorn, relies on the availability of water from the City to fight fires, and it will need to identify alternative options or risk being unable to provide fire suppression services.

c. I have communicated with representatives of the North Santiam School District and understand that its schools and offices likely could not operate if Stayton could not provide water and potentially would have to move to remote learning (although that would mean that the majority of students would return to homes that also did not have a water supply).

9. In addition to the above harms, the City of Sublimity does not have its own wastewater treatment system and relies, via an intergovernmental agreement with Stayton, on its ability to transport its wastewater for treatment at Stayton's wastewater treatment plant. As noted above, Stayton's wastewater treatment plant's is dependent on receipt of water from Stayton's drinking water treatment facility. It can function for only a few days without receipt of potable water, especially during rain events.

10. Attached hereto as **Exhibit A** is a true and correct copy of the Corps' Deep Drawdown Emergency Response Communications Plan for Green Peter and Lookout Point Reservoirs.

11. Given Stayton's size and socioeconomic status, it does not have a budget for the increased operational, maintenance and repair-related impacts to its slow sand treatment system likely to be caused by the plan to drawdown the Detroit Reservoir annually.

**I hereby declare under penalty of perjury that the foregoing is true and correct.**

Dated this 26th day of August 2026.

Julia Hajduk
Digitally signed by Julia Hajduk
Date: 2026.08.26 21:30:55 -07'00'

Julia Hajduk
City of Stayton

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| MARION COUNTY, a Political Subdivision of the State of Oregon,<br>Plaintiff,<br>and<br><br>SANTIAM WATER CONTROL DISTRICT, and CITY OF STAYTON, an Oregon municipal corporation,<br>Intervenor-Plaintiffs,<br>v.<br><br>U.S. ARMY CORPS OF ENGINEERS, DANIEL P. DRISCOLL, in his official capacity as Secretary of the Army, and WILLIAM H. GRAHAM, JR., in his official capacity as Chief of Engineers and Commanding General of the U.S. Army Corps of Engineers,<br>Defendants,<br>and<br><br>NORTHWEST ENVIRONMENTAL DEFENSE CENTER and NATIVE FISH SOCIETY,<br>Intervenor-Defendants. | Case No. 6:26-cv-00956-MTK (Lead Case)<br>Case No. 6:26-cv-01381-MTK (Trailing Case)<br><br>**DECLARATION OF LEE LOVING IN SUPPORT OF INTERVENOR-PLAINTIFF CITY OF STAYTON'S JOINDER IN MOTIONS FOR PRELIMINARY INJUNCTION** |
| CITY OF SALEM, an Oregon Municipal Corporation,<br>Plaintiff,<br>and<br><br>SANTIAM WATER CONTROL DISTRICT, and CITY OF STAYTON, an Oregon | |

municipal corporation,
Intervenor-Plaintiffs
v.

UNITED STATES OF AMERICA, and UNITED STATES ARMY CORPS OF ENGINEERS, an agency of the United States government,
Defendants,
and

NORTHWEST ENVIRONMENTAL DEFENSE CENTER and NATIVE FISH SOCIETY,
Intervenor-Defendants.

I, Lee Loving, under penalty of perjury declare that the following is true and based upon my personal knowledge or as indicated:

1. I am over the age of 18. I make the statement below freely and not for compensation.

2. I make this declaration on behalf of North Santiam School District (NSSD) in support of the City of Stayton's Joinders in City of Salem and Marion County's motions for preliminary injunction. This declaration is made with the support of the NSSD School Board.

3. I am the Superintendent for NSSD and have held this position since July 2022. I have over two decades of educational experience in Oregon, including various administrative positions, high school athletics coach, Social Studies teacher, President of the Oregon Assoc. of Secondary School Administrators, Coalition of Oregon School Administrators Board Member, and member of the Oregon AVID Principal's Collaborative Leadership Committee. In 2019, I was named the Oregon Secondary Principal of the Year.

4. NSSD includes six schools: four in Stayton, one in Sublimity, and one in Lyons. We serve approximately 2,100 students and have around 280 employees.

5. NSSD has major concerns regarding the proposed Detroit Lake Reservoir deep drawdown and the severe consequences it poses for our water supply, community stability, and school operations.

6. NSSD relies on water from the City of Stayton for food preparation, drinking, handwashing, cleaning, and sanitation (including wastewater).

7. The NSSD cannot operate safely without running water. Handwashing would be unavailable. Meals that so many children and families rely on could not be prepared. Those whose health requires a clean water supply would suffer physical harm. There would be no functioning fire suppression systems.

8. Without running water, each NSSD school site would need numerous portable toilets and massive quantities of potable water brought in every day for drinking, food service, and basic sanitation. This would be extremely costly and would present major logistical challenges.

9. If NSSD attempted to remain open, students in grades 9-12 may be required to shift to online learning, which would create significant instructional, scheduling, and access challenges.

10. Students across Oregon, including those in the NSSD, experienced significant disruptions to their learning during the pandemic, particularly in reading and math. The shift to asynchronous, at-home instruction led to significant and measurable learning loss. Our students should never have to experience that level of interruption again. Missed learning time creates long-term negative consequences for students.

11. The educational, financial, and public health consequences to the NSSD of the proposed Detroit Lake deep drawdowns are overwhelming.

**I hereby declare under penalty of perjury that the foregoing is true and correct.**

Dated this 26th day of August 2026.

Lee Loving
Superintendent
North Santiam School District

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

MARION COUNTY, a Political Subdivision of the State of Oregon,

Plaintiff,

v.

U.S. ARMY CORPS OF ENGINEERS, DANIEL P. DRISCOLL, in his official capacity as Secretary of the Army, and WILLIAM H. GRAHAM, JR., in his official capacity as Chief of Engineers and Commanding General of the U.S. Army Corps of Engineers,

Defendants.

Case No. 6:26-cv-00956-MC

**DECLARATION OF MARGARET HUDSON ON BEHALF OF SANTIAM MEMORIAL HOSPITAL IN SUPPORT OF THE CITY OF STAYTON'S MOTION TO INTERVENE**

I, Margaret Hudson, under penalty of perjury declare that the following is true and based upon my personal knowledge or as indicated:

1. I am over the age of 18. I make the statement below freely and not for compensation.

2. I make this declaration on behalf of Santiam Memorial Hospital in support of the City of Stayton's Motion to Intervene.

3. Santiam Memorial Hospital is a public benefit, domestic non-profit entity, first registered with the Oregon Secretary of State to do business in Oregon in 1950. It does business

in part through Santiam Hospital & Clinics (collectively, "Santiam Hospital"). The hospital is located in Stayton, Oregon, and there are 12 clinics, including three satellite clinics in Aumsville, Mill City and Sublimity.

4. I am currently the President and CEO for Santiam Hospital. I joined Santiam Hospital & Clinics in 1993; prior to my appointment in 2020 to President and CEO, I served nearly 20 years as Santiam Hospital's CFO/COO.

5. My making of this declaration is authorized by the Santiam Hospital's Board of Directors.

6. The mission of Santiam Hospital is to provide quality healthcare to people who suffer from illness, injury, or disability and to promote the general health and welfare of the community through education, support, and medical service.

7. Santiam Hospital provides medical transport, clinic-based care, and hospital services to over 60,000 patients per year and employs over 700 people. Santiam Hospital provides a wide range of medical services, including in-patient medical-surgical care, obstetrical care, emergency care, surgery, ancillary support services, and primary and specialty care.

8. Santiam Hospital is an important user of water in the City of Stayton. It receives water through the City of Stayton's water system. Santiam Hospital uses approximately 20,000-30,000 gallons of water per day.

9. Santiam Hospital has major concerns with the Army Corps' new policy of annual deep drawdowns at Detroit Lake, especially how it risks the hospital's water supply.

10. Water is used in Santiam Hospital for staff, patients, and visitors; for hygiene, cleaning, and sanitation; for fire suppression through sprinklers, which are required by the Fire Code, and for other purposes.

11. Due to both logistical issues and regulations that apply to hospitals, Santiam Hospital could not operate if the City of Stayton had to turn off municipal water supply and the hospital were unable to secure an alternative water source. The medical impact would be devastating.

12. If the City's water is turned off, Santiam Hospital will not be able to serve the medical needs of the people of Stayton and surrounding areas, including emergency care and life-sustaining treatments.

13. If Santiam Hospital were to close, even for just a few days, patients would need to be transferred and new patients needing hospital care would have to go to Salem or further, or go without treatment. I do not believe that medical facilities in Salem have enough capacity to cover the full influx of patients that would occur if Santiam Hospital paused operations, which means that some patients would have to go even further than Salem to receive treatment. Extended transport times to Salem or further would negatively impact the success rate of patient treatment. In short, patients would be harmed in a way that is irreparable, especially the most vulnerable.

14. The next closest hospital is the Salem Health Hospital in Salem, Oregon, which is approximately 16 miles away from Santiam Hospital. Santiam Hospital has received approval to combine with Salem Health, but this impending organizational change does not impact the issue of water consumption, use, or availability.

**I hereby declare under penalty of perjury that the foregoing is true and correct.**

Dated this 13th day of August 2026.

/S/ [signature]
Margaret Hudson, MBA
Santiam Hospital President and Chief Executive Officer

STEVE ELZINGA, OSB #123102
Marion County Legal Counsel
*selzinga@co.marion.or.us*
MICHELLE TEED, OSB #994398
Sr. Assistant Legal Counsel
*mteed@co.marion.or.us*
555 Court Street N.E., Suite 5242
P.O. Box 14500
Salem, OR 97309
Telephone: (503) 588-5220
Attorneys for County of Marion

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

MARION COUNTY, a Political Subdivision of the State of Oregon,

Plaintiff,

v.

U.S. ARMY CORPS OF ENGINEERS, DANIEL P. DRISCOLL, in his official capacity as Secretary of the Army, and WILLIAM H. GRAHAM, JR., in his official capacity as Chief of Engineers and Commanding General of the U.S. Army Corps of Engineers,

Defendants.

Case No. 6:26-cv-00956-MC

**DECLARATION OF SCOTT AMERMAN IN SUPPORT OF MARION COUNTY'S MOTION FOR PRELIMINARY INJUNCTION**

I, Scott Amerman, under penalty of perjury declare that the following is true and based upon my personal knowledge or as indicated:

1. I am over the age of 18. I make the statement below freely and not for compensation.

2. This Declaration is offered for purposes of the lawsuit filed by Marion County,

Oregon against the Defendants listed above.

3. Detroit Lake was created by the Detroit dam, implemented by the Army Corps of Engineers. Detroit Lake is part of the North Santiam River, both of which are in Marion County, Oregon.

4. I live in Monmouth, Oregon, in Polk County, where I was born, raised, and attended college. I have lived here full time for the last 22 years. I have been a Fishing Guide for 37 years. My dad was a fishing guide before me, and I grew up on the rivers of Oregon since the age of 5.

5. In my capacity as a Fishing Guide, I have fished and guided clients in rivers and lakes around Oregon, and in particular, at Detroit Lake and in the North Santiam River. I am very familiar with the fish species found in these bodies of water.

6. I am on the Board of Directors for the Oregon Anglers Association. I have been a board member for this Association since 2022. I am also a founding member, and have served on the Board of Directors of the Siletz Anglers Association for eight years. I presented my concerns about the deep drawdown at Detroit Lake and my desire to provide written input about the same to these Associations, and I have the full support of both organizations to do so. I have presented my concerns and questions, along with supporting information to executive staff at the Oregon Department of Fish and Wildlife (ODFW), and to NOAA. I routinely monitor, and am familiar with ODFW data; specifically, how it pertains to fish populations and efforts to track and ultimately protect designated species.

7. I am passionate about protecting fish.

8. In short, I have not seen evidence that the planned annual deep drawdowns will benefit the protected species. Observations and prior experience, evidenced by ODFW data,


Marion County Legal Counsel
555 Court Street NE · P.O. Box 14500 · Salem, OR 97309
Telephone: 503-588-5220

indicate it will actually harm those and other fish.

9. There are several areas of concern about the draining of Detroit Lake planned by the Army Corps that I can speak to, set out below.

10. Fish counts occur at the Willamette Falls in Oregon City. This is because fish must pass through these falls when they are migrating downstream, out to the ocean, or returning upstream to their home stream. Fish use a complex Willamette Falls Fishway system consisting of three individual fish ladders that help them move past natural barriers and the power infrastructure. The modern ladder was completed in 1971 and designed to handle large runs of migrating fish. Fish species that are tracked at this ladder include summer and winter steelhead, spring and fall Chinook salmon, and Coho salmon. The counting station is maintained by ODFW, and tracks fish via video camera 24 hours each day, every day. Information about the species, size and origin are kept as part of the fish count data.

11. The Army Corps executed drawdowns in 2023 on the South Santiam river. They deeply drained the Green Peter reservoir, and held out that that this would save wild spring Chinook smolts and help more wild spring Chinook return to the river. I developed this understanding of their explanation and purpose of the drawdown based on their information, statements, and actions. However, the drawdown did not have the effect of increasing returns to the Santiam River. I have seen no evidence that these actions did, or will, help this fish population.

12. Prior to the Gren Peter drawdowns, 10 years of historical data collected by ODFW shows that the wild spring Chinook salmon population was between 17.5% and 30% of the total Chinook population annually. In 2023, the wild spring Chinook comprised 30% of the Chinook population. In 2024, this figure was 22.5%; and in 2025, it fell to 17.8% Then in 2026 we had


Marion County Legal Counsel
555 Court Street NE · P.O. Box 14500 · Salem, OR 97309
Telephone: 503-588-5220

the first returns of adult wild spring Chinook from the drawdown at a rate of 10%, which is a historic low. Similarly, the wild Chinook returning to the hatchery downstream of the Foster Dam were at an all-time low of 4.5% in 2026. It normally takes 3-5 years before salmon return from the ocean, so we are only now seeing the true results of the drawdowns several years ago. This data demonstrates that the drawdown at the Green Peter and Foster reservoirs not only did not help the protected fish population, but hurt it.

13. After the Foster dam drawdown, presumably due to significantly increased turbidity, reflected in the photo below, ODFW moved a portion of their Foster dam facility. The photo below accurately depicts my observations and experience with the Santiam River in November 2023, related to the Green Peter drawdown.




Santiam River Confluence during the 2023 deep drawdown of Green Peter Dam.

The fish could not survive the turbidity that had resulted. We can see the data for spring Chinook above, but we cannot yet monitor the wild Coho population, the wild winter Steelhead or wild Trout population. However, my knowledge and many years of experience tell me that if the hatchery fish had to be moved out of the South Santiam to survive, then the wild spring


Marion County Legal Counsel
555 Court Street NE · P.O. Box 14500 · Salem, OR 97309
Telephone: 503-588-5220

Chinook, wild Coho, wild winter Steelhead and wild Trout population all faced a significant impact as well.

14. There is no indication that all, nor even the most significant, of the environmental impacts affecting fish related to the planned drawdown have been fully studied and evaluated. The fishing community has worked for years to rebuild wild winter Steelhead populations on the North Santiam and mainstem on the Santiam. The planned deep drawdown is likely to deposit silt on their spawning beds. This is critical because the silt fills in around gravel in the spawning beds, which blocks the flow of fresh water. The fish eggs are starved of oxygen, and developing embryos suffocate. For older fish, their gills are similarly impacted. Overall, the stilt – related to high turbidity – threatens their ability to survive. The same is true of the spring Chinook that spawn in the north Santiam.

15. The North Santiam and mainstem have one of the highest and most thriving Trout populations in the state of Oregon. Running all of the anticipated sediment down through the water where they live, feed and breed will be devastating. This turbidity will almost certainly lead to high numbers of fish death for both ESA-listed fish and non-listed fish alike.

16. All of the above wild fish populations rely on healthy aquatic insect life, of which the Santiam systems offer. This is a delicate ecosystem that supports all of the fish populations in addition to the health of the river's ecosystem in and of itself. The biggest danger to this ecosystem is water quality and sedimentation. This is another area that appears not to have been properly evaluated and considered.

17. In 2023 approximately 65,000 wild Coho returned to the Willamette River above Oregon City falls. This was the largest return on record. That year, the Army Corps did a drawdown at the Green Peter Dam, making the entire south Santiam river, mainstem and the


Marion County Legal Counsel
555 Court Street NE · P.O. Box 14500 · Salem, OR 97309
Telephone: 503-588-5220

Willamette below the mainstem unfishable - meaning we had record returns but couldn't fish on them.

18. Based on my extensive experience with fish and the Santiam river system, if a 2026 deep drawdown proceeds as planned, it will almost certainly cause irreparable harm to native species of fish in the Santiam River and Detroit Lake.

**I hereby declare under penalty of perjury that the foregoing is true and correct.**

Dated this 10th day of August 2026.

*/S/* Scott Amerman
Scott Amerman, Board of Directors for Oregon Anglers Alliance, Longtime Fishing Guide in Marion County, Oregon
Marion County, Oregon


Marion County Legal Counsel
555 Court Street NE · P.O. Box 14500 · Salem, OR 97309
Telephone: 503-588-5220

DAVID E. FILIPPI, OSB No. 965095
david.filippi@stoel.com
SAMANTHA K. SONDAG, OSB No. 154244
samantha.sondag@stoel.com
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 3000
Portland, OR 97205
Telephone: 503.224.3380
Facsimile: 503.220.2480

*Attorneys for Intervenor-Plaintiff Santiam Water Control District*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

MARION COUNTY, a Political Subdivision of the State of Oregon,

Plaintiff,

v.

U.S. ARMY CORPS OF ENGINEERS, DANIEL P. DRISCOLL, in his official capacity as Secretary of the Army, and WILLIAM H. GRAHAM, JR., in his official capacity as Chief of Engineers and Commanding General of the U.S. Army Corps of Engineers,

Defendants.

---

CITY OF SALEM, an Oregon Municipal Corporation,

Plaintiff,

v.

UNITED STATES OF AMERICA, and, UNITED STATES ARMY CORPS OF ENIGNEERS, an agency of the United States government,

Defendants.

---

Case No.: 6:26-cv-00956-MTK (Lead Case)
6:26-cv-01381-MTK (Trailing Case)

**DECLARATION OF BRENT STEVENSON IN SUPPORT OF SANTIAM WATER CONTROL DISTRICT'S MOTION TO INTERVENE**

**DECLARATION OF BRENT STEVENSON**

I, Brent Stevenson, declare the following:

1. I am the Manager of the Santiam Water Control District ("District"). I am over the age of eighteen and competent to testify in this matter. I submit this Declaration in support of the District's Motion for Intervention in the above-captioned case. I make this Declaration based on personal knowledge, District records, and information reported to me by District personnel in the regular course of the District's activities.

2. The District is a water control district that was formed in 1954 under Chapter 553 of the Oregon Revised Statutes. It is the largest diverter from the Willamette Valley System ("WVS") and operates and maintains a system of water control works that extend a total of 114 miles between Stayton and Salem.

3. Within the Willamette Basin, the District facilitates draining and flood control as well as the delivery of water for irrigation and domestic purposes. It also conveys water to hydroelectric plants and to the critical habitat of listed species. The District relies on both stored water and live flow water to fulfill its obligations.

4. The District holds over 197 cubic feet per second ("cfs") of consumptive and 947 cfs of non-consumptive surface water rights with priority dates spanning from 1866 to 1987.

5. The District delivers irrigation water to farmers, ranchers, and nursery growers on over 17,000 acres of agricultural land. This land is responsible for growing vegetables, hay, grain, grass, alfalfa, row crops, nursey crops, and raising livestock such as cattle and sheep.

6. In delivering irrigation water, the District relies, in part, on contracts for stored water rights with the Bureau of Reclamation ("Reclamation"). Under these contracts,

Reclamation is required to supply the District with stored water used for irrigation on nearly 1,000 acres of land. The District's Reclamation contracts are attached as **Exhibits 1** and **2**.

7. In the event of insufficient stored water supply, the District's ability to meet its delivery obligations for irrigation water is at risk.

8. The Oregon Department of Environmental Quality ("DEQ") considers the District to be a Designated Management Agency ("DMA"). The District has implemented strategies to manage mercury levels by reducing the amount of sediment discharged from District facilities into downstream waterbodies.

9. The District contracts with the City of Stayton to deliver live flow water to Stayton's domestic drinking water plant and with the City of Salem to deliver water for municipal purposes.

10. The District's ability to convey water to downstream channels will be hindered if the District is required to modify or close its systems as a result of increased turbidity.

11. Turbidity impacts the District's fish screens and fish barrier structure, which are located on the District's water conveyance systems. As sedimentation increases, it builds up along the fish screens and fish barrier structure, requiring excavation to ensure continued function.

12. Attached hereto as **Exhibit 3** is a true and correct copy of the District's comments on the draft Environmental Impact Statement ("EIS"), submitted on February 23, 2023. Attached hereto as **Exhibit 4** is a true and correct copy of the District's comments on the draft Supplemental Environmental Impact Statement ("SEIS"), submitted on January 13, 2026.

**I hereby declare that the above statement is true to the best of my knowledge and belief, and that I understand it is made for use as evidence in court and is subject to penalty for perjury.**

DATED: August 13, 2026

Brent Stevenson
Manager of the Santiam Water Control District

US Army Corps of Engineers®
Portland District

# WILLAMETTE VALLEY SYSTEM OPERATIONS AND MAINTENANCE

# FINAL SUPPLEMENTAL ENVIRONMENTAL IMPACT STATEMENT

**May 2026**

**Table 3-42. Summary of Effects to Public Health and Safety from Effects to Drinking Water[1] (continued).**

| Effect Category | No-action Alternative | Alternative 4 | Alternative 5 | Alternative 6 | Interim Operations |
|---|---|---|---|---|---|
| **Water Quality[2]** | **Turbidity –**<br>Adverse, but benefits from sediment trapped at all reservoirs during high-flow events.<br>Minor, short-term, adverse below Fall Creek Reservoir.<br>**Harmful Algal Blooms –**<br>Slightly adverse. | **Turbidity –**<br>Same as No-action Alternative.<br>**Harmful Algal Blooms –**<br>Slightly more adverse. | **Turbidity –**<br>Same as No-action Alternative but substantially more adverse below Foster and Cougar Reservoirs.<br>**Harmful Algal Blooms –**<br>Slightly more adverse.<br>Moderately more adverse in Foster and Cougar Reservoirs. | **Turbidity –**<br>Same as No-action Alternative but substantially more adverse below Foster and Cougar Reservoirs.<br>**Harmful Algal Blooms –**<br>Slightly more adverse.<br>Moderately more adverse in Foster and Cougar Reservoirs. | **Turbidity –**<br>Same as No-action Alternative but substantially more adverse below Green Peter, Foster, and Detroit reservoirs.<br>**Harmful Algal Blooms –**<br>Slightly more adverse.<br>Moderately more adverse in Green Peter, Foster, and Detroit reservoirs. |
| **Water Supply** | **Groundwater –**<br>No effect.<br>**Stored Water –**<br>Substantial beneficial.<br>**River Flow –**<br>Beneficial but not all uses satisfied in all years. | **Groundwater –**<br>Same as No-action Alternative.<br>**Stored Water –**<br>Same as No-action Alternative.<br>**River Flow –**<br>Same as No-action Alternative. | **Groundwater –**<br>Same as No-action Alternative.<br>**Stored Water –**<br>Slightly less beneficial than under the No-action Alternative.<br>**River Flow –**<br>Same as No-action Alternative. | **Groundwater –**<br>Same as No-action Alternative.<br>**Stored Water –**<br>Slightly less beneficial than under the No-action Alternative.<br>**River Flow –**<br>Same as No-action Alternative. | **Groundwater –**<br>Same as No-action Alternative.<br>**Stored Water –**<br>Slightly less beneficial than under the No-action Alternative.<br>**River Flow –**<br>Same as No-action Alternative. |

Table 3.19-2 in the FEIS

[1] All effects would be long term, occurring or reoccurring over the 30-year implementation timeframe.

[2] Effects to water quality in this section refer to the quality of the raw water itself, not the finished drinking water. Adverse effects from increased turbidity may affect the drinking water facility, but the quality of the finished drinking water is outside the scope of the USACE.

The Interim Operations are a set of operations for downstream fish passage and temperature management that would be implemented until the long-term measure for fish passage or temperature management is being used. These operations would result in decreased system-wide stored water in the conservation pool.

The timing and duration of Interim Operations would vary by alternative. Interim Operations could extend to nearly the 30-year implementation timeframe under Alternatives 2A, 2B, 4, 5, and 6. However, under Alternative 3A and Alternative 3B Interim Operations may not be fully implemented because long-term operational strategies for these alternatives are intended to be implemented immediately upon the Record of Decision.

Interim Operations are not an alternative (Chapter 2, Alternatives, Section 2.8.6, Interim Operations). Interim Operations analyses did not consider the impacts of Alternatives 2A, 2B, 3A, 3B, 4, 5, and 6 because Interim Operations would be implemented before, and not in addition to, an action alternative.

#### 3.19.4.1 Turbidity

Interim Operations would increase sediment and turbidity levels downstream of Lookout Point, Dexter, Green Peter, Foster, Detroit, and Big Cliff Reservoirs because of deeper drawdowns of the large reservoirs. Deep drawdowns increase the potential for bank erosion and sloughing as compared to NAA operations. While some fine-grained sediment that enters Dexter, Foster, and Big Cliff Reservoirs may partially settle, most fine-grained sediment would pass through these reservoirs and be transported downstream, likely resulting in increased turbidity downstream during deeper drawdowns compared to NAA operations.

The deep drawdown operation at Lookout Point and Green Peter reservoirs in 2023 and 2024 was required by the injunction (Section 1.12.3). In 2023 USACE drafted Green Peter reservoir 140 feet lower than the winter minimum pool elevation, causing turbidity levels that exceeded the design capabilities of some downstream drinking water facilities, resulting in unplanned maintenance and repairs to the equipment and additional staffing levels. USACE subsequently developed and implemented a Deep Drawdown Emergency Response and Communications Plan that outlines coordination protocols with downstream drinking water facilities and operations staff. Bi-annual status reports finalized in February of 2024 and 2025 summarized effects to downstream turbidity from the drawdowns (USACE 2024c; USACE 2025). Turbidity levels downstream from Lookout Point Dam in 2024 were much less than in 2023. As noted in the USACE February 2025 Bi-Annual Status Report, while turbidity downstream of Green Peter Dam was less than during the 2023 operation, the elevated turbidity was still a concern for downstream drinking water facilities and the public downstream of Green Peter and Foster dams (USACE 2025). Using the Deep Drawdown Emergency Response and Communications Plan, USACE coordinated closely with downstream utilities and suspended the 2024 operation early. In 2025, USACE delayed the deep drawdown operation further into the fall to minimize impacts to downstream river temperature and turbidity levels. This delay, combined with dry weather, resulted in significantly reduced sediment mobilization and subsequent turbidity downstream during the 2025 operation.

The deeper drawdown at Detroit Dam has not started yet. USACE expects the drawdown to mobilize sediment, increasing turbidity levels downstream of Detroit and Big Cliff dams, but to a lesser extent than in Green Peter Reservoir. The drawdown of Detroit reservoir will expose a significantly smaller area of sediment and retain a larger residual pool relative to the Green Peter drawdown operation (Figure 3-33), estimated to result in less turbidity in the North Santiam River. Additionally, USACE is proposing to draw down the reservoir to the target elevation over several falls/winters, minimizing how much new sediment is exposed each year. The larger residual pool is expected to act as a sediment sink more than the Green Peter residual pool, though fine clay material eroded from exposed sediment is likely to stay in suspension and pass downstream of Detroit dam.




| Project | Area Exposed Sediment |
|---|---|
| Detroit | 0.8 $mi^2$ |
| Green Peter | 4.5 $mi^2$ |

| Project | Change in Sediment Transport Potential |
|---|---|
| Detroit | 44% |
| Green Peter | 314% |

**Figure 3-33. Green Peter (bottom) and Detroit (top) Exposed Areas between the Normal Minimum Conservation Pool and the Deep Drawdown Elevations.**

See Appendix C for more information on this figure.

Increased turbidity would result in adverse effects to drinking water facilities that use water from the North Santiam River below Detroit and Big Cliff reservoirs. Adverse effects could include increased maintenance of filters and increased staffing of the drinking water facility.

While USACE expects the Detroit drawdown to result in much lower levels of turbidity than on the South Santiam during the Green Peter drawdown in 2023 and 2024, the cities of Salem and Stayton both identified that moderate levels of sustained increased turbidity levels will threaten the operation of the slow sand filtration (SSF) systems at their drinking water treatment facilities on the North Santiam and near Geren Island. These concerns were also raised by other communities in the North Santiam Canyon. The City of Stayton identified that SSF systems are much more sensitive to turbidity and fine sediment than treatment facilities systems on the South Santiam River. Recent studies by the City of Salem concluded that the treatment system could "handle turbidity of up to 50 NTU for up to 13 days before running into operational issues." The significant rain event in February of 1996 caused turbidity to spike to over 100 NTU in the North Santiam River. The City of Salem took their system offline from the river for eight days and issued water alerts restricting use. While the City of Salem can handle the system offline for some extended period, the City of Stayton's backup supply has less capacity and could fail to deliver finished drinking water in a much shorter timeframe.

The City of Salem indicated the expected particle size of the increased turbidity levels from the drawdown is also of concern for slow sand filtration systems as these very small particle size materials can pass through the system and into finished drinking water, potentially exceeding finished drinking water quality standards established by the State of Oregon and Environmental Protection Agency (EPA). Annual drawdowns resulting in elevated turbidity levels may accelerate the need for routine minor replacement of some of the sand layers. In a worst-case scenario elevated turbidity could require replacement of the entire amount of sand making up the SSF system early. These processes are usually planned for approximately every 10 years. The City of Stayton and others identified an indirect adverse effect to wastewater facilities if potable water supplies are shut off. These facilities include the wastewater facilities for both the cities of Stayton and Sublimity, the operation of which are linked to the operation of the City of Stayton drinking water facility.

USACE would use real time monitoring and the Deep Drawdown Emergency Response and Communications Plan for Detroit Reservoir deep drawdown operations to ensure strong communications with the State and cities of Salem, Stayton, and Gates's drinking water facilities during the drawdown of Detroit Reservoir to minimize impacts. A sediment transport modeling team would continue developing tools to inform adaptive management of future drawdown operations.

#### 3.19.4.2 Harmful Algal Blooms

Under Interim Operations, effects to water quality from harmful algal blooms would be moderately adverse compared to the slightly adverse conditions described under the NAA during the 30-year implementation timeframe. Interim Operations would increase sediment

US Army Corps
of Engineers®
Portland District

SYSTEM OPERATIONS AND MAINTENANCE
Willamette Valley
ENVIRONMENTAL IMPACT STATEMENT

# WILLAMETTE VALLEY SYSTEM OPERATIONS AND MAINTENANCE

## APPENDIX W: FINAL SUPPLEMENTAL ENVIRONMENTAL IMPACT STATEMENT PUBLIC COMMENTS AND RESPONSES

| Commenter Name | Commenter Affiliation | Comment | USACE Response |
|---|---|---|---|
| David Neal | Linn Soil and Water Conservation District | We thank you for the opportunity to comment on the Supplemental Environmental Impact Statement for the Willamette Valley System, particularly as it relates to Detroit Dam in Marion County and Foster and Green Peter Dams in Linn County.<br><br>Linn Soil & Water Conservation District is very concerned about water quality and water quantity.<br><br>By its rapid drawdown from the rule curve of Green Peter in July of 2023, the decision negatively affected water quality with increased turbidity, increased Total Suspended Solids (TSS), increased erosion and sedimentation. As the reservoir pool decreased, additional cutting of the waterways above increased erosion. The rapid drawdown did not allow enough time for vegetation to grow on the steep banks to aid in filtration of eroded soils.<br><br>Reduced pool volume concentrated any pollutants contained in the reservoir. The South Santiam Subbasin has stream segments listed under section 303 (d) of the federal Clean Water Act.<br><br>Water supply is identified by the USACE as a reservoir benefit. The drawdowns will negatively affect water quantity available for irrigation, fish and wildlife, and hydropower production.<br><br>Moving forward, the region needs more water storage capacity and more electrical production; not less.<br><br>We appreciate your consideration of our concerns regarding water quality and water quantity as you determine your best option. | USACE designed the proposed drawdown of Detroit Reservoir to minimize turbidity levels in the North Santiam downstream of Detroit and Big Cliff dams. Previous drawdowns at Cougar, Green Peter, Lookout Point, and Fall Creek dams released varying amounts of sediment eroded from cutting a new channel and newly exposed reservoir beds. The Green Peter drawdown mobilized the most sediment and exposed a lot of sediment from highly erodible mudflats.<br><br>USACE assessed elevation of the drawdown and the sediment data patterns from past drawdowns and determined a step-down approach would slow the amount of mobilized sediment and expose less surface area each year, reducing the amount of sediment that could erode and pass downstream of the Detroit and Big Cliff dams. USACE developed an Emergency Response and Communications Plan for other drawdowns and would coordinate with North Santiam communities to update the plan to include Detroit Reservoir. This effort is separate from the SEIS. USACE would use real-time hydrology and turbidity data each year to modify the operation to improve conditions for fish and reduce adverse impacts that may occur.<br><br>Figure 3-1 in Section 3.2.2.3 shows potential effects to reservoir refill from the late fall/early winter drawdown at Detroit. This figure shows model results and does not show how real-time water management can minimize negative effects to reservoir elevations. The drawdown would occur during the late fall and early winter, when the reservoir is at the minimum conservation pool elevation. The drawdown operation would end about one month before the normal refill season. The drawdown is not expected to impact refill of the reservoir, except during very dry years as the WVS reservoirs depend on late winter and spring rainfall to refill. |
| Julia Hajduk | City of Stayton | The City of Stayton submits the following comments on the U.S. Army Corps of Engineers' November 2025 Draft Supplemental Environmental Impact Statement ("Draft SEIS") for the operation and maintenance of the Willamette Valley System. The City draws its water from the North Santiam River, downstream of Detroit Reservoir. While the Draft SEIS recognizes adverse impacts to downstream water systems and water quality from a drawdown of the reservoir, it does so generically and vaguely, without any indication that the Corps understands the significant impacts to the City's water treatment systems and ability to provide water to residents and for critical City functions. As a result, the Draft SEIS also fails to identify any mitigation for this effect. The Draft SEIS thus does nothing to reassure the City and its residents that the Corps not only understands that the drawdown of the Detroit Reservoir could destroy millions of dollars of City infrastructure and prevent the delivery of any water for personal and municipal uses but intends to ensure that, if the drawdown goes forward, the Corps will ensure that the effects are mitigated. | USACE designed the proposed drawdown of Detroit Reservoir to minimize turbidity levels in the North Santiam downstream of Detroit and Big Cliff dams. Previous drawdowns at Cougar, Green Peter, Lookout Point, and Fall Creek dams released varying amounts of sediment eroded from cutting a new channel and newly exposed reservoir beds. The Green Peter drawdown mobilized the most sediment and exposed a lot of sediment from highly erodible mudflats.<br><br>USACE assessed elevation of the drawdown and the sediment data patterns from past drawdowns and determined a step-down approach would slow the amount of mobilized sediment and expose less surface area each year, reducing the amount of sediment that could erode and pass downstream of the Detroit and Big Cliff dams. USACE developed an Emergency Response and Communications Plan for other drawdowns and would coordinate with North Santiam communities to update the plan to include Detroit Reservoir. This effort is separate from the SEIS. USACE would use real-time hydrology and turbidity data each year to modify the operation to improve conditions for fish and reduce adverse impacts that may occur. |

| Commenter Name | Commenter Affiliation | Comment | USACE Response |
|---|---|---|---|
| Julia Hajduk | City of Stayton | I. The Draft SEIS Does Not Sufficiently Identify Effects of the Detroit Reservoir Drawdown on City of Stayton Infrastructure & Water Use.<br>The Draft SEIS generically acknowledges that an effect of the proposed interim operations, including the late fall/early winter deep drawdown at Detroit Reservoir, will be to mobilize fine sediments and result in increased downstream turbidity, with associated effects to water quality and water treatment facilities. However, the Draft SEIS lacks the type of detailed evaluation of this effect that is required and that would allow the Corps to undertake a complete mitigation analysis. For example, the Draft SEIS identifies only increased maintenance and staffing of water treatment facilities and potential, unstated effects on water quality (e.g. at 170, 211 ). This reflects a lack of understanding that the type of municipal water treatment systems downstream of the Detroit Reservoir differ from those on the South Santiam in meaningful ways that will result in a significant and direct adverse effect on those systems and the communities they supply. While the Draft SEIS references filtration broadly, it does not mention or evaluate the effect of a drawdown on the use of slow sand filtration (SSF) systems by multiple municipal water purveyors on the North Santiam River. SSF systems differ materially from rapid rate filtration, membrane treatment, or chemically assisted filtration processes (types used by South Santiam municipalities) in both design intent and operational resilience. As a result, generalized treatment references in the Draft SEIS do not adequately or accurately address how the sediment characteristics anticipated under the proposed action would affect SSF systems. | Previous drawdowns at Cougar, Green Peter, Lookout Point, and Fall Creek dams released varying amounts of sediment eroded from cutting a new channel and newly exposed reservoir beds. USACE assessed the sediment data patterns from past drawdowns and determined a step-down approach would expose less surface area each year, reducing the amount of sediment that could erode and pass downstream of the Detroit and Big Cliff dams. USACE would use real-time hydrology and turbidity data each year to modify, pause or cease the operation to improve conditions for fish and reduce adverse impacts that may occur. Mitigating impacts are not a statutory requirement of NEPA. USACE shaped the Detroit drawdown operation to mitigate adverse effects by minimizing impacts to water quality, drinking water facilities, and recreation including sport fisheries. It then analyzed the effect of the operation on each of the resource categories identified in Chapter 3.<br><br>USACE updated Section 3.19 of the SEIS to expound upon the on effects to the North Santiam drinking water facilities from the drawdown. |

| | | | |
|---|---|---|---|
| Julia Hajduk | City of Stayton | A. SSF Systems are Inherently Vulnerable to Very Fine Suspended Sediments and Elevated Turb<br>SSF systems vulnerability to fine suspended sediments is especially acute when those particles are dominated by silts, clays, colloids, organic fines, or algae. This vulnerability is a direct consequence of how slow sand filters function and where their treatment effectiveness is concentrated. The primary treatment mechanism of a slow sand filter occurs at the surface biological layer (schmutzdecke) and within the upper½ inch of the sand bed. Under normal operating conditions, this biologically active layer effectively removes pathogens and low concentrations of particulate matter through a combination of physical straining, adsorption, and biological degradation. However, when raw water contains sustained or episodic high turbidity, especially when dominated by very fine particles, those particles rapidly accumulate at the filter surface for turbidities greater than 10 NTU. ***1*** This leads to premature clogging, a sharp increase in<br>, reduced hydraulic capacity, and shortened filter run times.<br>Very fine sediments are particularly problematic because they:<br>• Penetrate and compact the sand,<br>• Are poorly removed by simple sedimentation or hydraulic buffering upstream,• Can smother or disrupt the schm<br>, reducing biological treatment effectiveness,<br>• Are slow to clear once loading subsides, even after turbidity levels return to baseline.As turbidity increases, slow sand filters experience a non-linear loss of performance, where small increases in fine sediment loading can result in disproportionate reductions in filter run time and treated water output. This condition often necessitates frequent scraping or removal of the top sand layer, accelerating media loss, increasing labor demands, and reducing overall system reliability. Once a slow sand filter is cleaned by scraping and the schmutzdecke is removed, the filter temporarily loses its primary fine-particle retention and biological treatment barrier. During this post-cleaning period, particularly if raw water turbidity remains elevated or is dominated by very fine sediments, fine particles penetrate deeper into the sand bed rather than being intercepted at the surface. This deep bed penetration results in the progressive accumulation of fines within the interstitial pore spaces of the sand matrix, leading to internal clogging that is not readily reversible through surface scraping alone. Therefore, subsequent filter runs become progressively shorter, development accelerates, and cleaning frequency increases - creating a compounding cycle of reduced performance and increased maintenance demand. Repeated cleaning under these conditions also leads to:<br>• Accelerated loss of filter media due to frequent removal of the upper sand layers,• Reduction in effective bed depth and treatment capacity,<br>• Increased risk of fines breakthrough during the filter ripening period before the schmutzdecke is fully<br>,<br>• Elevated potential for turbidity spikes or particulate passage into finished water, particularly during start-up following maintenance.Over time, the combination of deep bed fouling, media loss, and shortened ripening periods can compromise both the hydraulic and treatment integrity of the filter, ultimately necessitating partial or full media replacement. These impacts are especially pronounced under conditions of recurring fine sediment loading, such as those associated with reservoir drawdowns,<br>watershed disturbance, or prolonged elevated turbidity events. Accordingly, SSF systems exposed to fine sediment dominated turbidity face a cumulative degradation of | Thank you for your comments. Section 3.19 of the SEIS was updated to expand on effects to the North Santiam drinking water facilities. |

| | | | |
|---|---|---|---|
| | | performance, rather than isolated operational challenges, reinforcing the need for effective pretreatment, conservative operational thresholds, and alternative treatment or supply strategies during high-risk raw water conditions. SSF systems are therefore best suited to consistently low-turbidity source waters with limited fine sediment variability. They are not resilient to highly variable or storm-driven turbidity events, nor to conditions involving reservoir drawdowns, watershed disturbances, or algal and organic fines. Without adequate upstream pretreatment such as roughing-filters, bank filtration, off-stream storage, or advanced pretreatment processes, SSF systems face a heightened risk of operational failure during fine sediment loading events.<br>In summary, SSF systems are operationally fragile when exposed to very fine sediments and elevated turbidity, making source-water protection, pretreatment, and conservative operational thresholds critical to maintaining compliance and system reliability. Recent operability testing and system evaluations conducted by the City of Salem to evaluate the effect of higher turbidity on its slow sand filters indicate that sustained finesediment-dominated and high turbidity conditions comparable to those anticipated during deep drawdown operations would rapidly compromise the operability of direct online SSF systems. Such conditions are expected to result in accelerated surface clogging, deep bed penetration of fine materials following cleaning, shortened filter run times, loss of effective biological treatment capacity, and heightened risk of particulate breakthrough during filter ripening. These outcomes would likely render continuous operation of SSF systems unsustainable over a very short operational period without alternative supply activation or substantial pretreatment. Unlike the City of Salem, which utilizes some pre-treatment that may reduce turbidity or the percentage of finer sediment particles, the City of Stayton utilizes a direct online SSF system. Direct online SSF systems receive "raw" water directly from the running river. Thus, Stayton's water treatment infrastructure is at even greater risk of turbidity related impacts from the Detroit Reservoir drawdown than the City of Salem. The impacts described herein do not constitute a mere issue of temporary exceedance of drinking water quality standards or treatability. Rather, the projected fine sediment-dominated turbidity conditions associated with the Detroit Reservoir drawdown present a material risk of physical and functional destruction of critical drinking water treatment infrastructure. ***2*** Under sustained or recurring fine sediment loading, SSF systems are subject to irreversible or near-irreversible operational failure mechanisms, including deep bed fouling, accelerated and umecoverable media loss, collapse of biological treatment function, and structural degradation of the filter bed. These impacts are not correctable through standard operational adjustments or short-term compliance measures and extend beyond the scope of conventional drinking water standards enforcement or treatment optimization. As a result, the foreseeable consequence of the Detroit Reservoir drawdown is not merely degraded water quality or the need for increased staffing or maintenance, but the inability of affected municipal water systems to operate at all, leading to a cessation of potable water production. This would directly impair the provision of water for essential municipal purposes, including residential supply, fire protection, public health and sanitation, and other critical community functions. Once such infrastructure failure occurs, service cannot be restored without substantial reconstruction, extended outages, and reliance on alternative water supplies. Accordingly, this effect must also be evaluated as an infrastructure impairment and service continuity risk, rather than only a drinking water standards or maintenance cost issue. Failure to do so will result in understatement of the severity of reasonably foreseeable effect, mischaracterize the nature of the harm, and preclude informed decision-making regarding avoidance, | |

| Commenter Name | Commenter Affiliation | Comment | USACE Response |
|---|---|---|---|
| | | minimization, and compensation measures necessary to protect public health and essential municipal services.<br>**1** *The Corps typically refers to FTU, Formazin Turbidity Units, while modern water treatment relies on NTU (Nephelometric Turbidity Units). FTU is a legacy turbidity unit derived from non-standardized nephelometric measurements, whereas NTU is the current standardized and regulatory unit; such values should not be assumed to be directly interchangeable, and when evaluating turbidity for the purpose of effects on treatment systems, the Corps should utilize NTU consistently.*<br>**2** *This contrasts with the types of water treatment systems used by municipalities on the South Santiam River, which while degraded in effectiveness and life span during the 2023 and 2024 Green Peter drawdown, were not functionally destroyed.* | |

| | | | |
|---|---|---|---|
| Julia Hajduk | City of Stayton | B. Necessary Revisions to the Draft SEIS to Fully Analyze Impacts<br>The FEIS and Draft SIES do not sufficiently identify and analyze impacts to communities and infrastructure anticipated to result from the Detroit Reservoir drawdown. Considering the high risk that the proposed interim operations will cause physical and functional destruction of the City of Stayton's drinking water treatment infrastructure, rather than merely temporary drinking water standards exceedances, the City respectfully requests that the Final SEIS include the following analysis to ensure full understanding, informed decision making, and protection of essential municipal services.<br>a. Explicit Identification of Vulnerable Treatment Infrastructure<br>The Final SEIS should explicitly identify the presence of SSF municipal drinking water treatment systems and, more explicitly, direct online SSF systems, downstream of Detroit Dam and acknowledge that these systems are inherently vulnerable to fine sediment-dominated and sustained high turbidity conditions to a degree not experienced by other types of treatments systems, including those on the South Santiam River.<br>b. Treatment- and Infrastructure-Specific Impact Analysis<br>The Final SEIS should evaluate treatment-process-level impacts, not solely source-water quality changes, including:<br>o Deep-bed penetration of fine sediments following filter cleaning,<br>o Accelerated and unrecoverable filter media loss,<br>o Collapse of biological treatment function,<br>o Compounding maintenance and cleaning requirements,<br>o Risk of particulate and turbidity breakthrough during filter ripening, and<br>o The potential for complete loss of treatment operability over even short drawdown periods.<br>The Draft SEIS recognizes that there will be a "moderate increase in sediment and turbidity levels downstream of Detroit Reservoir." (ES-9). However, nothing in the draft indicates the meaning of moderate in this context or The Final SEIS cannot reasonably compare alternatives without a clear recognition and understanding of the vulnerabilities of water treatment systems downstream of Detroit Reservoir. The Final SEIS should explicitly assess the risk that the proposed drawdown of the Detroit reservoir would result in physical impairment or destruction of the City's treatment infrastructure, leading to the cessation of potable water production, rather than only temporary noncompliance with drinking water standards. This assessment should address impacts to:<br>o Residential water supply,<br>o Fire protection and emergency response,<br>o Public health and sanitation,<br>o Other essential municipal and community functions.<br>c. Cumulative and Recurrent Impacts Analysis<br>Because the Detroit Reservoir drawdown is an action planned to be repeated at least annually, the Final SEIS should analyze the cumulative effects of recurring or multi-year drawdown-related turbidity events on SSF systems, including progressive degradation, loss of remaining useful life, and the increasing likelihood of permanent infrastructure failure over the interim operations period. This analysis is particularly important given that, even after a significant 2023 drawdown that caused massive turbidity increases in the South Santiam River, during the 2024 drawdown, the City of Sweet Home again experienced such significant turbidity that its drinking water treatment system struggled, and a state of emergency was declared. The Corps' use of adaptive management to mitigate effects of the drawdown by immediately ceasing the interim operation to prevent further harm to the | Based on the detailed information provided by commentors, USACE updated Section 3.19 to clarify and disclose impacts unique to the North Santiam facilities, including SSF systems. The SEIS analyzes turbidity impacts, which are the direct effect of USACE operations, as well as how USACE will utilize operate to mitigate those specific impacts to downstream users by taking a measured approach to minimize and avoid certain impacts. The measured approach includes using a stepwise approach to lower the reservoir to a deeper elevation each year. By only lowering the reservoir by a small amount each year instead of the full 55 feet in one year there will be less sediment mobilized. Additionally, USACE will use its operational discretion and real time information to change, pause or cease the operation based on acceptable levels of turbidity to be determined with the downstream water purveyors and the State of Oregon's Department of Environmental Quality and Oregon Health Authority in an Emergency Response and Communications Plan. These minimization measures were developed utilizing the data collected from the Fall Creek, Cougar, Green Peter, and Lookout Point fish passage drawdowns and the previous operations at Detroit Reservoir as well as modeling data. However, the exact amount of turbidity in any given year cannot be accurately predicted due to all of the natural and extraneous factors that go into managing a reservoir system and how real time operations are then used to reduce those impacts. Therefore, USACE used high quality information and its professional judgement as well as comments to understand of the impacts to downstream users.<br><br>Figure 3-1 in Section 3.2.2.3 shows potential effects to reservoir refill from the late fall/early winter drawdown at Detroit. This figure shows model results and does not show how real-time water management can minimize negative effects to reservoir elevations. The drawdown would occur during the late fall and early winter, when the reservoir is at the minimum conservation pool elevation. The drawdown operation would end about one month before the normal refill season. The drawdown is not expected to impact refill of the reservoir, except during very dry years as the WVS reservoirs depend on late winter and spring rainfall to refill. The SEIS also includes a a discussion of socioeconomic impacts.<br><br>The cumulative impacts analysis required under NEPA is bound by reasonably foreseeable effects to USACE's actions like turbidity and water supply, as well as effects to downstream communities including impacts to drinking water facilities and wildfire. The drawdown at Detroit in 2025 was to minimum conservation pool which is the same elevation that USACE targets every year. |

| Commenter Name | Commenter Affiliation | Comment | USACE Response |
|---|---|---|---|
| | | City of Sweet Home is laudable. However, considering that experience, it is concerning that the SEIS does not fully evaluate the effects of a 2025 Detroit Reservoir drawdown on downstream municipal water systems, and in particular SSF systems which are much more sensitive to turbidity and fines than those on the South Santiam. | |
| Julia Hajduk | City of Stayton | II. The Draft SEIS Fails to Identify Mitigation Measures for Water Treatment & Infrastructure Impacts.<br>If the Corps determines that the proposed action will occur despite the high risk of major impacts to the City of Stayton, the Corps must identify and describe options for avoiding and minimizing the impacts in the Final SEIS. Given the significance of the risk, the Corps also should identify compensatory mitigation options to be implemented either as alternatives to avoidance and minimization, or because of effects on City infrastructure despite efforts to avoid and minimize them.<br>While the Draft SEIS indicates that an "Emergency Response and Communications Plan" will be utilized, it does not identify what that plan will cover, how and when it will be developed, and whether stakeholders, including the City of Stayton, will provide input on its development. ***3*** The mere indication that an undefined "plan" will be used by the Corp does not satisfy the requirement to identify mitigation options.***4***<br>***3*** *To the extent such a plan already exists for the Detroit Drawdown, the City has not found it in the FEIS, Draft SEIS, ROD or on the Corps' website.*<br>***4*** *The Corps' April 2025 Final Environmental Impact Statement for the Willamette Valley System Operations and Maintenance barely acknowledge impacts to community water systems and does not even mention mitigation for such impacts, much less an emergency communication plan, despite being published after the adverse effects of the 2023 and 2024 Green Peter Reservoir drawdowns were known.* | Previous drawdowns at Cougar, Green Peter, Lookout Point, and Fall Creek dams released varying amounts of sediment eroded from cutting a new channel and newly exposed reservoir beds. USACE assessed the sediment data patterns from past drawdowns and determined a step-down approach would expose less surface area each year, reducing the amount of sediment that could erode and pass downstream of the Detroit and Big Cliff dams. USACE would use real-time hydrology and turbidity data each year to modify, pause or cease the operation to improve conditions for fish and reduce adverse impacts that may occur. Mitigating impacts are not a statutory requirement of NEPA nor does it give USACE the authority to mitigate for impacts. USACE shaped the Detroit drawdown operation to mitigate adverse effects by minimizing impacts to water quality, drinking water facilities, and recreation including sport fisheries. It then analyzed the effect of the operation on each of the resource categories identified in Chapter 3.<br><br>USACE updated Section 3.19 of the SEIS to expound upon the on effects to the North Santiam drinking water facilities from the drawdown.<br><br>Emergency Response and Communications Plan for other drawdowns and would be updated to include how and when to coordinate with North Santiam communities, specifically the drinking water facilities. The plan would be updated with key metrics to determine how to safely perform the drawdowns in coordination with state experts. This effort is separate from the SEIS. |

| Commenter Name | Commenter Affiliation | Comment | USACE Response |
|---|---|---|---|
| Julia Hajduk | City of Stayton | A. Avoidance and Minimization Measures<br>Avoidance and minimization options necessary to prevent infrastructure damage should include, but are not limited to the following practices and limitations:<br>i. Turbidity Monitoring - Location and Particle Size<br>The location at which turbidity is monitored during a drawdown of the Detroit reservoir is critical to the meaningful protection of downstream drinking water treatment infrastructure. The draft SEIS identified the turbidity monitoring location as Niagara, i.e. after release of water from the Detroit dam. Turbidity monitoring conducted at Niagara or below spillway and outlet releases is inherently insufficient for operational decision making because it detects sediment conditions after fine materials have already been entrained, mixed, and irreversibly released downstream. Fine sediment-dominated turbidity, particularly silts, clays, colloidal particles, and organic fines, behaves fundamentally differently from coarser suspended material. These fine particles remain in suspension for extended periods, are not effectively attenuated once mobilized, and can penetrate deep into SSF beds once introduced into downstream treatment systems. Detection of elevated turbidity at a post-spillway or downstream monitoring location therefore occurs too late to prevent infrastructure damage or operational failure, as the sediment pulse has already entered the river system and is no longer controllable. To be operationally meaningful, turbidity monitoring must be conducted in-pool and upstream of release structures, where sediment mobilization can be detected prior to discharge and where adaptive management actions-such as modifying drawdown rates, suspending the drawdown, or activating alternative operations-remain feasible. In pool monitoring provides early indication of fine sediment entrainment, including the mobilization of legacy sediments exposed during drawdown, which are most likely to produce the fine particle size fractions that pose the greatest risk to SSF systems. Reliance on post-spillway turbidity monitoring conflates impact confirmation with impact prevention and fails to account for the time lag between sediment mobilization, downstream transport, and treatment system exposure. Because SSF systems are vulnerable to rapid and irreversible degradation once fine sediment enters the treatment process, monitoring that occurs after release does not provide a practicable opportunity to avoid infrastructure damage or service interruption. The Final SEIS 's identification of mitigation options must acknowledge that monitoring limited to post-spillway or downstream locations is insufficient for infrastructure protection and shall not be relied upon as the sole basis for operational decision making. Accordingly, to satisfy NEPA's requirement for meaningful impact disclosure and mitigation, turbidity monitoring associated with interim operations must be relocated or supplemented with in-pool, upstream monitoring points specifically designed to detect fine sediment mobilization before discharge. Without such monitoring, the proposed operations lack an effective mechanism to prevent foreseeable infrastructure destruction and cessation of drinking water service in the City of Stayton. | USACE will monitor turbidity in-reservoir in addition to downstream locations before, during, and after the drawdown to inform its real time operations. USACE has been speaking with the affected communities about monitoring outside of the NEPA process. |

| Commenter Name | Commenter Affiliation | Comment | USACE Response |
|---|---|---|---|
| Julia Hajduk | City of Stayton | ii. Adaptive Management and Triggered Operational Responses<br>The Final FEIS should articulate the components of an adaptive management plan aimed at avoiding and minimizing any effects on the City's infrastructure and ability to provide water for standard uses. Adaptive management for mitigation must include metrics and actions tied to the operational parameters and real-time status of the City's SSF system, and not solely to river turbidity monitoring results. Any adaptive management plan must include the following:<br>• Monitoring metrics specific to treatment operability (not solely river turbidity),<br>• Clear, enforceable operational triggers tied to infrastructure protection, and<br>• Defined response actions when operability thresholds are approached or exceeded.<br>Specific tools for this purpose should include:<br>• Operational turbidity and fine sediment thresholds identified in advance of each drawdown that, if reached, preclude the drawdown, require that the drawdown depth be limited, or trigger immediate halting of the drawdown,<br>• Modified drawdown timing, rate, or sequencing to limit sediment mobilization,<br>• Sediment management or pretreatment requirements upstream of City water intake, and<br>• Temporary and potentially permanent suspension of the drawdown during highrisk conditions, including when turbidity levels in the North Santiam River are higher than typical due to storms or other causes. Implementation of an adaptive management plan with these tools will require continuous direct communication and coordination between the Corps and the City of Stayton during any drawdown, and the Final SEIS should identify the importance of such communication to success of the adaptive management tools. | USACE developed an Emergency Response and Communications Plan for other drawdowns and would coordinate with North Santiam communities to update the plan to include Detroit Reservoir. The plan identifies key metrics determine how to safely perform the drawdowns in coordination with state experts and local communities. This effort is separate from the SEIS. |
| Julia Hajduk | City of Stayton | iii. Determine Depth of Each Incremental Drawdown Annually Based on Monitoring of Conditions<br>The City appreciates that the Corps has recognized that the lack of an incremental approach to drawdowns of the Green Peter Reservoir led to major impacts on the water treatment systems of South Santiam municipalities and that a different approach is warranted for the Detroit Reservoir drawdowns on the North Santiam. However, given that the 2024 drawdown of the Green Peter Reservoir quickly resulted in emergency shutdown conditions for the City of Sweet Home despite the major flushing of accumulated sediment that had occurred during the 2023 drawdown, a rigid and pre-determined drawdown increases the likelihood that the impacts to the City's water treatment system described above will occur. Instead, the depth of the drawdown should be determined prior to commencement of each drawdown based on annual monitoring of the pool depth, turbidity, and depth and location of newly deposited sediments. | USACE would use real-time hydrology and turbidity data each year to modify, pause or cease the operation to improve conditions for fish and reduce adverse impacts that may occur. Specifically, the Detroit deep drawdown would step-down 55 feet over several years to reach the target elevation of 1395 feet. The first year USACE would target 1425 feet, which is 25 feet lower than most years but is an elevation previously reached. Then based on the levels of turbidity the targeted elevation would go deeper each year until reaching 1395 feet (SEIS Section 2.8.6). |

| Commenter Name | Commenter Affiliation | Comment | USACE Response |
|---|---|---|---|
| Julia Hajduk | City of Stayton | B. Compensatory Mitigation<br>The most reliable option for avoiding the effect identified above also provides the most certainty: compensatory mitigation. The Final SEIS must identify compensatory measures sufficient to preserve drinking water and municipal water services continuity. Several compensatory measures obviate the need for any avoidance and minimization measures, because they all allow the City to cease water intake from the North Santiam River at the inception of a drawdown. Other compensatory measures ensure that City residences and businesses, and critical City functions, always have water available and allow repair and replacement of the SSF system. Compensatory mitigation measures considered in the Final SEIS should include at least:<br>• Guaranteed pre-drawdown access to alternative water supplies ( e.g., interties to non-affected systems, off-channel storage, ASR),<br>• Funding or implementation support for construction of pretreatment systems or existing systems' hardening,<br>• Infrastructure replacement or rehabilitation provisions where damage is unavoidable,<br>• Emergency response planning and cost recovery mechanisms.<br>To the extent compensatory mitigation is required, the Corps should delay implementation of the Detroit Reservoir drawdown to 2028 because every option to protect the City of Stayton's municipal water system takes significant time to implement. ***5***<br>***5*** *The Corps FEIS and draft SEIS do not mention socioeconomic impacts. Without compensatory mitigation, the damage to the City's SSF system will cause significant indirect socioeconomic impacts. The median income of the City of Stayton residents is approximately $72,000, significantly limiting the ability of the City and its residents to bear the costs associated with damage to its infrastructure or to independently fund provision of clean drinking water during any shutdown of its system. A failure of the potable water system would have immediate and severe consequences, potentially affect more than 10,000 residents and force the shutdown of businesses across Stayton and Sublimity (Sublimity's wastewater is disposed of through Stayton's wastewater system, which would fail to be operational without a potable water supply). Additionally, critical public safety, healthcare, and other essential facilities would be unable to operate, creating significant risks to public health, safety, and economic stability.* | USACE would use real-time hydrology and turbidity data each year to modify, pause or cease the operation to improve conditions for fish and reduce adverse impacts that may occur. Mitigating impacts are not a statutory requirement of NEPA nor does it give USACE the authority to mitigate for impacts. USACE shaped the Detroit drawdown operation to mitigate adverse effects by minimizing impacts to water quality, drinking water facilities, and recreation including sport fisheries.<br><br>USACE updated Section 3.19.4.1 to identify adverse effects to the cities of Sublimity and Stayton wastewater facilities. Section 3.11 of the SEIS analyze socioeconomic effects. |

| Commenter Name | Commenter Affiliation | Comment | USACE Response |
|---|---|---|---|
| Julia Hajduk | City of Stayton | C. The Corps Should Refrain from Issuance of the Final SEIS and Postpone Detroit Reservoir Drawdowns Until Sediment and Turbidity Are Better Understood.<br>The Draft SEIS notes that the Corps is engaging a sediment transport modeling team to develop tools to inform adaptive management. This modeling will shed light on the magnitude of the initial, cumulative and recurrent effects on municipal water treatment systems that will be caused by the turbidity that will accompany planned annual repetition of the Detroit Reservoir drawdown. Effective adaptive management is critical to prevent loss of use and destruction of treatment infrastructure. In addition, pursuant to the Water Resources Development Act of 2024, by January 2025, the Corps is expected to complete a report on the turbidity in the Willamette Valley System resulting from recent drawdowns. Given that the report will include analyses of lessons learned, changes in operations based on those lessons, and opportunities to minimize monetary strains on non-federal entities due to drawdown-related turbidity, the City of Stayton and other affected municipalities should be able to review and consider that report as it is highly relevant to the subject matter of these comments. Thus, finalization of the SEIS and any drawdown of the Detroit Reservoir should be postponed, allowing completion of modeling and the turbidity report, review of results of both by affected parties, and submission of comments on the SEIS considering that information. | This report was not completed prior to finalizing the SEIS; however, the underlying data was used to inform the water quality analysis in Chapter 3. USACE also updated the Final SEIS to more clearly highlight impacts to drinking water facilities in the North Santiam Canyon. |
| Julia Hajduk | City of Stayton | The City of Stayton appreciates the Corps' attention to this issue of critical importance to the City, its residents and businesses. Clear identification of the effects of the Detroit Reservoir Drawdown on City infrastructure not only are necessary to identify mitigation options but also to allow the Corps and City to work together to ensure that mitigation is sufficient and workable well in advance of the commencement of a drawdown. | Thank you for your comments. They will be taken under consideration. |
| Thomas Rumreich | Oregon Angler Alliance (OAA) | I'm the executive director of the Oregon Angler Alliance (OAA). We are a group of dedicated Oregonians who promote fish for fisheries because of the benefit to communities and the substantial economic impact that fishing creates. Fishing in Oregon is $1.5 billion a year industry.<br>On behalf of the OAA, I would like to go on record opposing the plan to draw down Detroit Reservoir to protect Endangered Species Act (ESA) salmonids that pass through the reservoir. That statement may not seem congruent to our mission, but after closely examining the North Santiam River and the invaluable role that Detroit Reservoir plays in the health of that waterway you can understand our position. The North Santiam is certainly one of the most productive stream ecosystems in Western Oregon. Surveys of the macroinvertebrates and the abundance of naturally produced rainbow trout (Oncorhynchus mykiss) are just two indications of a productive stream. The credit to the productive nature of this stream is attributed to Detroit Dam and the management of the summertime water releases. These releases sufficiently augment stream flow - but also substantially keep the temperatures cool enough to promote a myriad of aquatic organisms that provide forage for hundreds of species of animals. Simply put, more water translates to more habitat and more aquatic organisms. Colder water is critical to the proliferation of many native species in Oregon. | Thank you for your comments. They will be taken under consideration. |

| Commenter Name | Commenter Affiliation | Comment | USACE Response |
|---|---|---|---|
| Christopher Lish | Independent Citizen | Exploring these alternatives is essential for meeting Endangered Species Act obligations and reducing the long-term need for expensive and ineffective fish-collection facilities.<br>The SEIS should evaluate all reasonable actions that could help restore native fish populations—not just those that fit within traditional operational constraints. A broader range of alternatives will give the public, the resource agencies, and Tribal governments a clearer sense of what dam operations could look like if fish recovery were the central goal.<br>“The ultimate test of a moral society is the kind of world that it leaves to its children.”<br>-- Dietrich Bonhoeffer<br>Thank you for considering these comments. I urge the Corps to produce a Final SEIS that fully explores the options needed to recover wild salmon and steelhead while moving toward a more resilient and ecologically healthy Willamette River Basin. | A reasonable range of nine alternatives were analyzed in the SEIS. The alternatives included many operations that would not fit within the traditional operational constraints in Alternatives 2B, 5, 6 and especially 3A and 3B. The operations did not perform as well as structural passage in facilitating downstream passage for juvenile listed species. They also had adverse impacts to water quality and water supply. |
| Jason Pulley | City of Salem | This letter and the attached memorandum provide comments from the City of Salem (City) to the US Army Corps of Engineers (USA CE) regarding the Supplemental Environmental Impact Statement (SEIS) the USACE is preparing. The SEIS addresses two issues: (1) a permanent end to hydropower production at Willamette Valley Dams, as directed by the Water Resources Development Act of 2024, and (2) a deep drawdown of Detroit Reservoir, as published in the Biological Opinion (BiOp) issued in December 2024 by the National Marine Fisheries Services (NMFS). The City's comments are specific to a deep drawdown in which the level of Detroit Reservoir is dropped to a historically low elevation of 1,395 feet in the fall/winter in a single, continuous operation to facilitate the out-migration of threatened fish species. To begin, the City firmly supports the efforts of USACE, NMFS, and others that improve passage through Detroit Dam for spring Chinook and winter steelhead, both of which are listed as threatened under the Endangered Species Act (ESA). The City also recognizes and respects the historic, cultural, and spiritual interests these species represent to the tribal nations. However, the City cannot support a deep drawdown conducted as proposed in the BiOp because it will cause excessively high levels of turbidity in the North Santiam River which will put at risk the City's drinking water system. The attachment provides additional details and considerations to the City's comments below. | Thank you for your comments.  They will be taken under consideration. |

| Commenter Name | Commenter Affiliation | Comment | USACE Response |
|---|---|---|---|
| Jason Pulley | City of Salem | 1. As proposed, the deep drawdown puts in danger public health, public safety, and the regional economy because of the risks it places on the City's drinking water system.<br>The City is the only regional water provider in the Mid-Willamette Valley and is responsible for supplying safe and reliable drinking water to approximately 200,000 individuals and thousands of customers that include hospitals, schools, businesses, industries, irrigators, multifamily housing units, and single-family homes. The City's water service area includes the City of Salem, the City of Turner, four water districts, and portions of unincorporated Marion and Polk counties. In addition, the City must provide water in sufficient quantities for firefighting and other emergency needs. Moreover, the City is the only emergency source of drinking water to the City of Stayton and the City of Keizer should either, or both, municipalities suffer impairment to their drinking water system. There is little question that the deep drawdown will elevate turbidity levels in the North Santiam River. The City's operational procedure in the event of high turbidity involves filling the slow sandfilters to their maximum capacity and then closing the intake gates. With the gates shut, the filters can operate for no more than three days before being shut down because of low water levels. Historically, high turbidity events that triggered this procedure lasted less than three days. However, if high turbidity levels persist and the gates remain shut, the City must rely on remaining volumes in our reservoirs, several groundwater wells, the aquifer storage and recovery system, and an intertie with the City of Keizer. We estimate that these alternative water sources can marginally meet the projected water demand during the timeframe of the proposed drawdown. However - and this is a significant consideration - under this mode of operation there is no redundancy in the system. Should a critical component of one or more of these alternative sources fail, our ability to supply water will fall below the demand and our customers would be faced with untenable and unsustainable risks to life, property, and livelihood. The City is conducting research to determine the limitations and feasibility of keeping the intake gates open to allow high-turbidity surface water into the slow sand filtration system. Bench-scale testing is being carried out to evaluate the relationship between intake turbidity and filter performance. The results will help inform decision making on how best to manage high-turbidity events triggered by the drawdown. Our research is continuing but based on the preliminary results, at a turbidity level of 50 Nephelometric Turbidity Units ("NTU") we expect complete loss of filter performance within one week to ten days. If turbidity exceeds 50 NTU, in which is likely based on other drawdown operations conducted by the USACE, we expect our filter performance will degrade within days. Restoring a filter to full operational status may require months to drain the water, remove the clogged layer of sand, replace the bed with new sand if necessary, and restore the biological layer in the rebuilt filter bed. In addition, rehabilitating filters lost to sustained turbidity as a result of the drawdown operation is a laborious effort and has the real possibility of reducing the City's ability to meet peak summer demands as the filters remain offline for the duration of the work. | The SEIS was updated to identify the potential impacts to the City of Salem facility (Section 3.19.4.1 Turbidity).<br><br>The SEIS analyzed impacts water supply and turbidity. Figure 3-1 in Section 3.2.2.3 shows potential effects to reservoir refill from the late fall/early winter drawdown at Detroit based on model results. The impact is low because the drawdown would occur during the late fall and early winter during the season with the largest amount of precipitation. The drawdown operation would end about one month before the normal refill season would begin, meaning that USACE will have an entire month to regain the 55ft in elevation which can happen as quickly as in a few days. The drawdown is not expected to impact refill of the reservoir, except during very dry years as the WVS reservoirs depend on late winter and spring rainfall to refill. The model results in the SEIS also do not reflect how real-time water management can help to minimize impacts to reservoir elevations.<br><br>USACE updated Section 3.19 of the SEIS to expound upon the on effects to the North Santiam drinking water facilities from the drawdown. USACE designed the proposed drawdown of Detroit Reservoir to minimize turbidity levels in the North Santiam downstream of Detroit and Big Cliff dams. Previous drawdowns at Cougar, Green Peter, Lookout Point, and Fall Creek dams released varying amounts of sediment eroded from newly exposed reservoir beds. USACE assessed the sediment data patterns from past drawdowns and determined a step-down approach would expose less surface area each year, reducing the amount of sediment that could erode and pass downstream of the Detroit and Big Cliff dams. USACE would use real-time hydrology and turbidity data each year to modify, pause or cease the operation to improve conditions for fish and reduce adverse impacts that may occur. |

| Commenter Name | Commenter Affiliation | Comment | USACE Response |
|---|---|---|---|
| Jason Pulley | City of Salem | 2. As proposed, the deep drawdown will result in violations of federal law. The National Environmental Policy Act (NEPA) requires the lead agency, in this instance NMFS, to rigorously evaluate reasonable alternatives. However, the BiOp does not thoroughly analyze alternatives other than the drawdown. Further, the BiOp does not thoroughly consider the degree to which the degradation of water quality would impact users, including our water customers, or how the drawdown might impact other aquatic species in the basin. The failure to more fully consider these impacts is notable given that the USACE and NMFS are aware that the elevated turbidity will have dramatic and adverse impacts on the City's drinking water infrastructure. The Clean Water Act (CWA) addresses, among many other things, contaminants in water resources. Causing high levels of turbidity is a clear violation of the CWA. Typical turbidity levels at the City's intake from the North Santiam River are well below 10 NTU. The anticipated turbidity during the drawdown is expected to be well in excess of 100 NTU. In the EPA-approved Oregon Water Quality Standards "turbidity" is defined as "pollution" and the standard in ORS 340-041-0036 states, in part: Turbidity (Nephelometric Turbidity Units, NTU): No more than a ten percent cumulative increase in natural stream turbidities may be allowed, as measured relative to a control point immediately upstream of the turbidity causing activity. City's water treatment system, and generally impair the City's ability to provide safe drinking water, any one of which could constitute a violation of the SWDA. | USACE cannot speak for NMFS or what it considered in preparing the BiOp. The SEIS analyzes numerous operations at various locations throughout the WVS in alternatives 2A,2B,3A, 3B, 5, and 6, with alternatives 3A and 3B focusing on operational passaged. The SEIS assessed the water quality impacts of the operations in these alternatives.<br><br>USACE designed the proposed drawdown of Detroit Reservoir to minimize turbidity levels in the North Santiam downstream of Detroit and Big Cliff dams. Previous drawdowns at Cougar, Green Peter, Lookout Point, and Fall Creek dams released varying amounts of sediment eroded from cutting a new channel and newly exposed reservoir beds. USACE assessed the elevation of the drawdown and the sediment data patterns from past drawdowns and determined a step-down approach would slow the amount of mobilized sediment and expose less surface area each year, reducing the amount of sediment that could erode and pass downstream of the Detroit and Big Cliff dams. USACE would use real-time hydrology and turbidity data each year to modify, pause or cease the operation to improve conditions for fish and reduce adverse impacts that may occur.<br>USACE developed an Emergency Response and Communications Plan for other drawdowns and would coordinate with North Santiam communities to update the plan to include Detroit Reservoir. This effort is separate from the SEIS. |
| Jason Pulley | City of Salem | Given the many considerations, the City recommends the SEIS incorporate, at minimum, the following:<br>1. Developing a stepwise approach to the annual drawdown. It is imperative to avoid a scenario in which the elevation of Detroit Reservoir is continuously and without pause dropped to the target level of 1,395 feet regardless of downstream water quality, regardless of impacts to aquatic species, and regardless of the attendant harm to the City's drinking water system. A stepwise drawdown conducted in successive years, coupled with turbidity triggers (see below) would help fill many critical information gaps. These include: (1) How fast and how high will turbidity levels rise during the drawdown? (2) How quickly will turbidity levels drop once drawdown operations cease? (3) How long will it take before turbidity levels sufficiently decrease for the City to resume drawing water from the river? | USACE assessed the elevation of the drawdown and the sediment data patterns from past drawdowns and determined a step-down approach would slow the amount of mobilized sediment and expose less surface area each year, reducing the amount of sediment that could erode and pass downstream of the Detroit and Big Cliff dams. USACE would use real-time hydrology and turbidity data each year to modify, pause or cease the operation to improve conditions for fish and reduce adverse impacts that may occur. Turbidity has reduced varying amounts each subsequent year when a drawdown to the same elevation occurs until it reaches a new equilibrium. The amount is dependent on several factors like sediment type, remaining pool size, and precipitation.<br>USACE developed an Emergency Response and Communications Plan and would coordinate with North Santiam communities to include them in this plan. This effort is separate from the SEIS process. |
| Jason Pulley | City of Salem | 2. Establishing turbidity levels that trigger a clear and decisive response. The purpose of this recommendation is to balance the USACE's need to perform a deep drawdown with the impacts and duration of those impacts on the City's water system. Turbidity triggers could provide a degree of certainty and significantly enhance the City's ability to develop contingency and recovery plans. One approach to developing turbidity triggers' would be to establish a specific turbidity at which the USACE would cease drawdown operations, commence refilling the reservoir, and conduct no further deep drawdowns until the following year or complete recovery of the City's water treatment system, whichever is later. This recommendation comes with a commitment by the City to work with the USACE and to share information, data, and research results (see above) to help develop turbidity triggers that reflect current scientific research and sound engineering practices. | USACE developed an Emergency Response and Communications Plan and would coordinate with North Santiam communities to include them in this plan. This effort is separate from the SEIS process. USACE would use real-time hydrology and turbidity data to modify the operation to improve conditions for fish and reduce adverse impacts. |

| Commenter Name | Commenter Affiliation | Comment | USACE Response |
|---|---|---|---|
| Jason Pulley | City of Salem | 3. Evaluating the merits of delaying implementation. The SEIS should evaluate potential environmental impacts if the deep drawdown is delayed for one, two, or three years hence. Doing so would provide the City additional time to identify locations, obtain funding, and construct enough wells with sufficient yield to provide resiliency and mitigate risks to life, property, and livelihood. | The Detroit drawdown is included in the 2024 *Endangered Species Act Section 7(a)(2) Biological Opinion and Magnuson-Stevens Fishery Conservation and Management Act Essential Fish Habitat Response for the Continued Operation and Maintenance of the Willamette Valley System* under the authority provided to the National Marine Fisheries Service by the Endangered Species Act. The USACE requested to delay the drawdown in 2025 until it could conduct the necessary NEPA analysis on the drawdown. The NEPA process and public input has shaped the drawdown operation in a way that will minimize downstream impacts. The Biological Opinion requires the deeper drawdown of Detroit Reservoir every fall/winter until a different fish passage solution is in place. |
| Jason Pulley | City of Salem | 4. Creating a long-term strategy. The BiOp requires development of an Adaptive Management Plan that includes "decision criteria" that guide strategies (see Section 2.5.10 of the Bi Op). At issue is the City's need for the USACE to incorporate decision criteria that can be modified over time based on new information, changes in conditions, and lessons learned. More specifically, decision criteria should consider changes in risks and consequences from year to year. To illustrate, consider two scenarios. (1) The City's risk assessment is based, in part, on historic water demand. If the City adds a new industrial customer with a high, year-round water demand, the risks/consequences assessment will be altered. (2) The City's water system relies on a wide range of factors and components to deliver safe drinking water to our customers. If, prior to commencing a deep drawdown, one or more of our critical components has failed, decision criteria should be in place that delays or cancels the deep drawdown. Further, the BiOp instructs the USACE and NMFS to coordinate a review of the 2017 engineering design report for Detroit Dam downstream fish passage via a floating screen structure, to be initiated in early 2026 (see RPA 4.13 .5). The Action Agencies will complete construction of structural fish passage facilities by December 2033. By March 2034, the Action Agencies will begin operating downstream fish passage facilities at Detroit that enable collection of steelhead and Chinook salmon from above Detroit, with volitional passage of transport to habitat downstream of Big Cliff Dam. The City is adamant that the USACE adhere to these timelines to ensure a long-term plan is enacted for downstream passage that does not present an annual threat to the City's drinking water supply. | USACE developed an Emergency Response and Communications Plan that will detail how considerations like those listed in the comment will be considered during implementation if the operation is selected. USACE and the State of Oregon would coordinate each year with North Santiam communities. This effort would be separate from the SEIS process. USACE would use real-time hydrology and turbidity data to modify the operation to improve conditions for fish and reduce adverse impact..<br><br>The implementation timeline in the Biological Opinion is different from the analysis in the EIS because the EIS was focused on comparing the effects of the different long-term measures and their tradeoffs. To do this an assumption for the timing of implementation was made across all the alternatives. The ESA consultation process which is informed by the SEIS is a separate analysis with separate legal standards and compliance requirements so no changes to the document are required based on this comment. |

| Commenter Name | Commenter Affiliation | Comment | USACE Response |
|---|---|---|---|
| Jason Pulley | City of Salem | In summary, and for the reasons stated, the City has no choice but to stand in opposition to the deep draw down of Detroit Reservoir as proposed in the BiOp unless the heightened risks and substantial consequences of failure can be mitigated. Our position on this matter is regrettable given our longstanding support for the endeavors of the USACE and others, including our own work, to protect endangered species. However, we must give equally significant consideration to the health, life, safety, and livelihood of our customers and our region. Simply put, the risks to the City's water supply created by the deep drawdown are too high and consequences of failure are too staggering to accept. Regardless of our current opposition, the City commits to working with the USACE and others to evaluate and, ultimately, to implement measures that contribute to downstream passage of juvenile species, protect habitat and water quality, and support the many users of the North Santiam River. | Thank you for your comments. They will be taken under consideration. |
| Jason Pulley | City of Salem | On May 16, 2025 the U.S. Army Corps of Engineers ("USACE"), Portland District, published a press release seeking public comments as part of a Supplemental Environmental Impact Statement ("SEIS") focused on two new requirements related to the operations and maintenance of the Willamette Valley System ("WVS") of dams and reservoirs, including implementing a deep fall drawdown of Detroit Reservoir. This memorandum provides the City of Salem's (the "City") comments on the proposed drawdown that the City understands to refer to a proposal to draw Detroit Reservoir down to 1,395 feet in the December 26, 2024, Biological Opinion for the Continued Operation and Maintenance of the Willamette Valley System (the "BiOp") prepared by the National Marine Fisheries Service ("NMFS").<br>The City has a strong interest in this matter and intervened in prior litigation regarding potential changes to the WVS that would impact its drinking water supply. As a result of that litigation, the court specified interim measures (including draw downs) that the City found acceptable. The BiOp's proposed elevation target for the drawdown at Detroit Reservoir goes much further than those previous measures and USACE is seeking input from the public on what impacts should be investigated prior to the drawdown. | Thank you for your comments. They will be taken under consideration. |

| Commenter Name | Commenter Affiliation | Comment | USACE Response |
|---|---|---|---|
| Jason Pulley | City of Salem | At the outset, the City is emphasizing its overall support of efforts by NMFS, USACE, and others to protect and benefit listed fish species and the environment, including iconic fish species of the Pacific Northwest. The City also recognizes and supports tribal interests in those resources, including the Confederated Tribes of Grand Ronde and other tribal nations in the salmonid species, their habitat, and the environment. However, the City opposes the proposed drawdown as described in the BiOp and as scheduled because it would violate the National Environmental Policy Act ("NEPA"), the Clean Water Act ("CW A"), and the Safe Drinking Water Act ("SDWA"), and would result in unacceptable risks to the City's drinking water infrastructure. USACE's proposal is particularly troubling because other alternatives exist to benefit listed fish species that would allow USACE to comply with the Endangered Species Act ("BSA"). USACE 's drastic proposal is the result of the agency's own repeated failure to comply with the BSA for more than a decade and may jeopardize the water supply for over 200,000 Oregon residents, as well as threaten access to safe water for schools, hospitals, firefighters, and other essential services. USACE's decision to favor the drawdown as an interim measure seems to be guided by economic considerations and may pose a risk to public health for one of the most populated areas of the state. NMFS and USACE should consider alternatives to the proposed drawdown that would allow the agencies to comply with the ESA without putting the City's water supply at risk. The City strongly believes that USACE can and should find alternatives to the proposed drawdown allowing maximum benefit for listed fish species while protecting drinking water supplies for the City's residents. As part of those efforts, the City encourages the Corps to consider and study a stepped approach to the drawdown that would protect water quality in the North Santiam River. The City's comments first summarize the potential impacts of the drawdown on its water supplies, then address the lack of considerations for those impacts in the BiOp, and finally discuss the legal implications of the draw down in the context of NEPA, the CWA, and the SDWA. | The proposed Detroit Reservoir drawdown is a legal requirement under the Endangered Species Act (ESA). The National Marine Fisheries Service determined in their 2024 Biological Opinion that action is required to improve passage and access to habitat above Detroit Reservoir to avoid causing irreversible harm to threatened salmon and steelhead populations, until the long-term proposed plan for a structural downstream fish passage system at Detroit Dam is funded and completed, which would trap the juveniles and smolts and truck or bypass them below Big Cliff Dam.<br>A phased, gradual implementation of the proposed deeper drawdown of Detroit with constant water quality monitoring would reduce the risk of releasing high turbidity water downstream.<br>A late-fall drawdown schedule would also help reduce impacts on both the kokanee fishery and the peak summer recreation season, thereby reducing economic disruption. |

| Commenter Name | Commenter Affiliation | Comment | USACE Response |
|---|---|---|---|
| Jason Pulley | City of Salem | I. The Proposed Drawdown Creates an Unacceptable Risk of Public Health Emergency<br>a. Background on the City's Water Supply<br>For more than 80 years, the North Santiam River-where the Detroit Dam and Reservoir are located-has served as the primary drinking water source for the City of Salem. The City relies on the North Santiam River for water to serve over 200,000 customers and three wholesale customers: the City of Turner, Suburban East Salem Water District, and Orchard Heights Water Association. The City also provides emergency water supply connections to the Cities of Stayton and Keizer or an additional 47,000 residents. The City's drinking water treatment plant (the "Treatment Plant") is located on Geren Island in the North Santiam River, approximately 30 miles downstream from Detroit Dam. The high-water quality of the North Santiam River allows the City to use slow sand filtration as the core treatment process. Slow sand filtration is a natural filtration process, allowing naturally existing biota in the river to form a biological layer which then degrades and/or removes particulates and microbial contaminants in the water. This process uses locally sourced native materials that are reusable and recyclable, providing environmental and ecological benefits. Under normal operating conditions, the slow sand filters are operated without pretreatment. Historical operation of the Treatment Plant indicates that a raw water turbidity (the measure of water clarity or how much matter is suspended in water) of less than 10 N ephelometric Turbidity Units ("NTU") is necessary. An engineering evaluation and literature review concluded that sustained turbidity greater than 10 NTU in the feed water to a slow sand filter will lead to rapid head loss accumulation of filters, leading to excessive cleaning of filters which could become impractical for continued operation depending on filter run times. Slow sand filter subject experts have indicated the recommended sustainable feed turbidity to effectively treat water in slow sand filters is typically less than 10 NTU. These theoretical evaluations align with plant historical operating data. During normal plant operations, filter run times are typically in excess of 3 months. These long run times allow the City operational flexibility to schedule filter cleaning and maintenance activities to avoid peak demand and/or challenging water quality conditions. During normal operation, cleaning and maintenance activities generally consist of both scraping and ripening. Filter scraping is completed by draining the respective filters, scraping 1/4-inch to 1/2-inch of media off the top of the bed using machinery, then re-filling the filter. The overall scraping process normally lasts 3 to 5 days. Following scraping a filter is normally allowed to ripen before being placed into production. During the ripening period, which lasts anywhere from 1 week to 2 months, the filter develops a biologically active layer on top of the media, which is required to effectively produce potable water. | USACE updated Section 3.19 of the SEIS to expound upon the on effects to the North Santiam drinking water facilities from the drawdown. USACE designed the proposed drawdown of Detroit Reservoir to minimize turbidity levels in the North Santiam downstream of Detroit and Big Cliff dams. Previous drawdowns at Cougar, Green Peter, Lookout Point, and Fall Creek dams released varying amounts of sediment eroded from newly exposed reservoir beds. USACE assessed the sediment data patterns from past drawdowns and determined a step-down approach would expose less surface area each year, reducing the amount of sediment that could erode and pass downstream of the Detroit and Big Cliff dams. USACE would use real-time hydrology and turbidity data each year to modify, pause or cease the operation to improve conditions for fish and reduce adverse impacts that may occur. |

| Commenter Name | Commenter Affiliation | Comment | USACE Response |
|---|---|---|---|
| Jason Pulley | City of Salem | To quantify the impacts of the proposed deep draw down to the Treatment Plant, the City has developed a series of bench and pilot scale tests based on anticipated water quality conditions as observed during similar regional drawdown activities in other comparable basins. Below is a summary of the preliminary results:<br>• Pilot testing confirmed what is suggested by the literature and plant historical data - turbidities above the recommended feedwater turbidity range (<10 NTU) significantly increase filter clogging and reduce filter run durations.<br>• Pilot testing of 50 NTU feedwater with native sediments collected from Detroit Reservoir at filter loading rates required to produce 20-25 mgd from the Treatment Plant, resulted in filter run times of 11-13 days, or ~88% reduction compared to normal conditions.<br>• Pilot testing of 100 NTU feed water with surrogate sediments at filter loading rates required to produce 20-25 mgd from the Treatment Plant resulted in filter run times of 9 days, or 93% reduction compared to normal conditions.<br>• Preliminary results at higher turbidity loading verify this trend.<br>• Results from the pilot testing were obtained under controlled laboratory conditions. It is expected that actual run times will be shorter than what has been observed.<br>Sustainably producing adequate potable water at these reduced run times for an extended duration is unlikely. Significantly reduced filter run durations will lead to a significant increase in annual operating expenses while increasing the load on already heavily burdened City staff and resources. In addition to immediate increased operational costs from filter cleaning, there are longer term cost impacts associated with increased turbidity loading. Pilot results indicate the nature of solids removal during the drawdown period will require deeper sand removal from filters compared to notmal cleaning activities and will therefore increase the need for and the frequency of filter re-sanding. Re-sanding is required when sand depths in a filter reach a critical minimum value to ensure effluent water quality meets all drinking water standards and treatment goals. Supplies of additional filter sand, to replace the excessively scraped sand, are also limited and costly to procure, and adding sand to a filter is a costly ( estimated at between $2 and $3 .5 million for each filter) and time-consuming process, typically only occurring every 10 or more years during normal operation.<br>The Treatment Plant is capable of handling short-term turbidity events of a few days, which are frequently caused by unregulated flows in the fork of the river where the Treatment Plant's intake is located. In such instances, the intake to the City's Treatment Plant is shut and the City relies on limited back-up water supplies and in-town finished water storage. The City may also rely on temporary alterations of operations to mix groundwater (which itself may be impacted by surface water quality) with the river water. However, the City's back-up supplies of water are limited and still rely on treatment from the Treatment Plant. As a result, if high turbidity levels persist beyond a few days, the City's inability to normally operate its Treatment Plant for an extended period would create a significant risk to the City. | USACE updated Section 3.19 of the SEIS to expound upon the on effects to the North Santiam drinking water facilities from the drawdown. USACE designed the proposed drawdown of Detroit Reservoir to minimize turbidity levels in the North Santiam downstream of Detroit and Big Cliff dams. Previous drawdowns at Cougar, Green Peter, Lookout Point, and Fall Creek dams released varying amounts of sediment eroded from newly exposed reservoir beds. USACE assessed the sediment data patterns from past drawdowns and determined a step-down approach would expose less surface area each year, reducing the amount of sediment that could erode and pass downstream of the Detroit and Big Cliff dams. USACE would use real-time hydrology and turbidity data each year to modify, pause or cease the operation to improve conditions for fish and reduce adverse impacts that may occur. |

| Commenter Name | Commenter Affiliation | Comment | USACE Response |
|---|---|---|---|
| Jason Pulley | City of Salem | b. The Proposed Drawdown and Impacts on the Treatment Plant<br>Turbidity in the river water is a problem for the City's water supply because 1) it may force a shutdown of the Treatment Plant, and 2) the turbidity and other pollutants may be too high for the treatment process to effectively remove it to drinking water standards and regulations. The result could produce water for the City's customers that violates standards set by the SDWA. Currently, the water level in Detroit Reservoir is maintained at no lower than 1,450 feet as established by USACE. In the summer, the water level elevation is approximately 1,560 feet. Lowering the water level to 1,395 feet in the fall and/or winter, as proposed in the BiOp, is likely to result in high levels of turbidity due to both scouring of settled solids in the Reservoir and precipitation events causing significant erosion to the newly exposed shoreline. Further, lower water volume means the suspended sediment remains more concentrated in the lake. A reduced water level in the Reservoir will allow for less settling time of suspended solids entering the Reservoir. As a result, much of the sediment may flow through the dam and downstream, creating high turbidity, as shown in the case studies summarized in subsection e) below. The proposed drawdown would seriously exacerbate the problems described above, such as exposed shoreline erosion and low volume of reservoir water- creating a higher risk of excessively turbid water. Moreover, the drawdown conducted over multiple weeks creates a higher risk of sustained high-turbidity events and an unreasonable risk for the City and its ability to supply adequate potable water for its residents and customers. The impacts of drawing down the reservoir would not be limited to the fall or winter. If the reservoir is nearly empty into the spring, for example, it is unlikely to refill to the regular level of 1,560 feet during the summer, which would result in additional stress on the City's water supplies during peak demand times. As the weather gets warmer, the City's water needs more than double from approximately 25 million gallons per day to approximately 50 million gallons per day. If the Detroit Reservoir is near empty in late spring, the City would be largely reliant on natural flow levels of the river during dry months and simply may not have enough water to meet its customers' needs. The City's Treatment Plant relies on flows that pass by the facility's intake structure in the river channel on the north side of Geren Island. In order for the Treatment Plant to function properly, the water level at this point of the river must be 2.3 feet or higher, which requires flows of 700 cubic feet per second (cfs) or greater. A sustained drawdown into the spring poses the threat that flow levels in the following months will not be sufficient for the facility to operate. Also, lower water elevations in the reservoir as the weather warms are likely to lead to higher water temperatures in the North Santiam River. Any deviations from nonnal water quality parameters may impact the operations of the Treatment Plant, including but not limited to changing the filter performance and chemical dosages. Higher water temperatures may also increase the occurrence and magnitude of algal blooms in Detroit Reservoir and the North Santiam River. Algal blooms negatively impact the water treatment process (and wildlife and the environment) by (1) clogging filters and inhibiting the City's ability to meet water demand, (2) producing algal toxins, and (3) creating taste and odor issues caused by Geosmin and 2-Methylisoborneol (MIB). In summary, the proposed drawdown would be detrimental to water quality and the environment in the North Santiam River. | The SEIS analyzed impacts water supply and turbidity. Figure 3-1 in Section 3.2.2.3 shows potential effects to reservoir refill from the late fall/early winter drawdown at Detroit based on model results. The impact is low because the drawdown would occur during the late fall and early winter during the season with the largest amount of precipitation. The drawdown operation would end about one month before the normal refill season would begin, meaning that USACE will have an entire month to regain the 55ft in elevation which can happen as quickly as in a few days. The drawdown is not expected to impact refill of the reservoir, except during very dry years as the WVS reservoirs depend on late winter and spring rainfall to refill. The model results in the SEIS also do not reflect how real-time water management can help to minimize impacts to reservoir elevations but the ability to help minimize impacts in real time is described. |

| | | | |
|---|---|---|---|
| Jason Pulley | City of Salem | c. City's Alternative Water Supplies and Risk Scenarios<br>The City holds municipal water rights in the North Santiam River, and decreasing flows in the river as a result of draw downs at Detroit Lake would interfere with those rights. If the City were to obtain alternative water supplies sufficient to mitigate the potential impacts described above, the process would take years, not months. Upon the release of the BiOp, the City immediately started studying the impact of the proposed draw down on its water supply and assessed its ability to rely on alternative sources of water. While not final, the City's studies indicate that the Treatment Plant cannot sustainably accommodate the increase in turbidity that will result from the proposed drawdown. A preliminary operational impacts analysis resulted in the following findings:<br>• Sustained and peak turbidity of the North Santiam River will significantly increase because of the proposed draw down, potentially up to a sustained value of 200 NTU based on regional case studies of similar events.<br>• As a result of the proposed draw down, increased suspended solids concentrations will be deposited along the banks of the river, which may be re-suspended during future storm events, resulting in elevated turbidity into the Treatment Plant even when a deep drawdown is not actively occurring.<br>• Recent case studies show that water treatment facilities in similar basins have incurred increases in operational costs and encountered challenges meeting finished water quality goals because of increased raw water turbidity from similar draw downs.<br>• The City's Treatment Plant is not designed to sustainably treat raw water sources with sustained turbidities above 10 NTU.<br>• Excessive filter scraping will reduce the stocks of available filter sands, leading to limitations on the Treatment Plant's production capacity.<br>• Elevated raw water turbidity events may lead to permanent capacity reduction until the entire filter sand bed is replaced, extending impacts beyond the time of initial turbidity loading.<br>During the anticipated drawdown events of the Detroit Reservoir, large amounts of organic and inorganic sediment will be exposed to changes in hydraulic patterns that have not been previously experienced. This will result in water quality impacts by changing suspended solids concentrations. Based on those findings, the City has been researching alternative water supplies in preparation of a potential shutdown of the Treatment Plant caused by the Reservoir draw down. The City's water demand in the fall and winter months averages about 25 million gallons per day, with peak day demand reaching 27 to 28 million gallons per day. At full capacity, the City's existing groundwater supply system can provide up to 17 million gallons per day. The City may be able to secure up to 4.3 million gallons per day from the City of Keizer's water supply, if Keizer has excess supply available. This leaves the City short of at least 3 million gallons per day to barely accommodate its demand, assuming that the groundwater system of wells can run at full capacity for long periods of time, which is unrealistic. During pilot tests, the City of Keizer connection that would be used by the City to provide up to 4.3 million gallons per day operated at full capacity for only two days before breaking down. Even with the additional supply from the City of Keizer and potential additional wells commissioned as part of the City's existing groundwater supply, the City would be operating without any redundancy, which would constitute an unreasonable and unacceptable risk to human health. Finally, the cost of relying on the City of Keizer's system and on additional wells is estimated at an additional cost of at least $6,600 per day.<br>In summary, unless the City takes extraordinary measures to mitigate the impacts, the | USACE updated the SEIS to identify the potential impacts to the City of Salem facility (SEIS Section 3.19.4.1 Turbidity). |

| Commenter Name | Commenter Affiliation | Comment | USACE Response |
|---|---|---|---|
| | | proposed drawdown would cause irreparable harm to the City's infrastructure in such a way that could either (1) cause a shutdown of the treatment plant or (2) reduce the amount of water and water quality level to such a degree that adequate filtration of the water for health and safety may not be possible. In either scenario, the City would be unable to comply with the provisions of the SDWA and Oregon statutes adopting these standards and thus would be in breach of its duty to provide clean and safe drinking water. Additionally, the harm to the City's residents described above may harm the City's reputation and goodwill that cannot be adequately addressed by money. | |
| Jason Pulley | City of Salem | d. General Impacts of the Drawdown on Water Quality<br>High loading of fine suspended solids in water entering the Treatment Plant is a significant risk to maintaining effluent quality below limits for drinking water. States and the EPA establish effluent water quality standards. In Oregon, drinking water quality standards are established under the Oregon Drinking Water Quality Act (OAR 333 061), which includes implementation of national drinking water quality standards ( 40 CFR 141. 7 3 for turbidity requirements). To maintain public health, each contaminant has either an established maximum contaminant level (MCL) or a recommended treatment technique. For turbidity, the Treatment Plant must produce an effluent turbidity of less than 1.0 NTU 95 percent of the time and less than 5.0 NTU 100 percent of the time. Multiple literature sources indicate that colloidal clays (i.e., fine sediment type of a diameter less than 2 µm, matching the most expected suspended solids type from the Detroit Reservoir drawdown) can cause higher effluent turbidity from slow sand filters compared to larger particle sizes (AWWARF, 1991; Collins, Youngstrom, and Broder, 2012; EPA, 2024). For example, in one set of pilot slow sand filters in a Boulder, Colorado experiment, the process only removed 20 percent of raw water turbidity when feed water particles were primarily composed of colloidal clay particles. Elevated filter outlet turbidity can be correlated to decreased cyst and bacteria removal across the filters (A WW ARF, 1991). The City's Treatment Plant may not be equipped to remove the biological particles due to the elevated turbidities corresponding with lower water levels in the Reservoir. In addition to risk of passage of biological particulates through the Treatment Plant, biologicals in the filtered water would also increase due to the shorter than normal filter run times expected. Shorter run times will lead to more frequent scraping of the sand filter, which limits the biological maturity of the filters and increases the chances of biological and particulate breakthrough. Accordingly, during a deep drawdown of the Detroit Reservoir, elevated turbidity and biological contaminants in the filtered water of the Treatment Plant are at risk of not meeting MCLs. It is important to note that increased surface water turbidity could also impact groundwater quality of the City's groundwater sources, depending on the level of infiltration occurring in a specific location, which may be impacted by riverbed material, riverbed depth, and surface water quality. Finally, the proposed drawdown may impact the pH of water from the North Santiam River, which would impose a disproportionate burden on many food and beverage businesses served by the City. | USACE updated the SEIS to identify the potential impacts to the City of Salem facility (SEIS Section 3.19.4.1 Turbidity). Impacts to water quality from operations are in described in Section 3.5 of the SEIS. |

| Commenter Name | Commenter Affiliation | Comment | USACE Response |
|---|---|---|---|
| Jason Pulley | City of Salem | e. Case Studies of Deep Draw down Events<br>The impact to the City's Treatment Plant as a result of high turbidity is not just a hypothetical. Several water treatment plants designed for low turbidity raw water have been exposed to elevated raw water turbidity as a result of a deep drawdown of an upstream reservoir. These have consistently resulted in significant operational challenges, operational costs, and risks to finish water quality at the treatment plants:<br>• Deep draw downs of the Green Peter Dam have occured for the past two years on the South Santiam River, resulting in abnormally high turbidity levels in the water and leading to severe disruptions at treatment plants in Lebanon and Sweet Home. The City of Lebanon filed a claim for damages against USACE under the Federal Tort Claims Act on October 11, 2024, claiming $26 million in damages.<br>• The initial drawdown of the Cougar Reservoir, which feeds the McKenzie River, created severe operational challenges and treatment costs for the City of Eugene's Hayden Bridge Water Treatment Plant, with turbidity ranging from 50 to 200 NTU for a three-month period. Water quality was monitored during fall drawdowns of the Fall Creek Reservoir, showing recorded values of turbidity ranging from 501 to 814 Formazin Nephelometric Units (FNU). Turbidity remained elevated during the drawdown period for all years in which drawdowns were observed, with erosion and re-suspension of sediment as primary causes for the increased turbidity.<br>• With regard to the City's Treatment Plant, one noteworthy event provides valuable insight to the Treatment Plant's operations when raw water turbidity spikes in the North Santiam River. In February 1996, due to a 50+ year flood event in Northwest Oregon, the North Santiam River turbidity rose to values in excess of 100 NTU, leading to the shutdown of the Treatment Plant for eight days due to concerns of finished water quality not meeting safe drinking water standards. In response, the City issued a stage three water alert prohibiting the use of water outdoors and asking households and businesses to cut water use. Those cases suggest that the proposed drawdown is likely to result in the type of impacts to the City's Treatment Plant that could shut down the Treatment Plant and jeopardize City's customers' access to safe drinking water. | Thank you for your comments. They will be taken under consideration. |
| Jason Pulley | City of Salem | f. Summary<br>In summary, the proposed drawdown will result in elevated raw water turbidity for extended periods of time, resulting in significantly shorter filter run times at the Treatment Plant. This, in turn, is likely to produce finished water quality that does not meet all MCLs and/or result in a shutdown of the Treatment Plant. Despite its best efforts, the City may not be able to provide sufficient alternative water supplies to meet peak demand during the proposed drawdown periods and months following the proposed draw down if the Reservoir does not fill back up as needed. As a result, the proposed drawdown may result in a public health emergency by jeopardizing access to safe drinking water for hundreds of thousands of residents, and for hospitals, schools and other public services. | USACE designed the proposed drawdown of Detroit Reservoir to minimize turbidity levels in the North Santiam downstream of Detroit and Big Cliff dams. Previous drawdowns at Cougar, Green Peter, Lookout Point, and Fall Creek dams released varying amounts of sediment eroded from cutting a new channel and newly exposed reservoir beds. USACE assessed the elevation of the drawdown and the sediment data patterns from past drawdowns and determined a step-down approach would slow the amount of mobilized sediment and expose less surface area each year, reducing the amount of sediment that could erode and pass downstream of the Detroit and Big Cliff dams. USACE would use real-time hydrology and turbidity data each year to modify, pause or cease the operation to improve conditions for fish and reduce adverse impacts that may occur. USACE developed an Emergency Response and Communications Plan for other drawdowns and would coordinate with North Santiam communities to update the plan to include Detroit Reservoir. This effort is separate from the SEIS. |

| Commenter Name | Commenter Affiliation | Comment | USACE Response |
|---|---|---|---|
| Jason Pulley | City of Salem | II. USACE Did Not Properly Consider the Impacts of the Drawdown to the City's Water Supply<br>Under the ESA, lead agencies must identify reasonable and prudent alternatives to a proposed action. Those reasonable and prudent alternatives ("RP As") are those that can be implemented consistent with the scope of the agency's legal authority and jurisdiction. 50 C.F.R § 402.02. In Section 8 of the BiOp, NMFS concluded that the continued operation of the WVS would jeopardize the continued existence of Upper Willamette River ("UWR") Chinook salmon and UWR steelhead and destroy or adversely modify their designated habitat. As a result, NMFS developed an RP A that it believes would avoid jeopardizing the continued existence for those species and avoid impacts to their habitat. The RP A is in fact comprised of a number of measures related to adaptive management, flow management, water quality management, fish passage, hatchery management, and habitat improvement. In the BiOp, the proposed drawdown is part of RPA 4 addressing fish passage and more particularly RPA 4.12 addressing juvenile downstream passage in the North Santiam Basin. As part of RPA 4.12.2, the BiOp provides the following:<br>"[t]he Action Agencies will test and improve effectiveness of interim juvenile fall drawdown operations through Detroit and Big Cliff Reservoirs and Dams with the following operations in years 2025-2028, and will conduct studies to measure effectiveness, as part of the Adaptive Management process with input from the WATER<br>Technical Teams:<br>• In the fall, draw Detroit Reservoir elevation down to no more than 50 feet above upper RO for passage (1395 ft), when possible given hydrology and hydropower activity in the North Santiam and other sub basins.<br>• Design and conduct a study, or use existing data, to optimize RO gate openings at Detroit for survival and reduced harm. While also considering temperature implications downstream, as well as turbidity effects."<br>The BiOp does not provide any information regarding alternatives that were considered in place of the Detroit Reservoir draw down that could have met ESA objectives related to UWR Chinook salmon and UWR steelhead. The BiOp also does not discuss at all how the proposed drawdown would impact users in the basin, including the City. The failure to consider or discuss those impacts is even more glaring due to the fact that the USACE and NMFS know that the resulting elevated turbidity will have dramatic impacts on the City's drinking water infrastructure. In fact, after USACE implemented a similar drawdown at Green Peter Reservoir in 2023, the cities of Lebanon and Sweet Home experienced extreme operational costs, equipment damage, and were forced to implement costly pretreatment system upgrades due to elevated turbidity levels in the South Santiam River. The cities filed a tort claim against USACE to seek compensation for over $26 million in damages for Lebanon and over $11 million for Sweet Home. While NMFS and USACE have a duty to comply with the BSA, this does not necessarily translate into a duty to move forward with the Detroit Reservoir drawdown. Agencies retain considerable discretion in choosing what specific actions to take in order to implement the mandatory goal of the BSA. NFMS's failure to consider alternatives to the drawdown that would not result in a public health emergency for over 200,000 residents is arbitrary, capricious, and inconsistent with its various mandates under federal law. The City has repeatedly expressed concern about the impacts that a drawdown at Detroit Reservoir would have on its drinking water supplies and NMFS seems to have ignored those impacts altogether. | USACE cannot speak for NMFS or what it considered in preparing the BiOp. The SEIS analyzes numerous operations at various locations throughout the WVS in alternatives 2A,2B,3A, 3B, 5, and 6, with alternatives 3A and 3B focusing on operational passaged. The SEIS assessed the water quality impacts of the operations in these alternatives in Section 3.5 and 3.19.<br><br>USACE designed the proposed drawdown of Detroit Reservoir to minimize turbidity levels in the North Santiam downstream of Detroit and Big Cliff dams. Previous drawdowns at Cougar, Green Peter, Lookout Point, and Fall Creek dams released varying amounts of sediment eroded from cutting a new channel and newly exposed reservoir beds. USACE assessed the elevation of the drawdown and the sediment data patterns from past drawdowns and determined a step-down approach would slow the amount of mobilized sediment and expose less surface area each year, reducing the amount of sediment that could erode and pass downstream of the Detroit and Big Cliff dams. USACE would use real-time hydrology and turbidity data each year to modify, pause or cease the operation to improve conditions for fish and reduce adverse impacts that may occur.<br>USACE developed an Emergency Response and Communications Plan for other drawdowns and would coordinate with North Santiam communities to update the plan to include Detroit Reservoir. This effort is separate from the SEIS. |

| Commenter Name | Commenter Affiliation | Comment | USACE Response |
|---|---|---|---|
| Jason Pulley | City of Salem | III. USACE Has a Duty to Comply with All Federal Laws<br>Moving forward with the drawdown would likely violate NEPA, the CWA, and SDWA. Compliance with one statute (ESA) shall not come at the expense of another.<br>a. NEPA violation<br>The consideration of alternatives to a proposed action is the heart of the environmental impact statement. 40 C.F.R. § 1502.14. The alternatives section of an EIS should identify the reasonably foreseeable environmental effects of the proposed action. In doing so, the analysis should "sharply define the issues for the decision maker and the public and provide a clear basis for choice among options." Id. As part of its ESA duties, NMFS (the lead agency) must "[r]igorously explore and objectively evaluate reasonable alternatives to the proposed action, and, for alternatives that the agency eliminated from detailed study, briefly discuss the reasons for their elimination." 40 C.F.R. § 1502.14(a). NMFS has not addressed how the drawdown would impact water quality in the North Santiam River below Detroit dam and how the proposed action could have lasting effects on the health of the basin beyond the period of the drawdown itself. USACE and NMFS are required to consider and respond to the City's comments as part of its decision-making process and to consider alternatives to the proposed drawdown. Failure to do so would be a violation of NEPA. | The SEIS analyzes, in detail, a reasonable range of nine alternatives. Chapter 3 contains a detailed analysis of water quality impacts for all nine alternatives including the fall fish passage operation at Detroit Dam. The ESA Section 7 consultation process, which was informed by the SEIS, is separate legal process from NEPA and this SEIS prepared to comply with NEPA. No changes to the SEIS are required to address this comment. |

| Commenter Name | Commenter Affiliation | Comment | USACE Response |
|---|---|---|---|
| Jason Pulley | City of Salem | b. CWA violation<br>The goal of the CWA is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The CWA prohibits the discharge of any pollutant from a point source into navigable waters, unless the discharger possesses a valid permit authorizing the release of the particular pollutant discharged in the specific amount, or concentration, contained in the discharge. 3 3 U.S. C .A. § 1311. While courts have generally recognized that dams are not point sources and operators may not always be required to obtain a National Pollutant Discharge Elimination System (NPDES), it does not mean that USACE and NMFS have no obligation under the CW A. First, some courts have found that dam operators do not need an NPDES permit when dam operation does not involve an addition of a pollutant to navigable waters. National Wildlife Federation v. Gorsuch, 693 F.2d 156 (D.C. Cir. 1982); National Wildlife Federation v. Consumers Power Co., 862 F.2d 580 (6th Cir. 1988); accord Los Angeles Flood Control District v. Natural Resources Defense Council, 568 U.S. 78 (2013). Second, USACE has been required to obtain an NPDES permit to account for the discharge of oil, grease, and heated water for certain dams on the Columbia River. In fact, USACE seems prepared to apply for an obtain NPDES permits for certain WVS dams in 2025. Third, USACE's obligations under the CWA may be implicated in this case where USACE's actions will directly result in polluted water being discharged from Detroit Dam, including high turbidity and increased temperature. USA CE and NMFS cannot ignore the CW A goals and mandates just to comply with the ESA. Courts previously rejected an argument by USACE that it was not able to comply with Washington water quality standards because of the Endangered Species Act and stated "the Endangered Species Act and the Clean Water Act 'should be read together, so that compliance with one statute does not come at the expense of the other.'" Nat'! Wildlife Fed'n v. U.S. Army Corps of Eng'rs, 132 F.Supp. 2d 876, 891 (D. Or. 2000). USACE's own policy is to meet downstream water quality standards whenever possible: "[w]hen releases are found to be incompatible with state standards they should be studied to establish an appropriate course of action for upgrading release quality, for the opportunity to improve water quality in support of ecosystem restoration, or for otherwise meeting their potential to best serve downstream water quality needs. Any physical or operational modification to a project (for purposes other than water quality) shall not degrade water quality in the reservoir or project discharges." Nat'l Wildlife Fed'n v. U.S. Army Corps of Eng'rs, 92 F. Supp. 2d 1072, 1076 (D. Or. 2000) (quoting USACE's Digest of Water Resources Policies and Authorities, Engineering Pamphlet 1165-2-1, dated February 15, 1996). | Thank you for your comments. They will be taken under consideration. |

| Commenter Name | Commenter Affiliation | Comment | USACE Response |
|---|---|---|---|
| Jason Pulley | City of Salem | c. SDWA Violation<br>The SDWA, 42 U.S.C.A. §§ 300f et seq., establishes a federally mandated, state administered regulatory scheme for the protection of drinking water. Its general purpose is to assure that the water supply systems serving the public meet minimum national standards for protection of public health. Manufactured House. Inst. v. U.S. Env't Prat. Agency, 467 F.3d 391, 394 (4th Cir. 2006). The Act regulates contaminants in drinking water supplied by public water systems and empowers the EPA to promulgate regulations protecting the quality of drinking water sources in the United States, which regulations specify dangerous contaminants and prescribe either maximum contaminant levels or satisfactory treatment techniques. It delegated to EPA the responsibility for setting the standards for drinking water contaminants, 42 U.S.C.A. § 300g-1. Under the statute, the EPA must regulate the majority of contaminants in drinking water by formulating maximum contaminant level goals (MCLGs), representing its expert determination of "the level at which no known or anticipated adverse effects on the health of persons occur and which allows an adequate margin of safety." 42 U.S.C.A. § 300g-l(b )(4)(A). It then must set a maximum contaminant level (MCL) "as close to the [MCLG] as is feasible." 42 U.S.C.A. § 300g-l(b)(4 (B). Generally, federal agencies are subject to and comply with all federal, state, interstate, and local requirements respecting wellhead protection area, public water systems and any underground injection in the same manner and to the same extent as any person is subject to such requirements. 42 U.S.C.A. § 300j-6(a). The proposed drawdown may impact the City's surface water and groundwater sources by dramatically increasing turbidity and other pollutants in the North Santiam River. Clean drinking water is a necessity and a failure to provide it can create irreparable harm. See, e.g., Concerned Pastors for Social Action v. Khouri, 217 F. Supp. 3d 960, 972 (E.D. Mich. 2016) ("It is abundantly clear that the public relies every day on the ready availability of safe drinking water at the tap .... In modem society, when we tum on a faucet, we expect safe drinking water to flow out."). The action proposed by NMFS and the Corps would jeopardize access to clean drinking water for communities relying on the North Santiam River. USACE needs to take this into account when looking at different RPAs. | Thank you for your comments. They will be taken under consideration. |

| Commenter Name | Commenter Affiliation | Comment | USACE Response |
|---|---|---|---|
| Jason Pulley | City of Salem | IV. Conclusion<br>As proposed in the BiOp for the WVS, the drawdown of Detroit Reservoir would dramatically increase turbidity in the North Santiam River at the time of the draw down but also potentially for months afterwards. This in turn could cause permanent harm to the City's drinking water infrastructure and impact hundreds of thousands of residents and businesses who rely on that water. The drawdown as proposed would violate the CWA and the SDWA, and NMFS and USACE's lack of consideration of those impacts would also violate NEPA. The City understands USACE's obligations under the ESA and is committed to the protection of listed fish species in the WVS and would like to work with USACE to find a solution that is protective of fish and wildlife and of the City's water supplies. The City also acknowledges and recognizes the Confederated Tribes of Grand Ronde's and other tribal nations' interest in the WVS and welcomes opportunities to speak with the tribes to find a solution. More specifically, the City's preliminary engineering studies suggest that its Treatment Plant could handle a turbidity of up to 50 NTU for up to 13 days before running into operational issues. As such, the City encourages the Corps to better study a stepped approach to the drawdown that would remain below such turbidity triggers to allow the City and the Corps to respond and adapt to changing water quality conditions and ensure continued access to safe drinking water for the City's residents and businesses. | USACE updated the SEIS to identify the potential impacts to the drinking water facilities downstream of Detroit (SEIS Section 3.19.4.1 Turbidity). Impacts to water quality from operations are in described in Section 3.5 of the SEIS. Providing detailed legal positions for how USACE complied with other laws like the SDWA and CWA is not required under NEPA. USACE Chapter 7 and the Record of Decision describe USACE's compliance with applicable laws. |
| Jason Pulley | City of Salem | The purpose of this letter and its supporting attachment is to provide comments from the City of Salem (City) regarding the Willamette Valley System Operations and Maintenance Draft Supplemental Environmental Impact Statement (Draft SEIS) that was issued by the U.S. Army Corps of Engineers (USACE) in November 2025. The Draft SEIS fulfills two directives contained in the 2024 Water Resources Development Act: (1) It identifies options to permanently end federal hydropower production at eight Willamette Valley Dams; and (2) It evaluates options to comply with the Biological Opinion (BiOp) by the National Marine Fisheries Service (NMFS) regarding annual deep drawdowns of Detroit Reservoir. The City's comments are specific to the deep drawdowns, in which the level of Detroit Reservoir is proposed to be dropped to a historically low elevation each year to facilitate the outmigration of threatened fish species. | Thank you for your comments.  They will be taken under consideration. |

| Commenter Name | Commenter Affiliation | Comment | USACE Response |
|---|---|---|---|
| Jason Pulley | City of Salem | First and foremost, the City continues to support the actions of the USACE, NMFS, and other federal, state, and local agencies intended to enhance habitats and support out-migration of spring Chinook and winter steelhead, both of which are listed as threatened under the Endangered Species Act (ESA). The City also recognizes and respects the historic, cultural, and spiritual interests these species represent to members of the Tribal Nations. Finally, the City acknowledges and appreciates that the Draft SEIS addresses many of the concerns we have expressed to the USACE over the past 12 months. Among the significant commitments made by the USACE in the Draft SEIS that are responsive to our concerns:<br>(1) The USACE will "initiate the drawdown closer to late November or early December" (Page 18).<br>(2) The deep drawdown will be conducted "in a stepwise manner" (Pages ES-9, 210).<br>(3) The duration of the deep drawdown "is set to last for two weeks" (Page 18).<br>(4) The incremental deep drawdown approach "would span over three years" (Page 90).<br>However, the City remains deeply concerned at the absence in the Draft SEIS of any reference to turbidity triggers and accompanying action measures. As described and justified in our comments below and in our previous comments (see Attachment), these two important operational factors must be incorporated into the Final SEIS. | The SEIS has been modified to reflect a change to the proposed operation denoted in the comment as (4) The incremental deep drawdown approach "would span over three years" (Page 90). Instead USACE would use real-time hydrology and turbidity data to modify, pause or cease the operation in any given year to improve conditions for fish and reduce adverse impacts. The drawdown elevation could be reduced based on unacceptable turbidity levels meaning it could take longer than 3 years to reach the elevation. Determining the appropriate level of turbidity is informed by yearly coordination with State agencies and drinking water facilitates via Emergency Response and Communications Plan. That effort is separate from the SEIS process.<br>The SEIS analyzed the effects of reaching the final elevation of 1395 feet, as required by the 2024 BiOp, including the adverse impacts to water quality and water supply, and disclosed those reasonably foreseeable impacts. The analysis also acknowledges that the design of the operations and real time adaptive management may lessen those impacts in any given year. |

| Commenter Name | Commenter Affiliation | Comment | USACE Response |
| --- | --- | --- | --- |
| Jason Pulley | City of Salem | Key Recommendation: Establish a Turbidity Trigger of 10 NTU/12 hours to Cease the Drawdown<br>It is critical that the USACE adopt a turbidity trigger which, if exceeded over a specified period of time, will cause the immediate cessation of drawdown operations and the resultant return of Detroit Dam and Detroit Reservoir to normal operating conditions. The purpose of the turbidity trigger is to protect human health, protect the City's water treatment system, and protect the City's customers. Once drawdown operations cease, it is anticipated that turbidity levels in the river will decrease over time and normal operations at the City's water treatment plant will be able to resume. Further, to provide time to restore normal operations and to evaluate lessons learned, once the turbidity trigger has been exceeded, drawdown operations should not resume again until the following year. This recommendation is based on years of operational experience coupled with scientific research conducted over the past 12 months. Additionally, a turbidity trigger should be the minimum safeguard for downstream water users to protect from reasonably foreseeable environmental effects of the proposed action. The Thomas R. Carper Water Resources Development Act of 2024 (WRDA 2024) required that the Corps complete a report on instances in which turbidity concerns have arisen following a drawdown at a reservoir in the Willamette Valley, including "identify(ing) lessons learned associated with turbidity resulting from drawdowns and … how changes based on those lessons learned are being implemented." Absent completion of the report, the Corps should proceed with the drawdown of Detroit Reservoir under strict guidelines for downstream water quality while data is being collected and analyzed from similar operations in the Willamette Valley. Given that the Corps failed to analyze specific turbidity level effects from the proposed action on downstream users, a strict turbidity trigger that protects downstream users is a reasonably prudent alternative. The specific recommendation is that the turbidity trigger should be set at a reading of 10 NTU[1] or above, experienced over a period of 12 consecutive hours, as measured at the United States Geological Survey's (USGS) Niagara gauge. (USGS-14181500).<br>***1*** *Nephelometric Turbidity Units (NTU) and Formazine Nephelometric Units (FNU) are measures of the clarity of the water. The City typically reports turbidity levels in NTU; the USACE typically reports turbidity levels in FNU. Although the two units reflect the same characteristics, the analytical methods used to determine FNU and NTU are different and the two are not numerically interchangeable. Generally, water with turbidity of 10 NTU or 10 FNU or less looks clear. Water with turbidity of 50 NTU or 50 FNU looks cloudy; water with turbidity exceeding 500 NTU or 500 FNU looks muddy.* | Thank you for your comments. They will be taken under consideration in development of the Emergency Response and Communications Plan. |

| Commenter Name | Commenter Affiliation | Comment | USACE Response |
|---|---|---|---|
| Jason Pulley | City of Salem | ADDITIONAL BACKGROUND INFORMATION.<br>The City's Responsibilities as Regional Water Provider<br>The City is the only regional water provider in the Mid-Willamette Valley. We are responsible for supplying safe and reliable drinking water to approximately 220,000 individuals and thousands of properties that include hospitals, schools, businesses, industries, irrigators, multifamily housing units, and single-family homes. The City's water service area includes the City of Salem, the City of Turner, four water districts, and portions of unincorporated Marion and Polk counties. In addition, the City must provide water in sufficient quantities for firefighting and other emergency needs. Moreover, the City is the only emergency source of drinking water to the 48,000 citizens of the cities of Stayton and Keizer should either, or both, municipalities suffer impairment to their own drinking water systems. | Thank you for your comments. They will be taken under consideration. |
| Jason Pulley | City of Salem | High Turbidity Endangers Treatment System, Places Customers at Risk, Limits Future Growth<br>At issue is the fact that the deep drawdown of Detroit Reservoir will increase the presence of fine particles in the North Santiam River, the source of drinking water for the region served by the City. These particles pose a significant risk to the City's slow sand filtration treatment system that is located on Geren Island on the North Santiam River near downtown Stayton. Highly turbid water, if allowed into our treatment system, will clog the sand filters. Run times between filter maintenance periods will be significantly reduced, the cost and time to recondition each filter will substantially increase, and drinking water production from our treatment plant will be considerably diminished. If, to protect the sand filters, the City closes the intake gates from the North Santiam River, our ongoing ability to meet water demand will depend solely on the amount of water stored in reservoirs, water drawn from a handful of wells, and water provided through interties with the City of Keizer. At this writing, the City has embarked on substantial capital investments, expected to cost approximately $8 million, to prepare for potential disturbances caused by the drawdown. These improvements are not yet complete. With these significant investments, the City believes we can meet winter demand during the 2026 deep drawdown but there is no assurance that we will be able to meet future demands, which are expected to grow higher with each passing year. Further, under this mode of operation there is limited redundancy in the system. Should a critical component of one or more of these alternative sources of drinking water fail, our ability to supply water may fall below the demand of our many customers. Depending on the severity and duration of the shortfall, the consequences range from temporary inconvenience to untenable and unsustainable risks to life, property, and livelihood. In addition to limited potentially life-saving redundancy, operating a regional water supply system at or near capacity with no back-up will also create a significant and highly consequential condition – it could limit opportunities for future growth. Economic growth invariably relies on a region's ability to reliably provide essential services, water being the most critical of these. No housing deficiency can be addressed if there is insufficient water for new residential development. No new businesses, small or large, will locate in our service area if our ability to provide drinking water is questionable. No water-dependent industry seeking a new location will select Salem if we cannot provide assurances of reliable, year-round water for its production. | Thank you for your comments. They will be taken under consideration. |

| Commenter Name | Commenter Affiliation | Comment | USACE Response |
|---|---|---|---|
| Jason Pulley | City of Salem | How the City Treats Water under Normal Turbidity Conditions<br>Under normal operating conditions, the City draws raw water from the North Santiam River through intake gates at our facility on Geren Island. This water is treated using slow sand filtration, a highly reliable, time-tested method for producing drinking water. For sand filters to properly operate, the intake water must have very low levels of turbidity. Typically, the water drawn from the North Santiam River has a turbidity level of less than 10 NTU. At this level, our sand filters can operate for about three months before the filter must be taken offline for cleaning (scraping 0.25 to 0.5 inches from the top layer of sand) and reconditioning (allowing a biological layer of microorganisms to regrow on the surface of the sand). | USACE updated the SEIS to identify the potential impacts to the drinking water facilities downstream of Detroit (SEIS Section 3.19.4.1 Turbidity). Impacts on water quality from operations are in described in Section 3.5 of the SEIS. |
| Jason Pulley | City of Salem | How the City Treats Water under Elevated Turbidity Conditions<br>There are naturally occurring, short-term periods during which the turbidity levels in the North Santiam River increase well above 10 NTU. High turbidity is typically caused by storm events, which increase runoff volumes and sediment transport from up-river creeks and streams. The City's operational procedure in anticipation of high turbidity in the river involves filling the slow sand filters to their maximum capacity prior to the arrival of high turbidity and then closing the intake gates. With the gates shut, the filters can operate for about three days until low water levels in the filters required them to be taken offline. Historically, high turbidity levels triggered by storm events have lasted less than three days. | USACE updated the SEIS to identify the potential impacts to the drinking water facilities downstream of Detroit (SEIS Section 3.19.4.1 Turbidity). Impacts on water quality from operations are in described in Section 3.5 of the SEIS. |
| Jason Pulley | City of Salem | Results of Research on the Consequences of High Turbidity<br>There is little question that the deep drawdown will elevate turbidity levels in the North Santiam River, both during the initial drawdown, during subsequent drawdowns, and for a significant period of time after each drawdown operation has ended. As stated earlier, typical turbidity levels in the North Santiam River at our intake gates is less than 10 NTU. Of concern is information collected by the USACE during initial drawdowns in 2023 impacting the South Santiam River. Data provided by the USACE showed turbidity levels ranging from roughly 50 FNU (see footnote on Page 2) to over 450 FNU. Data from the most recent drawdown conducted in 2025 indicate sustained turbidity levels had decreased but still ranged between approximately 20 and 80 FNU. The adverse impacts of sustained elevated levels of turbidity in the City's intake from the North Santiam River are summarized below. | Thank you for your comments. They will be taken under consideration. |

| Commenter Name | Commenter Affiliation | Comment | USACE Response |
|---|---|---|---|
| Jason Pulley | City of Salem | 1. Short-term Impacts to Our Filters<br>The City conducted extensive research in 2025 to determine the risks of keeping the intake gates open and allowing highly turbid surface water into a slow sand filtration system. Based on this bench-scale scientific testing, we now know that turbidity levels as low as 50 NTU will reduce the runtime of a slow sand filter from approximately three months to three weeks. Higher turbidity levels will result in even lower runtimes, some of which are less than 24 hours. Additionally, fine particles from highly turbid intake water can penetrate deep into a sand filter, essentially fouling the entire depth of the sand bed well beyond the typical 0.25-0.5 top inches. This will significantly increase the cost and complexity of reconditioning a filter and measurably reduce the life cycle of a filter from four years to less than two months. Restoring a filter to full operational status once the filter has been terminally fouled can require up to six months to drain the water, remove the clogged layer of sand, procure and then replace the bed with new sand, and restore the biological layer in the rebuilt filter bed. The time required to return a filter from failure to full operational status is expected to extend beyond winter drawdown and into the summer months, a period during which water demand will be at its highest. The estimated cost to replace a filter bed ranges between $3 million and $4 million each. The City will have no choice but to pass this cost burden to our customers in the form of rate increases. | USACE updated the SEIS to identify the potential impacts to the City of Salem facility (SEIS Section 3.19.4.1 Turbidity).<br><br>USACE designed the proposed drawdown of Detroit Reservoir to minimize turbidity levels in the North Santiam downstream of Detroit and Big Cliff dams.  Previous drawdowns at Cougar, Green Peter, Lookout Point, and Fall Creek dams released varying amounts of sediment eroded from cutting a new channel and newly exposed reservoir beds. USACE assessed the elevation of the drawdown and the sediment data patterns from past drawdowns and determined a step-down approach would slow the amount of mobilized sediment and expose less surface area each year, reducing the amount of sediment that could erode and pass downstream of the Detroit and Big Cliff dams. USACE would use real-time hydrology and turbidity data each year to modify the operation to improve conditions for fish and reduce adverse impacts that may occur. |
| Jason Pulley | City of Salem | 2. The Longer-term and Recurring Impacts<br>The adverse impacts of highly turbid water entering the City's sand filtration system extend well beyond the immediate period of the deep drawdown. Rehabilitating filters lost to sustained turbidity is a labor-intensive and expensive endeavor. There are long-term consequences related to increases in operating and capital budgets which will drive utility rates higher. There are challenges related to limited staffing, uncertainty in supply chains and procurement, and indeterminate planning timelines. The time required to restore filters to full operation may extend into the spring and summer months, a period during which water demand is at its highest. Among the potential consequences is the real possibility of compromising the City's ability to meet peak summer demands while, concurrently, adversely impacting the City's ability to prepare for the next deep drawdown later in the same year. | USACE updated the SEIS to identify the potential impacts to the City of Salem facility (SEIS Section 3.19.4.1 Turbidity). |

| Commenter Name | Commenter Affiliation | Comment | USACE Response |
|---|---|---|---|
| Jason Pulley | City of Salem | 3. Risks of Total Reliance on Alternative Water Sources<br>If the intake gates remain shut because of high turbidity in the river, or if the sand filters are offline for cleaning and reconditioning post-drawdown, the City must rely on water drawn from groundwater wells, water stored in our reservoirs, and water provided via an intertie with the City of Keizer. Depending on the time of year, the duration of the high turbidity, and the time needed to restore operations of slow sand filter(s), these alternate sources may not be able to meet the demand of our water customers. We estimate that existing alternative water sources – wells, reservoirs, and interties – will meet the projected water demand during the timeframe of the first proposed drawdown. However – and this is a significant consideration – under this mode of operation there is limited redundancy in the system. Should a critical component of one or more of these alternative sources fail, our ability to supply water will fall below the demand, creating an unacceptable risk to human health and safety. | Thank you for your comments. They will be taken under consideration. |

| Commenter Name | Commenter Affiliation | Comment | USACE Response |
|---|---|---|---|
| Jason Pulley | City of Salem | Advantages of Implementing Turbidity Triggers and Action Measure<br>Among the advantages to having turbidity triggers.<br>Frames Intergovernmental Collaboration<br>Including this turbidity trigger level and action measure in the Final SEIS will require the City and USACE engage in follow-up conversations to establish details such as: communication protocols, pre-approved authorities for implementation of action steps, reporting requirements, and specific details regarding the immediate and follow on measures to be taken.<br>Facilitates Compliance with the Federal Clean Water Act<br>Adopting turbidity triggers would also allow USACE to reconcile the proposed drawdown action with potential violations of the federal Clean Water Act (CWA). The CWA addresses, among many other things, contaminants in water resources. There is no doubt that causing high levels of turbidity should be considered a violation of the CWA. Water quality sampling data show that typical turbidity levels at the City's intake from the North Santiam River are well below 10 NTU. In the EPA approved Oregon Water Quality Standards "turbidity" is defined as "pollution" and the standard in ORS 340-041-0036 states, in part:<br>Turbidity (Nephelometric Turbidity Units, NTU): No more than a ten percent cumulative increase in natural stream turbidities may be allowed, as measured relative to a control point immediately upstream of the turbidity causing activity.The turbidity levels reported by the USACE during drawdown operations on the South Santiam River clearly violated federally approved state water quality standards. There is little doubt that turbidity levels in the North Santiam River during the deep drawdown will rise above "natural stream turbidities" by more than 10 percent. From a regulator perspective, once a violation in water quality standards has occurred, among the correction actions is to cease the activity causing the violation. The Oregon Department of Environmental Quality may consider a turbidity trigger and corrective action to stop the drawdown as appropriate measures which will allow the USACE to avoid liability related to violations of state and federal law.<br>Supports Compliance with the Federal Safe Drinking Water Act<br>Adopting turbidity triggers would also allow USACE to reconcile the proposed drawdown action with potential violations of the federal Safe Drinking Water Act (SDWA). The Safe Drinking Water Act (SDWA) requires persons to protect public water systems. The Draft SEIS does little to address potential violations of the SDWA. The proposed drawdown is expected to contaminate the City's source of drinking water, potentially contaminate the City's water treatment system, and generally impair the City's ability to provide safe drinking water, any one of which could constitute a violation of the SDWA. | USACE will use real-time hydrology and turbidity data each year to modify, pause or cease the operation to improve conditions for fish and reduce adverse impacts. USACE updated the SEIS to identify the potential impacts to the drinking water facilities downstream of Detroit (SEIS Section 3.19.4.1 Turbidity). Impacts to water quality from operations are in described in Section 3.5 of the SEIS. Responding to comments does not require USACE to provide detailed legal positions for how USACE complied with other laws like the SDWA and CWA. USACE Chapter 7 and the Record of Decision generally describe USACE's compliance with applicable laws.<br><br>USACE developed an Emergency Response and Communications Plan for other drawdowns and would coordinate with North Santiam communities to update the plan to include Detroit Reservoir. This effort is separate from the SEIS. |

| Commenter Name | Commenter Affiliation | Comment | USACE Response |
|---|---|---|---|
| Jason Pulley | City of Salem | SUMMARY OF RECOMMENDATIONS AND CONCLUSION<br>Six Recommendations<br>While there is much to be commended in the Draft SEIS, the City presents to the USACE six specific recommendations for incorporation into the Final SEIS.<br>Recommendation #1: Acknowledge the Significance of Increased Turbidity<br>The City disputes that the proposed drawdown of Detroit Reservoir, even following a stepwise approach, would cause only a "moderate increase in sediment and turbidity levels" in the North Santiam River (see Page ES-9). The word "moderate" is subjective and situational. Based on our best professional judgement, which is now backed up by extensive research and bench-scale testing, levels of turbidity as low as 50 NTU – a measure potentially viewed as "moderate" by some – will have significant and sustained consequences to our treatment systems. For the Final SEIS, a more accurate sentence would read:<br>For water quality and drinking water, the deeper drawdown of Detroit Reservoir would cause a moderate an increase in sediment and turbidity levels downstream of Detroit Reservoir during the operation. This increase will threaten the operation of the slow sand filtration systems operated by the City of Salem and the City of Stayton. | USACE updated the SEIS to discuss impacts to slow sand filtration systems (SEIS Section 3.19.4.1 Turbidity). The methodology for how the determination is made as to the degree of an effect is disclosed in Chapter 3 and associated Appendix C. This methodology is consistently applied to all alternatives and is based on the level of turbidity in the water not its indirect effect on a particular water system as all systems are different. |
| Jason Pulley | City of Salem | Recommendation #2: Establish the Need for a Turbidity Trigger and USACE Response<br>A stepped approach alone is insufficient to protect human health and safety for communities relying on the North Santiam River for drinking water, firefighting, industrial production, and commercial purposes. The USACE must adopt in the Final SEIS a clear turbidity trigger consisting of a NTU level that, if exceeded over a specific period of time, will require cessation of the drawdown operation. A turbidity trigger with mandated actions will provide a degree of certainty and significantly enhance the City's ability to develop contingency and recovery plans. This recommendation comes with a commitment by the City to work with the USACE and to share information, data, and research results to help support a turbidity trigger that protects public health, lowers risks, supports long-term objectives of the drawdown, and reflects current scientific research and sound engineering practices. | The reasonably foreseeable effects of the operations are disclosed in Chapter 3. These effects will be further reduced by using real time data to modify, pause, or cease the drawdown based on turbidity levels. The request for triggers will be taken under consideration in development of the Emergency Response and Communications Plan and will be developed with state Agencies and the City of Salem. This will be developed separate from the NEPA process. |
| Jason Pulley | City of Salem | Recommendation #3: Establish a Turbidity Trigger of 10 NTU over 12 Hours to Cease Operations<br>The City's specific recommendation, which is consistent with multiple conversations with the USACE and supported by scientific research, is that a firm turbidity trigger of 10 NTU should be established in the Final SEIS. Based on the anticipated variability of turbidity in the North Santiam River during the drawdown, the City further recommends that a time duration of 12 hours be incorporated as part of the trigger. Once this trigger is reached, the USACE should cease all drawdown activities for that year and allow the City's water treatment system to recover and resume full operation. Based on the studies and research conducted, the City strongly recommends that the USACE establish in the Final SEIS a turbidity trigger as follows: The USACE will immediately take steps to cease the deep drawdown operation and restore Detroit Dam and Detroit Reservoir to normal operations the moment turbidity levels in the North Santiam River, as measured at the USGS Niagara gauge, have been at or above 10 NTU for 12 consecutive hours. | Thank you for your comments. They will be taken under consideration in development of the Emergency Response and Communications Plan. |

| Commenter Name | Commenter Affiliation | Comment | USACE Response |
|---|---|---|---|
| Jason Pulley | City of Salem | Recommendation #4: Evaluate Merits of Delaying Implementation<br>The Final SEIS should evaluate potential environmental impacts if the deep drawdown is delayed for one, two, or three years hence. Doing so would provide the City additional time to develop and test wells currently under construction to determine if they have sufficient yield to provide resiliency and mitigate risks to life, property, and livelihood. | USACE recognizes the immediate impacts are a serious concern, including potential adverse effects to drinking water facilities downstream of Detroit Dam. The proposed drawdown is a direct response to our legal obligations under the Endangered Species Act (ESA). The North Santiam River's spring Chinook salmon and winter steelhead are listed as threatened, and the dams currently block their access to essential spawning habitat. Federal wildlife agencies have determined that continuing to operate the dams without providing fish passage risks the extinction of these species. Therefore, to comply with the ESA, action is required to provide passage for these fish. Doing the drawdown sooner, allows the USACE to shape the operation and work with downstream communities, rather than being directed by the Court. |
| Jason Pulley | City of Salem | Recommendation #5: Focus on a Long-term Strategy of Implementing Structural Solutions<br>Our read of the BiOp, the Final Programmatic Environmental Impact Statement***2***, the Draft SEIS, and various reports and evaluations, is that the long-term strategy does not focus on year over year deep drawdowns. However, the long-term strategy requires implementation of structural remedies designed to facilitate out migration of threatened species. The current Draft SEIS considers annual deep drawdowns of Detroit Reservoir as an "Interim Operation" that will occur "until the long-term solution for downstream fish passage and water temperature management at the respective location is in place and operational" (Page 17). We agree, but as written in the Draft SEIS, as implied in recent public meetings, and as demonstrated by the years that have passed since the structural solutions were first proposed, implementation of structural measures have not been a priority. The Final SEIS should clearly state the intention of the USACE to pursue all means available to secure funding, initiate project planning, and ultimately construct what is expected to be the long-term strategy to support the out-migration of threatened species. Until these measures are in place, the financial burden and highrisk scenarios are being borne not by the responsible federal agencies but by local jurisdictions and our ratepayers.<br>***2*** *"Willamette Valley system operations and maintenance: Final environmental impact statement." United States Army Corps of Engineers. Portland District. April 2025.* | The purpose of the SEIS document is to evaluate and disclose effects of a federal action. The Record of Decision is document that discloses the agency's decision and what actions it will take. |

| Commenter Name | Commenter Affiliation | Comment | USACE Response |
|---|---|---|---|
| Jason Pulley | City of Salem | Recommendation #6: Employ Adaptive Management with Each Annual Drawdown<br>The underlying Biological Opinion for the Willamette Valley System requires development of an Adaptive Management Plan that includes "decision criteria" that guide strategies (see Section 2.5.10 of the BiOp). At issue for the City is a pressing need for the USACE to incorporate decision criteria that can be modified over time based on new information, changes in conditions, and lessons learned. More specifically, decision criteria should consider changes in risks and consequences from year to year. To illustrate, consider two scenarios:<br>(1) The City's risk assessment is based, in part, on historic winter water demand. If the City adds a new industrial customer with a high, year-round water demand, the risks/consequences assessment must be reevaluated.<br>(2) The City's water system relies on a wide range of factors and components to deliver safe drinking water to our customers. If, prior to commencing a deep drawdown, one or more of our critical components has failed, decision criteria should be in place that delays or cancels that year's deep drawdown.<br>In the context of Adaptive Management, there is the ambiguity in the Draft SEIS regarding the duration of the drawdown, which "is set to last two weeks" (Page 18) and the timespan of the incremental steps toward the ultimate desired elevation in the reservoir which "would span over three years" (Page 90). For our purposes of operational planning and risk management, the City requires assurances that the duration of the deep drawdown "is set to last will not exceed two weeks" and the incremental drawdown approach "would span over at least three years." Further, a requirement for the USACE to conduct additional analysis, reviews, and consultation with affected parties should incorporated into the Final SEIS to provide assurances that the USACE will employ both science based and risk-based decision making during the course of adaptively managing the drawdown operations over the years. | Thank you for your comments. They will be taken under consideration in development of the Emergency Response and Communications Plan. |

| Commenter Name | Commenter Affiliation | Comment | USACE Response |
|---|---|---|---|
| Jason Pulley | City of Salem | Conclusion<br>In conclusion, the City is grateful that the Draft SEIS addresses several of the concerns we have expressed over the past year in our conversations with the USACE regarding the risks each deep drawdown will present to our water treatment plant and our customers. However, the absence of any references to turbidity triggers and action measures is deeply troubling. Clear triggers and actions are essential for the City's operational and contingency planning. Establishing mutually acceptable triggers and action measures also represents the best way forward for providing assurances to our current and future regional customers that safe drinking water will continue to be reliably delivered. Lastly, turbidity triggers and action measures will facilitate the USACE's compliance with the federal Clean Water Act, federal Safe Drinking Water Act, and Oregon State Water Quality Standards, among other regulations. Simply put, the risks to the City's water supply created by the deep drawdown are too high and consequences of failure are too staggering to accept without some kind of documented assurances that the drawdown operations will cease before the high levels of turbidity have resulted in highly consequential harm has occurred to our treatment system and our customers have been placed at risk. The City is committed to working with the USACE and others to evaluate and, ultimately, to implement measures that support downstream passage of juvenile species, protect habitat and water quality, ensure water demands are met, and provide for the many users of the North Santiam River. | The SEIS is a programmatic evaluation of effects from proposed actions.<br><br>USACE developed an Emergency Response and Communications Plan for other drawdowns and would coordinate with North Santiam communities to update the plan to include Detroit Reservoir. This effort is separate from the SEIS. USACE would use real-time hydrology and turbidity data each year to modify the operation to improve conditions for fish and reduce adverse impacts that may occur. |
| Joel Myers | Independent Citizen | I am submitting six comments in regard to the proposed drawdown of Detroit Lake, which I believe have not been discussed.<br><br>1.There has not been open discussion or data released of original native populations of salmon that were able to travel above Willamette falls prior to 1885. The populations were very limited, how do they compare to today? The first augmentation occurred in 1885 and again in 1893. After these man made improvements in the Willamette falls, fish migration and populations in the main stem Willamette basin increased drastically. Without man made improvements to the Willamette falls would fish even migrate past the falls?<br>Will the future plans to "re -wild "the Willamette Falls include removing the man- made augmentation of the falls to enhancing fish migration. Why would you spend millions more dollars on the Willamettte Basin Salmon if the "re-wilding" of the falls is going to remove the salmon's ability to travel above the Falls? | Available estimates of number of spring Chinook salmon and winter steelhead in the North Santiam just prior to construction of Detroit Dam numbered in the thousands. Prior to construction of fish ladders at Willamette Falls, these species were known to migrate up the falls during spring before river flows seasonally declined making the falls impassable. Fish ladders extended the season over which these species could pass upstream of the falls into summer. USACE is not aware of any plans to remove the fish ladders. The Endangered Species Act (ESA) requires Federal agencies to actively conserve threatened or endangered species and use their authorities to further the Act's purposes, and to ensure their actions don't jeopardize threatened or endangered species or destroy critical habitat. Actions considered here, such as the Detroit drawdown, follow the ESA. |

**From:** [redacted]
[redacted]
**Subject:** [Non-DoD Source] your order in 18-cv-00437-HZ violates several section of Clean water act.
**Date:** Wednesday, December 24, 2025 6:29:26 PM
**Attachments:** image001.png
**Importance:** High

---

The ruling said to drain the dam to release the massive silt behind it (The silt is around 775 feet tall according to an Operator of the dam). The result was dark colored water running from Linn County their faucets. The clean water act specifically prevents this: the provisions of the Federal Water Pollution Control Act, specifically 33 U.S.C. 1251 a. 1-7. This is also 42 USC CHAPTER 6A, SUBCHAPTER XII: SAFETY OF PUBLIC WATER SYSTEMS.

The clean water act prevents discharge of silt from any dam. Specifically Section E 1 as the required public meetings for this single subject were not scheduled. No Judge can violate this. https://www.epa.gov/cwa-404/overview-clean-water-act-section-404

Neither the Secretary of War or Secretary of Commerce has approved this drawdown.

Therefore, an injunction to stop the illegal drawdown is required by federal law.

Plaintiff and Class action members humbly request the Federal Court to vacate by FRCP 60 (2) the erroneous ruling in 18-cv-00437-HZ.

As of November 3rd 2025 No Dam in the USA or its territories may be removed or have its turbines removed without specific permission of salmonprotectiondevice.com

The 2008 and 2024 Biological Opinions are junk science and void. https://salmonprotectiondevice.com/Dam_Removal_Application.pdf

https://salmonprotectiondevice.com/Dam_removal_Approval_Procedure.pdf

https://www.supremecourt.gov/search.aspx?filename=/docket/docketfiles/html/public/25-5808.html

| | |
|---|---|
| Nov 06 2025 | DISTRIBUTED for Conference of 11/21/2025. |
| Nov 03 2025 | Waiver of right of respondent FERC to respond filed.<br>**Main Document** |

**Attorneys for Respondent**
D. John Sauer
*Counsel of Record*
Solicitor General
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001
SUPREMECTBRIEFS@USDOJ.GOV
Ph: 202-514-2217
Party name: FERC




No legal or scientific reason to remove any dam. Fish ladders work. The sea lions are the almost 1:1 ratio to the decline of the salmon in the Columbia river. Our salmon protection device attached to the down stream fish ladders will fix declining salmon runs within seven years, salmonprotectiondevice.com 503-608-7611 x602
Reality is that which when taken away still exists.

# Willamette Basin
# Bi-Annual Status Report
# February 28, 2025

# FINAL

Turbidity

During drawdown and while the reservoir was held in its drawn down state, increased turbidity was observed within the reservoirs and at downstream locations. This was due to the upper reservoir shifting from lake to river, cutting a new channel through the sediment that had accumulated in the bottom of the reservoir over decades. Minor bank sloughing and rain on newly exposed banks likely also contributed to the increased sediment. This was especially true during the month of November when the region was hit with a series of strong atmospheric rivers, driving up inflows and turbidity response.

Turbidity was monitored in real-time upstream and downstream of Green Peter and Foster Dams throughout the drawdown, and this monitoring will continue throughout the remainder of the year and in future years (Table 5). Based on initial, provisional information from the U.S. Geological Service, turbidity levels peaked to approximately 800 formazin nephelometric units ("FNU") directly downstream of Green Peter Dam, with elevated turbidity measured for the entirety of November (Figure 15). High levels of turbidity were also measured downstream of Foster Dam and at the monitoring gage located near Waterloo, Oregon (Figure 15).

While turbidity levels measured downstream of Green Peter Dam in 2024 were less than what was measured in 2023 (Figure 16), elevated turbidity still remains a concern for downstream drinking water facilities and the public. The Corps is currently working on development of sediment transport models and associated tools to predict sediment responses to future deep drawdowns so that communities and stakeholders can plan accordingly.

The first modeling effort is an empirical, data mining approach, that will use observed turbidity, hydraulic, and hydrologic data to predict downstream turbidity in response to forecasted inflows for use in real-time during future drawdowns. A more versatile, physics-based sediment transport modeling approach is also being developed to predict sediment flushing rates under different drawdown alternatives with a variety of hydrologic conditions. The more complex modeling will be valuable in supporting deep drawdown planning.

Ongoing monitoring and sampling are being carried out to determine model boundary conditions and to aid in calibration. A few highlights follow. In addition to turbidity monitoring, the USGS is also measuring suspended sediment concentrations (SSC) at the same locations (Table 8). These SSC measurements will help establish a relationship between sediment concentrations and turbidity for communication purposes, and eventually to have a continuous record of SSC for estimating total loads. Separately, the Corps is collecting reservoir hydrosurveys to quantify the total sediment flushed during each drawdown. This year, the Corps is also planning supplemental sediment sampling (e.g. for grain size analysis) and in-situ (e.g. reservoir sediment erodibility) testing to further characterize the system's mobile sediment and improve model performance.




***Figure 15. Provisional Turbidity Data Measured at the USGS Gages #14186200, Middle Santiam River below Green Peter Dam near Foster, Oregon, #14187200, South Santiam River near Foster, OR, and #14187500, South Santiam River at Waterloo, OR, 2024***




***Figure 16. Turbidity Measured Downstream of Green Peter Dam, 2023 and 2024 Comparison***

# Congress of the United States

Washington, DC 20515

July 13, 2026

Colonel Larry Caswell, Jr.
District Commander
U.S. Army Corps of Engineers, Portland District
333 SW 1st Avenue
Portland, OR 97204

Dear Colonel Caswell:

We write regarding the U.S. Army Corps of Engineers' Record of Decision ("ROD") for the Willamette Valley System Operations and Maintenance Final Supplemental Environmental Impact Statement ("SEIS") and the proposed late fall/early winter deep drawdown of Detroit Reservoir later this year.

We support science-based efforts to improve fish passage, recover Endangered Species Act (ESA)-listed species, and uphold the United States' trust and treaty obligations to tribes in the Northwest. However, management of the Willamette Valley System must balance fish recovery objectives with the public health, safety, and economic needs of Oregon communities. Success should be measured not only by our ability to strengthen salmon recovery, but by whether every downstream community can still turn on the tap with confidence.

We have heard serious and repeated concerns from local governments, public water providers, emergency managers, and community stakeholders in the North Santiam Canyon and throughout Marion County regarding the potential impacts of the proposed drawdown on turbidity, drinking water reliability, public health, and critical infrastructure. Based on the information currently available, we believe the Corps should proceed with a Detroit Reservoir deep drawdown only after allowing affected drinking water systems to complete the infrastructure improvements, alternative supply measures and emergency preparedness actions necessary to protect public health and ensure continuous service to the communities they serve.

These concerns are not hypothetical. The Corps' SEIS acknowledges that the Detroit Reservoir drawdown is expected to "mobilize sediment, increasing turbidity levels downstream of Detroit and Big Cliff dams," and that fine clay material eroded from exposed sediment is likely to remain suspended and pass downstream of Detroit Dam. The SEIS further states that increased turbidity would result in adverse effects to drinking water facilities using water from the North Santiam River below Detroit and Big Cliff reservoirs, including increased filter maintenance and staffing needs.

For many of these affected communities, these additional operational demands present a significant challenge. Smaller water systems often operate with limited budgets, staffing capacity, and financial flexibility, making it difficult to absorb the costs of increased monitoring, treatment adjustments, filter maintenance, and personnel requirements. Without adequate

resources and preparation, these communities may face substantial operational and financial obstacles to maintaining safe and reliable drinking water service.

The SEIS specifically identifies Salem, Stayton, and Gates as drinking water systems requiring coordination during Detroit Reservoir drawdown operations. Our offices have heard directly from these local governments and water providers about the vulnerabilities and infrastructure needed to withstand elevated turbidity associated with a deep drawdown.

The **City of Salem's** water treatment system relies on seven slow sand filters that cannot operate effectively when turbidity levels exceed 20 Nephelometric Turbidity Units (NTU), threatening water reliability for 220,000 regional residents. Repairing a single damaged filter layer could take six months and cost $4 million. The **City of Stayton** also operates a slow sand filtration system that is highly vulnerable to sustained turbidity events, as turbidity above 10 NTU could completely halt its water production, exhausting its critical four-day supply and firefighting reserve within days or hours under severe conditions. The **City of Gates** faces similar threats to its membrane filtration system, making it a high-priority community for immediate emergency planning and mitigation support. Each of these communities is actively pursuing infrastructure upgrades, but funding and readiness gaps remain.

These examples demonstrate that affected water systems are at substantially different stages of preparedness, with critical resilience projects still underway across various stages of planning, design, funding, procurement, or construction. Although local governments and water providers have taken significant steps to improve resilience, many of the measures necessary to protect drinking water services will not be completed before the Corps' proposed implementation timeline. Under these circumstances, proceeding with a deep drawdown would transfer substantial operational, financial, and public health risk to local communities that are not yet fully prepared to absorb it.

Given the risks identified in the SEIS and the current status of affected water systems, we request that the Corps delay implementation of the Detroit Reservoir deep drawdown until affected providers have completed necessary upgrades, alternative supply measures, and emergency preparedness actions sufficient to protect public health and maintain reliable drinking water service. As this work moves forward, the Corps should use the time to comply with its legal requirements and fulfill its obligations to communities in the Willamette Valley, including:

1. Allowing affected drinking water providers, including Salem, Stayton, Gates, and other downstream systems, to complete necessary infrastructure improvements, alternative supply measures, and emergency preparedness actions and demonstrate operational readiness.
2. Completing and publicly releasing the turbidity study required by the Thomas R. Carper Water Resources Development Act of 2024, including lessons learned from prior Willamette Valley drawdowns and a system-specific assessment of potential impacts on municipal drinking water systems.

3. Publicly releasing the report on the federal interest in hydropower within Oregon's Willamette Valley System required by the James M. Inhofe Water Resources Development Act of 2022.
4. Preparing and sharing a comprehensive drinking water readiness assessment identifying each affected provider's treatment technology, turbidity tolerance, backup supply capacity, planned improvements, funding needs, construction timelines, and emergency response requirements.
5. Clearly defining the turbidity and water-quality thresholds that will trigger modification, suspension, or termination of drawdown operations when drinking water systems face unacceptable risk.
6. Identifying and committing funding, technical assistance, and mitigation measures sufficient to support affected local governments and water providers in implementing necessary resiliency improvements.
7. Establishing a clear communication protocol with affected water systems, local governments, and affected communities before and during any drawdown.

The consequences of a drinking water disruption extend far beyond inconvenience. Loss of reliable drinking water affects public health, fire protection, emergency response capability, schools, businesses, and basic community functions. These impacts also carry significant economic consequences, particularly for communities with limited financial resources that may not have the capacity to absorb unexpected costs associated with mitigation. As it works toward a deep drawdown, the Corps must work with community partners to fully address these risks of increased turbidity in the North Santiam River. The Corps must allow affected communities to implement the infrastructure and operational readiness improvements necessary to maintain safe and reliable drinking water service.

We respectfully request a written response detailing how the Corps intends to address these drinking water readiness concerns prior to implementing a deep drawdown at Detroit Reservoir. We also request a briefing for our offices and affected water providers regarding the Corps' implementation timeline, turbidity modeling, emergency response protocols, and planned funding and mitigation measures for impacted public water systems.

Thank you for your attention to this important matter.

Sincerely,

Janelle S. Bynum
Member of Congress

Jeffrey A. Merkley
United States Senator

Andrea Salinas
Member of Congress

Ron Wyden
United States Senator

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

MARION COUNTY, *a Political Subdivision of the State of Oregon*,

Plaintiff,

And

SANTIAM WATER CONTROL DISTRICT and CITY OF STAYTON,

Plaintiff-Intervenors.

v.

U.S. ARMY CORPS OF ENGINEERS; DANIEL P. DRISCOLL, *in his official capacity as Secretary of the Army*; and WILLIAM H. GRAHAM, JR., *in his official capacity as Chief of Engineers and Commanding General of the U.S. Army Corps of Engineers*,

Defendants,

And

NORTHWEST ENVIRONMENTAL DEFENSE CENTER and NATIVE FISH SOCIETY,

Defendant-Intervenors.

Lead Case No. 6:26-cv-00956-MTK
Trailing Case No. 6:26-cv-1381-MTK

**OPINION AND ORDER**

CITY OF SALEM, *an Oregon Municipal Corporation*,

Plaintiff,

SANTIAM WATER CONTROL DISTRICT and CITY OF STAYTON,

Plaintiff-Intervenors.

v.

UNITED STATES OF AMERICA; UNITED STATES ARMY CORPS OF ENGINEERS, *an agency of the United States government*,

Defendants,

And

NORTHWEST ENVIRONMENTAL DEFENSE CENTER and NATIVE FISH SOCIETY,

Defendant-Intervenors.

**KASUBHAI,** United States District Judge:

Plaintiffs Marion County and the City of Salem brought these actions for violations of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706, challenging Defendants' decision to conduct an annual deep drawdown of Detroit Reservoir on the North Santiam River. The Court consolidated the cases and granted motions to intervene filed by Plaintiff-Intervenors Santiam Water Control District and City of Stayton and Defendant-Intervenors Northwest Environmental Defense Center and the Native Fish Society. *See* ECF Nos. 28, 42. Before the Court are Plaintiffs' Motions for Preliminary Injunction, ECF Nos. 18, 51, and Plaintiff-Intervenors' Joinders, ECF Nos. 55, 58. For the reasons below, the motions are denied.

## BACKGROUND

Defendant U.S. Army Corps of Engineers ("the Corps") owns, operates, and maintains the Willamette Valley System ("WVS"), a large network of 13 dams and reservoirs, hatcheries, adult fish facilities, and bank protection structures on various tributaries in the Willamette Valley River basin. Pulley Decl. Ex. D ("SEIS"), ECF No. 52-4. At issue in this case is Defendants' decision to conduct annual deep drawdowns of Detroit Reservoir, located in the North Santiam River subbasin of the WVS, in order to allow for volitional passage of Endangered Species Act ("ESA")-listed Upper Willamette River Chinook salmon ("UWR Chinook") past the Detroit Dam. The Court begins with an overview of the relevant legal framework before turning to the factual background.

### I. Legal Framework

#### A. Endangered Species Act

Congress enacted the ESA in 1973 "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved [and] to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b). When enacted, the ESA "represented the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978). The ESA charged the National Marine Fisheries Service and the Fish and Wildlife Service (collectively, "the Services") with administering the ESA. Under Section 4 of the ESA, the Services are directed to list endangered and threatened species, and to designate critical habitat for those species. 16 U.S.C. § 1533.

Under Section 7 of the ESA, federal agencies ("action agencies") are required to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the

destruction or adverse modification of [critical habitat].” 16 U.S.C. § 1536(a)(2). The action agency must consult with the relevant Service in making such a determination. If either the action agency or the relevant Service “determines that the proposed action is ‘likely to adversely affect’ a listed species or habitat, formal consultation is required.” *Conservation Cong. v. Finley*, 774 F.3d 611, 615 (9th Cir. 2014) (quoting 50 C.F.R. § 402.14). In formal consultation, the relevant Service prepares a Biological Opinion which includes, among other things, “[t]he Service’s opinion on whether the action is . . . [l]ikely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat.” 50 C.F.R. § 402.14(h)(1)(iv)(A). If the Service concludes that “take” will not jeopardize the listed species, it will provide an “Incidental Take Statement” that sets forth the terms and conditions of such allowable take. 16 U.S.C. § 1536(b)(4)(c)(i); 50 C.F.R. § 402.14(i). The action agency must reinitiate consultation immediately if it exceeds the permissible amount of incidental take. 50 C.F.R. § 402.14(i)(5), 402.16(a)(1).

Section 9 prohibits the “take” of listed species, which means “to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct.” 16 U.S.C. § 1538(a)(1), 1532(19). An Incidental Take Statement operates as a safe harbor from otherwise impermissible take, but the action agency or applicant is no longer insulated from Section 9 liability “where an action agency does not reinitiate consultation with the [Service] despite the failure of promised conservation measures.” *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 698 F.3d 1101, 1115 (9th Cir. 2012). The ESA includes a citizen-suit provision empowering citizens to sue any person who violates the ESA and its implementing regulations. 16 U.S.C. § 1540(g).

### B. National Environmental Policy Act

The purpose of the National Environmental Policy Act ("NEPA") is to require agencies to disclose "relevant environmental considerations that were given a 'hard look' by the agency, and thereby to permit informed public comment on proposed action and any choices or alternatives that might be pursued with less environmental harm." *Lands Council v. Powell*, 395 F.3d 1019, 1027 (9th Cir. 2005). It "does not mandate particular results, but simply prescribes the necessary process." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). To that end, NEPA requires agencies proposing "major Federal actions significantly affecting the quality of the human environment" to prepare a detailed statement—an Environmental Impact Statement ("EIS")—discussing environmental impacts of the proposed action and a range of alternatives to avoid adverse impacts. 42 U.S.C. § 4332(C).

## II. Factual Background

Defendants intend to conduct annual deep drawdowns of the Detroit Reservoir "to increase survival for juvenile ESA-listed fish as they migrate downstream." SEIS 19. The drawdown decision follows litigation in which the Corps was sued for causing "take" of ESA-listed salmonids in their operation of the WVS. The Court begins with a summary of that litigation and its outcomes before turning to Defendants' decision to proceed with annual drawdowns of the Detroit Reservoir and Plaintiffs' concerns about the impacts of that decision.

### A. Prior Litigation and Outcomes

A 2008 BiOp issued by the National Marine Fisheries Service ("NMFS") assessed the operation and maintenance of dams and related facilities in the WVS and their effect on ESA-listed UWR Chinook and steelhead. *Nw. Env't Def. Ctr. v. United States Army Corps of Eng'rs* ("*NEDC*"), 479 F.Supp.3d 1003, 1008-09 (D. Or. 2020). The 2008 BiOp found that "the dams harmed the listed salmonids by, among other things, blocking downstream passage of juvenile

salmonids, interfering with upstream migration of salmonids returning to their spawning grounds, and harming water quality and quantity downstream from the dams." *Id.* at 1009. The 2008 BiOp set out certain mitigation measures that the Corps was required to carry out to continue operating the WVS without causing jeopardy to the ESA-listed salmonids. *Id.* at 1009-10. In 2018, the Northwest Environmental Defense Center, the Native Fish Society, and other conservation groups sued the Corps related to its operation of the WVS.

1. <u>*NEDC* Decision</u>

In *NEDC*, the plaintiffs alleged that the Corps failed to implement the mitigation measures required by NMFS' 2008 BiOp to protect ESA-listed UWR chinook and steelhead, caused a "take" of ESA-listed species, and failed to reinitiate formal ESA consultation with NMFS. On summary judgment, the court ruled in favor of the plaintiffs, concluding that the Corps violated Section 7(a)(2) and Section 9 of the ESA. *NEDC*, 479 F.Supp.3d at 1019, 1023; Pulley Decl. Ex. E at 3, ECF No. 52-5. The court ordered the defendants to complete ESA re-consultation and ordered NMFS to issue a new BiOp by December 31, 2024. *Nw. Env't Def. Ctr. v. United States Army Corps of Eng'rs* ("*NEDC II*"), 558 F.Supp.3d 1056, 1076-77 (D. Or. 2021). The court also issued an interim injunction requiring numerous operational changes in the WVS to afford relief until the completion of the 2024 BiOp. *Id.*

2. <u>Deep Drawdowns</u>

Among the interim operational measures the court ordered in *NEDC II* were "deep drawdowns" of certain reservoirs in the WVS. *Id.* at 1077-78. Judge Hernandez explained the necessity of those measures as follows:

> Juvenile salmonids must pass through the dams to successfully outmigrate to the marine environment. The salmonids typically navigate downstream by following the flow of the river; however, the large, slow-moving reservoirs behind the dams disrupt these natural outmigration cues, making it difficult for the fish to find their way downstream to the dam and lengthening their exposure to predators and

> pathogens in the reservoirs. Increasing flow via drawdowns and spill operations reduces the size of the reservoir and accelerates the salmonids' navigation to the dam, thereby decreasing their exposure to pathogens and predators. But once the juvenile salmonids reach the dams, they can only pass downstream through the hydropower turbines, regulating outlets ("ROs"), or spillways. For likely obvious reasons, significantly higher fish mortality occurs when the juvenile salmonids pass through the turbines instead of the ROs or spillways, making non-turbine fish passage the safest available option. And, concerning drawdowns specifically, juvenile salmonids are surface-oriented fish, meaning they cannot sound very deep and are unlikely to find the ROs unless the reservoir surface elevation is drawn down within 20 to 25 feet of the outlet opening.

*Id.* at 1064-65.

As a result of the interim injunction, the Corps implemented a deep drawdown of the Green Peter Reservoir to allow for fall juvenile fish passage through Green Peter Dam. NFS Resp. Ex. 3, ECF No. 66-3. During the initial drawdown in November 2023, the Corps drew the Green Peter Reservoir down 142 feet in one month. SEIS 19. The drawdown of the Green Peter Dam exposed sediment that substantially increased turbidity in the South Santiam River, resulting in operational disruptions at water treatment plants in the Cities of Lebanon and Sweet Home. Page Decl. ¶ 7, ECF No. 21; Pulley Decl. Ex. B at 7, ECF No. 52-2; FSEIS at 19. In addition, the drawdown caused the death of thousands of kokanee salmon, a non-ESA-listed salmonid. Teed Decl. Ex. 3 at 2, ECF No. 25-3.

Following the issues caused by the 2023 Green Peter Reservoir drawdown, the Corps moved to amend its implementation plan for future fall deep drawdowns of the Green Peter Reservoir, which the court granted over objections from downstream cities concerned that the modifications would not adequately address the turbidity concerns. NFS Resp. Exs. 11, 12, ECF Nos. 66-11, 66-12. The drawdown of Green Peter Reservoir that occurred the following fall, in 2024, resulted in less turbidity both in level and duration. Schroeder Decl. ¶ 35, ECF No. 67. Lower turbidity was attributed to a later drawdown start date and reduced sediment volume following the 2023 drawdown. *Id.* Deep drawdowns of other reservoirs within the WVS have

also taken place due to the interim injunction. For example, the Corps conducted drawdowns of Lookout Point and Dexter Dams in the Middle Fork Willamette River in 2023 and 2024, noting that turbidity levels were significantly lower in 2024 as compared to 2023, "suggest[ing] that the river cut through most of the sediment accumulated in the upper portions of the reservoir during the first year of drawdown." NFS Resp. Ex. 9, ECF No. 66-9.

As a result of the turbidity issues caused by the 2023 Green Peter Reservoir drawdown, Congress enacted legislation that required the Corps to submit a report analyzing instances of high turbidity resulting from drawdown of WVS reservoirs, and identifying lessons learned and opportunities to minimize economic impacts of turbidity on non-Federal entities. 33 USC Section 1205(b) ("WRDA"). Although the report was due to Congress by January 4, 2026, the Corps has not yet submitted it. Def. Opp'n 8-9, ECF No. 68. The Corps has no estimated date for completion of the report, and notes that "its completion is contingent on the availability of funding." Def.'s Notice Re WRDA 5, ECF No. 79.

3. 2024 Biological Opinion

In December 2024, NMFS issued its new Biological Opinion for the continued operation of the WVS. NFS Resp. Ex. 2 ("2024 BiOp"), ECF No. 66-2. As relevant to this litigation, the 2024 BiOp instructed the Corps to "test and improve effectiveness of interim juvenile fall drawdown operations through Detroit and Big Cliff Reservoirs and Dams . . . 2025-2028," including "[i]n the fall, draw Detroit reservoir elevation down to no more than 50 feet above upper RO for passage (1395 ft), when possible given hydrology and hydropower activity in the North Santiam and other subbasins." 2024 BiOp 6.4-524. The BiOp explained that the rationale was to increase the "possibility for RO outlets to be accessible by lowering reservoir elevations" to increase survival for juvenile migrants. *Id.*

### B. Detroit Reservoir Drawdown

Following the issuance of the 2024 BiOp, the Corps prepared a Supplemental Environmental Impact Statement ("SEIS") for WVS operation and maintenance. The SEIS included "revisions to the Interim Operations including a late fall/early winter deep drawdown for downstream fish passage at Detroit Dam" based on the 2024 BiOp. SEIS xiv. The Detroit Reservoir drawdown is part of a series of interim operations that would take place until the long-term solution for downstream fish passage and water temperature management is operational. SEIS 19.

Under the SEIS, the Corps plans to use a gradual approach over several years to reach the target elevation of 1395 feet. Tackley Decl. ¶ 6, ECF No. 69; SEIS 19, 80, 137. "[I]n late November or early December" 2026, the Corps intends to lower the reservoir 30 feet to 1425 feet over the course of two weeks, and then hold the reservoir at that elevation for another two weeks. SEIS 19. The Corps noted that the Detroit Reservoir has reached this level twice before, "for low flow augmentation (2015) and spillway gate maintenance (2019)." SEIS 19. The Corps would then use the turbidity information from each year to make informed decisions about how much to "lower the reservoir . . . each year until reaching 1395 feet." SEIS 19; Tackley Decl. ¶ 7.

As required by NEPA, the Corps solicited public comment before finalizing its SEIS. SEIS 14. The public comment period ran from November 14, 2025, to January 13, 2026. SEIS at ES-2. The Corps received input from affected stakeholders including tribes, state and federal agencies, and the public, which it used to shape its evaluation of the impact of the interim operations. SEIS 14-15. The Corps received extensive feedback about the proposed drawdown at Detroit Dam, specifically, the drawdown's "effects on water quality, municipal water supplies, recreation, and kokanee populations." SEIS 15. After the comment period, the Corps updated the Final SEIS based on comments, specifically to shape the interim operation to minimize adverse

effects such as turbidity. SEIS 216-18. The Corps indicated it would use real time turbidity data to modify, pause, or cease the drawdown to avoid unacceptable adverse impacts to drinking water systems and practice strong communication with the State of Oregon, as well as the Cities of Salem, Stayton, and Gates. SEIS 218.

The SEIS acknowledges that drawing down the Detroit Reservoir will increase turbidity because it will leave more of the reservoir bank exposed, increasing the potential for shoreline erosion and sloughing. SEIS 92. However, the SEIS concludes that the downstream turbidity effects are expected to lessen in severity after a few years as the sediment reaches a new equilibrium. SEIS 92. In response to specific comments raised comparing the proposed drawdown to the Green Peter Reservoir drawdown, the Corps explained that it expects the Detroit Reservoir drawdown to "result in much lower levels of turbidity than on the South Santiam during the Green Peter drawdown in 2023 and 2024." SEIS 218.

Defendants have finalized and circulated a "Deep Drawdown Emergency Response Communications Plan" for planned deep drawdowns, including Detroit Reservoir. ECF No. 77-1. The Plan provides for regular meetings with stakeholders "to discuss real-time and forecasted (expected future) dam operations and reservoir level information." *Id.* at 2. It provides that "[i]f drinking water facility concerns arise, the impacted city will contact OHA, who will consider whether to ask for a halt of operations according to . . . criteria." *Id.* at 3. The Corps will not take action to halt the drawdown "unless requested by the Oregon Governor's Office or unless a drinking water emergency has been determined." *Id.* The plan does not provide a timeframe for how long it would take to pause or halt the drawdown in the event of an emergency.

### C. Plaintiffs' Asserted Irreparable Harm

Plaintiffs each present evidence and argument that the Detroit Reservoir deep drawdown will cause them irreparable harm. Because each Plaintiff raises concerns unique to their own interests, the Court summarizes them each separately.

#### 1. <u>City of Salem</u>

The City of Salem operates the Geren Island Water Treatment Plant ("the Facility"). Pulley Decl. ¶ 3, ECF No. 52. The Facility is the primary regional drinking water source in the Mid-Willamette Valley. Pulley Decl. ¶ 4. Salem supplies drinking water to approximately 220,000 individuals, hospitals, schools, businesses, firefighting and emergency services, and is the sole emergency source of drinking water for both the City of Stayton and the City of Keizer. Pulley Decl. Ex. C at 2-3, ECF No. 52-3; Pulley Decl. ¶¶ 5-6.

The Facility uses slow sand filtration and draws water from the North Santiam River downstream of Detroit Dam. Pulley Decl. ¶ 3; Pulley Decl. Ex. C at 3. The plant passes the raw river water through several layers of sand, trapping contaminants in a biologically active surface layer, to produce clean drinking water. Pulley Decl. ¶ 9. The intake water must have low levels of turbidity for the slow sand filtration process to work effectively and prevent damage to the filters. Pulley Decl. Ex. C at 4.

Turbidity in the North Santiam River is naturally low, typically below 10 Nephelometric Turbidity Units ("NTUs"). Pulley Decl. ¶ 9. Salem conducted pilot testing which found that high levels of turbidity in the water affects the ability of the Facility's filters to work correctly, threatening the long-term viability of the water system. Pulley Decl. Ex. F at 13-14, ECF No. 52-6; Pulley Decl. Ex. C at 4-5. The testing demonstrated that filters at the facility ran for 67 days with turbidity at 10 NTU, 14-38 days at 20 NTU, 14-18 days at 30 NTU, 11-12 days at 40 NTU, and 8-13 days at 50 NTU. Pulley Decl. Ex. F at 6. Salem cites empirical data from previous

drawdown actions of the Green Peter Reservoir and asserts that the Detroit Drawdown "will likely increase the concentration of suspended solids and fine particles in the river well above 50 NTU" and therefore imperil drinking water and impact Salem's ability to fight fires. Pulley Decl. ¶¶ 11, 13, 22. In addition, when turbidity exceeds 10 NTUs, Salem "may be required" to shut down the Facility to prevent damage to the filters. Pulley Decl. ¶ 7. If Salem shuts down the Facility, it would be forced to rely on backup sources with no operational redundancy like "groundwater wells, stored reservoir water, and emergency interties with the City of Keizer and Stayton." Pulley Decl. ¶ 7.

2. <u>Marion County</u>

Detroit Dam and Reservoir are located in Marion County, which has a population of over 340,000 residents. Amerman Decl. ¶ 3, ECF No. 20; Elzinga Decl. ¶ 11, ECF No. 27. Plaintiff Marion County notes that the North Santiam River, into which water released from the Detroit Dam flows, is a key source of irrigation and drinking water in the County. Marion County asserts that increased turbidity and inadequate refill of the Detroit Reservoir after the drawdown will cause it irreparable harm.

On the issue of water quantity, Marion County presents evidence that in the event Detroit Reservoir is unable to refill, it or its residents will suffer harm. During a dry winter, the Detroit Reservoir is less likely to rise to the conservation pool level. Elzinga Decl. ¶ 15. If the water does not reach marinas in the reservoir or there were significant fish death, boating, fishing, recreation rentals, campground use, and income from park use, would be adversely impacted. O'Donnell Decl. ¶ 8, ECF No. 22; Lunski Decl. ¶ 7, ECF No. 23; Nicholas Decl. ¶ 5, ECF No. 24. By way of example, Marion County notes that in 2015, when Detroit Reservoir was unable to refill as it would under normal weather patterns, "[t]ourism heavily declined, docks had to move out, and during the annual 'free fishing' weekend in June, there wasn't even enough water to allow for

fishing." Elzinga Decl. ¶ 15. Given that a "very strong" El Niño event is predicted for this fall and winter—which typically result in warmer and drier seasons—Marion County asserts that the likelihood of inadequate refill is particularly high this year. Elzinga Decl. ¶¶ 13-14.

Like Salem, Marion County is also concerned that the drawdown will affect water treatment plants serving Marion County residents and harm downstream water quality. Page Decl. ¶ 15; O'Donnell Decl. ¶ 12. Marion County notes that safe drinking water is necessary not only for its residents but also for the operation of Marion County schools and hospitals. Marion County's Mot. 13, ECF No. 18 (citing SEIS at W-306-07). Also like Salem, Marion County points to the turbidity issues caused by the Green Peter Reservoir drawdown as evidence of the level of turbidity it fears the Detroit Reservoir drawdown will cause. *See* Amerman Decl. ¶¶ 11-13; Page Decl. ¶ 7; Lunski Decl. ¶ 6.

3. <u>City of Stayton</u>

The City of Stayton is a municipal corporation with a population of just over 8,000 people. Hajduk Decl. ¶ 3, ECF No. 60. Stayton provides drinking water to Santiam Hospital and North Santiam School District and provides wastewater treatment and disposal to the City of Sublimity. Mot. Intervene Ex. 3 ¶¶ 8, 11, ECF No. 41-3; Loving Decl. ¶¶ 6-7, ECF No. 62; Hajduk Decl. ¶ 9; Taylor Decl. ¶ 4, ECF No. 61. Stayton's water supply comes exclusively from the North Santiam River downstream of the Detroit Dam and Reservoir. Buchanan Decl. ¶ 7, ECF No. 59. Like Salem's water treatment plant, Stayton's plant uses slow sand filtration to treat the water. Buchanan Decl. ¶ 7. Stayton notes that sustained turbidity within the North Santiam River will lead to frequent cleaning or possible replacement of its water treatment plant's filters, "put[ing] Stayton's drinking water treatment system and the residents and other users who depend on the proper functioning of that system at risk of not only reduced or limited water

availability but also closure of all the public services, hospitals, schools and other functions that depend on the availability of clean water." Buchanan Decl. ¶¶ 11-13.

4. Santiam Water Control District

The Santiam Water Control District ("District") is a municipal corporation. District Intervenors Compl. ¶ 1, ECF No. 46. The District receives water from the North Santiam River and operates an 114-mile irrigation system extending from Stayton to Salem. Stevenson Decl. ¶ 2, ECF No. 39. This system delivers water to over 17,000 acres of agricultural land, and provides water to hydroelectric plants, wetland restoration projects, and municipal governments. Stevenson Decl. ¶¶ 3, 5. Nearly 1,000 acres of farmland depend on stored water from the District for irrigation, and the District is the sole source of irrigation for 580 of those acres. Am. Stevenson Decl. ¶ 3, ECF No. 63. Loss of irrigation to those crops "can quickly reduce yields and, if sustained, kill the plants." Am. Stevenson Decl. ¶ 4.

Santiam is concerned about the impacts of both high turbidity and inadequate reservoir refill. On the issue of turbidity, the District's water conveyance system includes "fish screens and fish barrier structure[s]." Stevenson Decl. ¶ 11. During a high turbidity event, sediment increases and builds up on the fish barriers requiring extra excavation and increasing operations costs. Stevenson Decl. ¶ 11. The District is further concerned that in dry years, the drawdown will cause inadequate reservoir refill, preventing the District from fulfilling its delivery obligations for irrigation water. Am. Stevenson Decl. ¶ 2. During a past El Niño year—as this year is expected to be—"Detroit Reservoir [was left] well below full pool, and thus the District was very worried about stored water supply that year." Am. Stevenson Decl. ¶ 5.

## STANDARD

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*,

555 U.S. 7, 22 (2008). A plaintiff seeking a preliminary injunction generally must show that: (1) he or she is likely to succeed on the merits; (2) he or she is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his or her favor; and (4) that an injunction is in the public interest. *Id.* at 20, 22 (rejecting the Ninth Circuit's earlier rule that the mere "possibility" of irreparable harm, as opposed to its likelihood, was sufficient, in some circumstances, to justify a preliminary injunction).

The Supreme Court's decision in *Winter* did not disturb the Ninth Circuit's alternative "serious questions" test. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-32 (9th Cir. 2011). Under this test, "serious questions going to the merits and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *Id.* at 1132 (quotation marks omitted). Thus, a preliminary injunction may be granted "if there is a likelihood of irreparable injury to plaintiff; there are serious questions going to the merits; the balance of hardships tips sharply in favor of the plaintiff; and the injunction is in the public interest." *M.R. v. Dreyfus*, 697 F.3d 706, 725 (9th Cir. 2012).

**DISCUSSION**

Plaintiffs and Plaintiff-Intervenors contend that they satisfy the *Winter* test and ask the Court to grant preliminary injunctive relief. Plaintiff Marion County seeks injunctive relief that compels the Corps to complete the WRDA report, compels Defendants to withdraw the decision to conduct annual drawdowns of Detroit Reservoir, and prohibits Defendants from conducting any drawdowns until they have completed a new SEIS in compliance with all applicable laws. Plaintiff City of Salem seeks an order barring Defendants from initiating or proceeding with a deep drawdown of Detroit Reservoir until there is a final decision on the merits of this case. In the alternative, Plaintiff City of Salem seeks a preliminary injunction requiring Defendants to

immediately cease the planned drawdown below 1,450 feet if turbidity levels reach 10 NTUs or more, and to refrain from any further drawdown until turbidity levels fall below 10 NTUs. The Plaintiff-Intervenors join in both motions, seeking the same relief.

The Court cannot order the requested relief because Plaintiffs and Plaintiff-Intervenors have not offered sufficient evidence to meet their burden to show that irreparable harm is likely in the absence of the relief they seek. Even assuming without deciding that Plaintiffs and Plaintiff-Intervenors have met their burden to show a likelihood of success on the merits, that the balance of equities weighs in their favor, and that an injunction is in the public interest, they are not entitled to the "extraordinary remedy" of a preliminary injunction because they have not made a "clear showing" that irreparable harm is likely. *Winter*, 555 U.S. at 22.

A party seeking a preliminary injunction must "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Id.* (emphasis in original). "Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction." *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988). "Subjective apprehensions and unsupported predictions" are insufficient to satisfy the moving party's burden to show a likelihood of irreparable harm. *Id.* at 675-76.

The Court begins its analysis by acknowledging that the ultimate harm Plaintiffs and Plaintiff-Intervenors discuss in their motions, should it occur, is undoubtedly irreparable. Plaintiffs' and Plaintiff-Intervenors' motions are supported by evidence of the profound impact that a loss of drinking water would have on hundreds of thousands of residents as well as hospitals, schools, businesses, and industries. Likewise, the record explains the impact of inadequate reservoir refill on necessary irrigation as well as industrial, recreational, and environmental uses of the water stored in the Detroit Reservoir. The problem for Plaintiffs'

motions, however, is that Plaintiffs fail to show that the proposed drawdown is likely to cause that harm.

With respect to turbidity, Plaintiffs rely on two general bodies of evidence: data showing the effects high turbidity levels would have if such turbidity was sustained over various periods of time; and evidence of what happened during drawdowns of other reservoirs, especially the Green Peter Reservoir in 2023. Plaintiffs essentially argue that those two categories of evidence together are enough for this Court to find it likely that the turbidity experienced following the Green Peter Reservoir drawdown will likewise occur as a result of the proposed 2026 drawdown of Detroit Reservoir, which would cause the harm discussed above. But Plaintiffs have failed to "connect the dots" by explaining and supporting with scientific evidence why the deep drawdown here will produce the same or similar turbidity effects seen at Green Peter or indeed any specific level of turbidity for any specific period of time.

As noted in the SEIS and other documents in the record, there are significant differences between the 2023 drawdown of the Green Peter Reservoir and the drawdown the Corps proposes at the Detroit Reservoir. In particular, as compared to the Green Peter Reservoir drawdown, the Detroit Reservoir drawdown (1) will expose much less sediment; (2) involves a drawdown to a level that the reservoir has been drawn down to twice before in recent years; and (3) will occur later in the year. The record suggests that each of these three factors would result in less turbidity than occurred as a result of the Green Peter Drawdown. The Court is therefore left with a record that suggests turbidity is likely to occur at some level, and that level is likely to be less than experienced as a result of the Green Peter Drawdown, but contains no way for the Court to discern what level of turbidity is actually expected as a result of the Detroit Reservoir drawdown and for how long. In other words, there is no site-specific analysis or data that shows turbidity

will reach damaging levels for any particular length of time. Without such information in the record, the Court cannot find that the drawdown is likely to cause the harm Plaintiffs identify in their motions.

At oral argument, citing *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011), counsel for Plaintiff City of Salem suggested that because of the magnitude of the potential harm, a lesser showing of its likelihood is required. Tr. 175:12-176:12. Given the public health risks at issue in depriving thousands of residents of drinking water, Salem contends that "even a threat [to that supply] is enough to find irreparable harm." Tr. 175:12-17. While that idea has an inherent and appealing logic to it, it is not the law. The irreparable harm element requires a party to "demonstrate a significant threat of irreparable injury, *irrespective of the magnitude of the injury*." *Big Country Foods, Inc. v. Bd. of Educ. of Anchorage Sch. Dist.*, 868 F.2d 1085, 1088 (9th Cir. 1989) (emphasis added). A similar sliding scale approach to the one Plaintiff City of Salem now urges is precisely what the U.S. Supreme Court rejected in *Winter*. *All. for the Wild Rockies*—the case Salem cited for the proposition that the magnitude of the harm mitigates the need to show a high probability that the harm will occur—only confirms that *Winter* "explicitly rejected" the Ninth Circuit's prior holding that a "'possibility' of irreparable harm was sufficient, in some circumstances, to justify a preliminary injunction." *All. for the Wild Rockies*, 632 F. 3d at 1131. Though the Court recognizes the gravity of the harm Plaintiffs allege could occur if turbidity reaches the level Plaintiffs fear it will, the law prohibits the Court from finding that the degree of that harm mitigates Plaintiffs' need to show its likelihood to occur.

On the issue of refill of the Detroit Reservoir, that harm is likewise speculative on the record before the Court because Plaintiffs fail to demonstrate that inadequate refill is likely to occur. Plaintiff Marion County and Plaintiff-Intervenor Santiam Water Control District both note

that this year's predicted El Niño event makes it more likely than the average year that the Detroit Reservoir will fail to refill to normal levels as quickly as desired because such years tend to yield drier fall and winter seasons. But "more likely than usual" does not tell this Court how likely it is to happen at all, as compared to a normal year or otherwise. While Marion County's motion notes that rainfall fails to sufficiently replace water in Detroit Reservoir "one in four years," it fails to cite to any evidence supporting that proposition. Marion County Mot. 36. During oral argument, counsel for Marion County directed the Court to a graph in an appendix to the SEIS for its "one in four years" assertion. Tr. 145:15-146:10; NFS Resp., ECF No. 66. While that appendix is not in the record, the Court located it and the graph at page B-358 on the Corps' website.[1] The Court is unsure that the graph shows what Marion County asserts that it shows, but in any event, a 25% likelihood—even when bolstered by the amorphous prospect of a strong El Niño event—fails to show "likelihood." Without meaningful and interpretable data on expected rainfall coupled with evidence of what length and severity of inadequate refill is likely to result in the harm Plaintiffs allege, the Court cannot find that such harm is likely.

Finally, the Court notes that the emergency plan in place for the drawdown provides a mechanism by which the drawdown may be paused or halted in the event that the State of Oregon "has data and/or information demonstrating that the affected Public Water System is at high risk of failing to provide adequate water (water quantity) or to meet regulatory requirements for safe drinking water (water quality)" if the halt would help remedy or ease the problem. Deep Drawdown Emergency Response Communications Plan 2. While this Court finds for the reasons

---

[1] *Willamette Valley System Operations and Maintenance, Appendix B: Hydrologic Process Technical Information,* US Army Corps of Engineers (2025), https://publibrary.sec.usace.army.mil/api/download?id=d921d01f-aab9-4224-b3a7-4a813728b3b0&filename=USACE%20WVS%20FSEIS_Appendix%20B_Hydrologic%20Processes_May2026.pdf&token=&preview=true

outlined above that Plaintiffs fail to show a likelihood of irreparable injury regardless of the existence of this plan, the emergency plan provides an additional reason to deny the motions because Plaintiffs fail to demonstrate why the plan is inadequate to prevent the harm from occurring.

The Court shares Plaintiffs' concerns about the threats posed by the possibility of high turbidity and inadequate refill to their interests, and to the interests of the many people, communities, and businesses that rely on a clean and adequate water supply from the North Santiam River downstream of the Detroit Dam and Reservoir. But "possibility" is not "likelihood," and the law requires parties seeking injunctive relief to demonstrate that the irreparable harm they fear is "likely" to occur. Plaintiffs fail to make that showing here and their motions are therefore denied without reaching the other elements of the *Winter* test. *See Ctr. for Food Safety v. Vilsack*, 636 F.3d 1166, 1174 (9th Cir. 2011) (explaining the court need not address remaining elements where moving party fails to demonstrate likelihood of irreparable harm). However, Plaintiffs have leave to file renewed motions for injunctive relief either during the 2026 drawdown or prior to the 2027 drawdown, should new facts and data—specific to the Detroit Reservoir drawdown—support it.

**CONCLUSION**

For the reasons discussed above, the parties' Motions for Preliminary Injunction (ECF Nos. 18, 51, 55, 58) are DENIED without prejudice to renewed motions for injunctive relief as explained in this Opinion and Order.

DATED this 4th day of November 2026.

MUSTAFA T. KASUBHAI (he/him)
United States District Judge

**From:** Steve Elzinga
**To:** "Leneis, Brad (ENRD)"; Ryan Adams; emergency@ca9.uscourts.gov
**Cc:** epotter@advocateswest.org; lrule@advocateswest.org
**Subject:** RE: Emergency Motion: Marion County, et al v. US Army Corps of Engineers, et al; Case No. 26-7415
**Date:** Tuesday, November 17, 2026 11:40:00 AM
**Attachments:** image002.png

---

Thank you, Brad. Yes, I can confirm that based on this representation we will now seek relief by 9:00 AM on November 21.

Thank you,

*Steve Elzinga*
County Counsel
Marion County
Office of Legal Counsel

Email: selzinga@co.marion.or.us
Phone: 503-588-5220

CONFIDENTIALITY NOTICE
*This email may contain information that is privileged, confidential or otherwise exempt from disclosure under applicable law. If you are not the addressee or it appears from the context or otherwise that you have received this email in error, please advise me immediately by reply email, keep the contents confidential and immediately delete the message and any attachments from your system.*

---

**From:** Leneis, Brad (ENRD) <Brad.Leneis@usdoj.gov>
**Sent:** Tuesday, November 17, 2026 11:35 AM
**To:** Ryan Adams <ryan@firlawgroup.com>; emergency@ca9.uscourts.gov
**Cc:** Steve Elzinga <SElzinga@co.marion.or.us>; epotter@advocateswest.org; lrule@advocateswest.org
**Subject:** RE: Emergency Motion: Marion County, et al v. US Army Corps of Engineers, et al; Case No. 26-7415

⚠ **WARNING:** This email originated outside of Marion County.
**DO NOT CLICK** links or attachments unless you trust the sender and know the content is safe.

Hello all –

I represent the Army Corps in this appeal.

I wanted to let everyone know that the Army Corps has updated me that it will not begin the action about which appellants seek relief before 9:00am on Saturday, November 21.

I spoke about this a few minutes ago with Mr. Elzinga, who indicated that appellants will

consider changing the time by which they request relief until that time.

Thanks,

**Brad Leneis**
Attorney, Appellate Section
Energy & Natural Resources Division
U.S. Department of Justice
303-844-1363 (desk)
202-532-3252 (cell)
brad.leneis@usdoj.gov

---

**From:** Ryan Adams <ryan@firlawgroup.com>
**Sent:** Tuesday, November 17, 2026 12:12 PM
**To:** emergency@ca9.uscourts.gov
**Cc:** Steve Elzinga <selzinga@co.marion.or.us>; Leneis, Brad (ENRD) <Brad.Leneis@usdoj.gov>; epotter@advocateswest.org; lrule@advocateswest.org
**Subject:** [EXTERNAL] Emergency Motion: Marion County, et al v. US Army Corps of Engineers, et al; Case No. 26-7415

Good morning,

I represent Marion County, Oregon; the City of Stayton, Oregon; and the Santiam Water Control District in the above captioned case. I am reaching out in accordance with Circuit Rule 27-3 to notify the clerk's office that we plan to file an emergency motion for an injunction pending appeal within the next couple of hours.

We are respectfully requesting the court to provide relief by 9:00AM on November 20, 2026.

All parties are copied on this correspondence. Please reach out with any questions or issues.

Thank you,

Ryan Adams
Founder and Managing Attorney
Fir Law Group
Ryan@FirLawGroup.com
(503) 383-1640

www.firlawgroup.com

The information contained in this e-mail is confidential and may also be attorney-client privileged. This information is intended only for the use of the individual or entity to whom it is addressed. If you have received this communication and are not the intended recipient, delete this message and contact my office immediately.